Marc E. Kasowitz
David M. Friedman
Christine A. Montenegro
Paul J. Burgo
KASOWITZ, BENSON, TORRES,
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800


**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X
                                                                   :
HARBINGER CAPITAL PARTNERS LLC, HGW US                             :
HOLDING COMPANY LP, BLUE LINE DZM CORP.,                           :
HARBINGER CAPITAL PARTNERS SP, INC.,                               :
                                                                   :
                              Plaintiffs,                          :
                                                                   :  CIVIL ACTION NO. _____
              - against-                                           :
                                                                   :  **COMPLAINT**
CHARLES W. ERGEN, DISH NETWORK                                     :
CORPORATION, L-BAND ACQUISITION LLC,                               :  **JURY TRIAL DEMANDED**
SP SPECIAL OPPORTUNITIES LLC,                                      :
SPECIAL OPPORTUNITIES HOLDINGS LLC,                                :
SOUND POINT CAPITAL MANAGEMENT LP,                                 :
STEPHEN KETCHUM,                                                   :
                                                                   :
                              Defendants.                          :
-------------------------------------------------------------------X

       Plaintiffs Harbinger Capital Partners LLC, HGW US Holding Company LP, Blue Line

DZM Corp., and Harbinger Capital Partners SP, Inc. (collectively, "Harbinger"), for its

complaint against Defendants Charles W. Ergen ("Ergen"), Dish Network Corporation ("DISH,"

and with Ergen, the "DISH Defendants"), L-Band Acquisition LLC ("LBAC"), SP Special

Opportunities LLC ("SPSO"), Special Opportunities Holdings LLC ("SO Holdings"), Sound

Point Capital Management LP ("Sound Point"), and Stephen Ketchum ("Ketchum," and with Sound Point, the "Sound Point Defendants"), hereby allege as follows:

## PRELIMINARY STATEMENT

1.      This civil racketeering action arises from an illegal scheme involving mail and wire fraud, bankruptcy fraud, obstruction of justice, tortious interference, and abuse of process by Ergen, his company DISH, and their confederates (collectively, the "RICO Enterprise"), aimed at stripping Harbinger of its equity in LightSquared Inc. ("LightSquared") and its valuable contractual rights to control the company and to make critical decisions during LightSquared's Chapter 11 Cases[1] – rights that Harbinger acquired pursuant to its multi-billion dollar investment in the company (the "Fraudulent Scheme").  The RICO Enterprise – using illegal tactics for which Ergen and companies that he controls have repeatedly been cited and sanctioned in other cases – carried out the scheme to disenfranchise Harbinger, the majority and controlling shareholder, in an effort, among other goals, to enable Ergen, DISH, and RICO Enterprise member EchoStar Corporation ("EchoStar")[2] to acquire LightSquared's valuable wireless spectrum assets at fire-sale prices.

2.      Defendants' conduct was, as the Bankruptcy Court found, an affront to the Chapter 11 process, in which Defendants abused LightSquared's Chapter 11 Cases, withheld crucial evidence, and engaged in a "troubling pattern of noncredible testimony."  Defendants wrongfully and deceptively created chaos in the Chapter 11 Cases directed at disabling Harbinger – the only stakeholder with a large enough interest to act against their scheme and, as

---

[1]      LightSquared's Chapter 11 Cases refer to the jointly administered bankruptcy cases of LightSquared Inc. and its affiliated debtors and debtors-in-possession currently pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), *In re LightSquared, Inc., et al.*, No. 12-12080.  Notably, LightSquared's Chapter 11 Cases are in their post-confirmation phase as the Bankruptcy Court entered an order confirming the Modified Second Amended Joint Plan pursuant to Chapter 11 of the Bankruptcy Code (the "Second Amended Joint Plan") on March 27, 2015.

[2]      While EchoStar is a member of the RICO Enterprise, it has not been named as a defendant in this action.

the largest equity holder, the party most interested in maximizing the estate's value.  Defendants knew that the success of their scheme required that they acquire LightSquared's assets in advance of a spectrum auction held by the Federal Communications Commission ("FCC") known as "Auction 97," where they knew that their own bidding would materially drive up spectrum values.  The market perception of spectrum values would change drastically post-Auction 97 such that Defendants could no longer claim LightSquared's assets were worth a fraction of their true value and acquire them at a discount.  Therefore, it was imperative that Defendants appropriate LightSquared's spectrum assets prior to Auction 97 for their scheme to succeed.

3.      Indeed, as Defendants expected, Auction 97 ultimately revealed to the broad market the true value of LightSquared's spectrum assets.  Once the auction occurred, Defendants – unwilling to pay the prevailing market rates for LightSquared's spectrum – shifted gears, and for the first time sought repayment of their debt as a traditional creditor.  LightSquared agreed to such payment, but with a full reservation of rights to hold Defendants accountable for their misconduct.

4.      While the RICO Enterprise's scheme to acquire LightSquared's assets ultimately failed, Defendants' egregious misconduct caused tremendous damages to Harbinger through the mayhem they intentionally and maliciously created in LightSquared's Chapter 11 Cases.  Once the dust settled, Harbinger's corporate governance rights and equity interests were completely eviscerated.  Even though Harbinger mitigated its damage through a confirmed plan of reorganization (the Second Amended Joint Plan) by which it recovered preferred and common equity on account of its debt and litigation claims, it nevertheless received no recovery on the account of its common equity and lost all of the control rights it once had under the stockholders'

3

agreement it entered into with LightSquared and other shareholders (the "Stockholders' Agreement"). Accordingly, Harbinger brings this action for, among other things, violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Colorado Organized Crime Control Act ("COCCA"), and tort law to recover the damages Harbinger suffered.

5.      Harbinger is an investment fund that through the years has spent billions of dollars on the development and operation of an innovative satellite and terrestrial wireless-services network, through its ownership and unique management rights in LightSquared. To protect the substantial capital, labor, and resources that Harbinger had invested in LightSquared, Harbinger entered into the Stockholders' Agreement. Under the provisions of the Stockholders' Agreement – of which Defendants were at all relevant times aware – Harbinger was afforded expansive protections and management rights with respect to LightSquared, including the ability to appoint and remove a majority of directors and committees, chair all committees, and make material management decisions. These contractual rights – which provided Harbinger the ability to exercise its control of LightSquared to protect its multi-billion dollar investment, including during LightSquared's Chapter 11 Cases – represented a significant premium independent of, and incremental to, the value of Harbinger's equity alone.

6.      Ergen and his fellow RICO Enterprise are sophisticated participants in bankruptcy cases. Here, they fully understand the dynamics of the Chapter 11 cases. They knew that LightSquared was a steward of its assets and unlikely to fight for the rights of one stakeholder versus another. They knew that the LightSquared LP and LightSquared Inc. lenders were fully secured and would be paid under any scenario. They knew that all trade creditors would be paid in full. They knew that preferred stockholders were likely to be paid in full, and in any event, held relatively small, finite and subordinated claims. It was only Harbinger – which had invested

$2 billion and owned in excess of 82% of LightSquared's common equity – that had the will, the means and the incentive to oppose Defendants' efforts to steal LightSquared's assets.

7.      Accordingly, Defendants pursued an abusive scheme targeting Harbinger through wire, mail, and bankruptcy fraud, abuse of process, tortious interference with contract and obstruction of justice to, *inter alia*:  (a) surreptitiously obtain a majority of LightSquared's senior secured debt (the "LP Debt") in breach of the governing credit agreement (the "Credit Agreement); (b) make grossly undervalued bids for the spectrum assets just high enough to gain the support of LightSquared's secured creditors and prevent Harbinger from formulating a plan that maintained its equity; (c) cause Harbinger to lose its control rights to remove the obstacle presented by Harbinger's desire to maximize the value of the estate, including the right to appoint and remove directors, chair committees, and make key management decisions pursuant to the Stockholders' Agreement; and (d) terminate their bid on a pretextual basis related to the value of the spectrum assets to dissuade any future strategic investors from partnering with Harbinger, hinder Harbinger's ability to access capital to put forth another plan that preserved Harbinger's equity interest and pave the path for Defendants to acquire the spectrum assets in liquidation.  Ergen and SPSO more recently continued to obstruct justice in LightSquared's bankruptcy cases, knowingly causing a former FCC official to illegally submit evidence in violation of a criminal federal statute to influence the Bankruptcy Court's valuation of LightSquared's spectrum.

8.      RICO Enterprise members EchoStar and DISH, led by their Executive Chairman, Ergen, have been on a continuing quest to acquire additional spectrum assets to compete in the wireless business and for years have coveted the spectrum assets held by LightSquared.  When in 2012 LightSquared filed for Chapter 11 protection (the "Bankruptcy Proceedings"), Defendants

saw their opportunity.  As they had done in the past – including in connection with their acquisition of the wireless assets of DBSD North America Inc. ("DBSD") by using what the Second Circuit concluded to be bad-faith debt acquisitions – Defendants knew that they could use a controlling position in the LP Debt to dominate the Bankruptcy Proceedings and direct a bargain-basement sale of LightSquared's valuable spectrum assets to DISH.  They were not deterred by the Credit Agreement governing the LP Debt, which forbade competitors like DISH from acquiring the LP Debt – in part because Harbinger and LightSquared had feared that competitors, instead of acting as ordinary creditors, would not act in the company's interests but instead do exactly as Defendants planned to do.

9.     Instead, the DISH Defendants knowingly perpetrated the Fraudulent Scheme – with the substantial assistance of their longtime banker Ketchum and his recently created investment management fund Sound Point – "to do indirectly what [Ergen] knew was not permitted directly," as the Bankruptcy Court later concluded, and surreptitiously acquired LP Debt.

10.     In furtherance and on behalf of the RICO Enterprise, Sound Point knowingly created a front, SPSO, and used Ergen's funds to secretly purchase a majority position in the LP Debt that would allow the RICO Enterprise to block Harbinger's control over LightSquared and force a DISH-sponsored bid to acquire LightSquared's assets at a discount and simultaneously repay Ergen at a profit.  With each purchase of LP Debt, Sound Point, on behalf of the RICO Enterprise, fraudulently stated in interstate wire communications that SPSO was not prohibited under the Credit Agreement from purchasing the LP Debt.  The Bankruptcy Court ultimately concluded that Defendants' end run around the transfer restrictions breached the Credit Agreement.

11.     As the RICO Enterprise secretly amassed the LP Debt, Harbinger – which, as LightSquared's largest equity holder, was the constituent most concerned with maximizing the value of the estate – was seeking to raise financing and directly negotiate a consensual plan of reorganization with creditors that would realize the true value of LightSquared, and thereby allow Harbinger to retain a substantial portion of its equity and control.  In connection with these efforts, Harbinger and LightSquared entered into a so-ordered stipulation with creditors (the "Exclusivity Order") extending the "exclusivity period," or the period in which only LightSquared could propose a plan of reorganization.  The Exclusivity Order required that the creditors engage in good-faith negotiations toward a plan of reorganization, but contemplated that if these efforts were unsuccessful, LightSquared would have to begin exploring a potential sale of its assets.

12.     To complete its goal of wresting away the valuable wireless spectrum assets held by LightSquared while in bankruptcy, however, the RICO Enterprise first had to strip Harbinger of its control rights pursuant to the Stockholders' Agreement.  Concerned that Harbinger would be successful in raising financing sufficient to pay off LightSquared's creditor constituencies, thereby avoiding a sale, and desperate to fulfill the Fraudulent Scheme, the RICO Enterprise moved swiftly to remove Harbinger from the equation and debase any notion that LightSquared's enterprise value was worth more than the value of the LP Debt let alone sufficient to provide a recovery to equity holders.  The RICO Enterprise believed that with Harbinger unable to exercise its control over LightSquared's board, the company's ability to pursue a plan that would maximize the value of LightSquared's estate would be compromised.

13.     On May 15, 2013, purposefully timed to interfere with Harbinger's financing efforts, Ergen, through the as-yet unformed LBAC,[3] made an unsolicited and nonbinding bid for LightSquared's assets that, while sufficient to pay off in full the holders of LP Debt, including Ergen, was for far less than what Ergen knew to be the true value of the assets, and was a bid Ergen never intended to consummate (the "LBAC Bid").  Defendants then leveraged the influence garnered by their illegal holdings of LP Debt to represent to the Bankruptcy Court and an ad hoc group of lenders collectively possessing a majority of the LP Debt (the "Ad Hoc Secured Group") that the LBAC Bid was fair, and that LightSquared's failure to embrace the grossly inadequate LBAC Bid demonstrated that LightSquared was beholden to Harbinger's interests and could not discharge its fiduciary duties to LightSquared's secured creditors. Unbeknownst to the parties and the Bankruptcy Court, however, Defendants were withholding critical documents that conclusively established that Defendants knew full well that the LBAC Bid represented a mere fraction of LightSquared's true value (the "Valuation Materials"), and thus that Harbinger and LightSquared properly had opposed the LBAC Bid.

14.     The Ad Hoc Secured Group – whose financial advisor later testified that absent Defendants' machinations it likely would have reached a consensual plan of reorganization with Harbinger – was eager for a quick payoff and quickly embraced the bid and SPSO's efforts, as the RICO Enterprise knew it would.  As soon as the exclusivity period ended, the Ad Hoc Secured Group proposed a plan of reorganization (the "Ad Hoc Plan"), placing DISH through its wholly-owned subsidiary, LBAC, as the stalking horse bidder committed to purchase LightSquared's spectrum assets for $2.2 billion (the "Stalking Horse Bid"), and requiring that the

---

[3]      LBAC is an entity that Ergen formed on May 28, 2013 – six weeks after Ergen made his bid through LBAC.  LBAC was subsequently sold to DISH on July 22, 2013 for a single dollar and became the stalking horse bidder under the plan of reorganization proposed by the Ad Hoc Secured Group (as defined herein).

Ad Hoc Secured Group abandon its ongoing negotiations for any alternative plan – even though Defendants secretly planned to withdraw the Stalking Horse Bid and drive the price even lower.

15.     To further ensure the success of a fire sale of LightSquared's assets, the RICO Enterprise needed to neutralize Harbinger's influence.  Now supported by the hoodwinked Ad Hoc Secured Group, Defendants forcefully argued that LightSquared could not be trusted to fairly conduct an auction with Harbinger at the helm.  Defendants sought to create the impression that Harbinger's interests – to maximize LightSquared's distributable value – conflicted with the interests of LightSquared's creditors, which, Defendants asserted, would be served by embracing the Stalking Horse Bid.  As Defendants knew, this was false.  Harbinger's desire to maximize LightSquared's value was not a fanciful attempt to "shoot for the moon."  In fact, as Defendants' own Valuation Materials reflect, LightSquared's assets possessed tremendous value and the company's refusal to embrace the Stalking Horse Bid was entirely justified independent of Harbinger's interests as an equity holder.

16.     Based upon Defendants' misrepresentations, the Bankruptcy Court – without having the benefit of the Valuation Materials – directed LightSquared to appoint an independent committee (the "LightSquared Special Committee") to eliminate the purported conflict falsely alleged by Defendants.  The LightSquared Special Committee was imbued with power over the LightSquared operations that mattered most, including decision-making related to a sale or reorganization of LightSquared and actions related to regulatory approval.  Directly contravening Harbinger's rights under the Stockholders' Agreement, the existence of the LightSquared Special Committee negated Harbinger's power to appoint and remove directors and make material management decisions.

17.     Unbeknownst to the Ad Hoc Secured Group, however, Ergen never had any intention to purchase LightSquared's assets at even the highly distressed price of the Stalking Horse Bid.  Instead, Defendants meant only to displace Harbinger and disrupt the Bankruptcy Proceedings, thereby forcing a distressed liquidation in which DISH could obtain the assets at an even greater discount for Ergen, DISH, and EchoStar's wireless businesses.  Thus, barely three months after the LightSquared Special Committee was appointed, LBAC abruptly announced that it was canceling the Stalking Horse Bid, giving a pretextual reason for the cancellation that sought to further taint the value of LightSquared's spectrum.  In so doing, the RICO Enterprise capitalized on the existing chaos and sought to further drive down the price of LightSquared's assets in order to acquire them later on through liquidation and prevent Harbinger from partnering with strategic investors and/or accessing capital to formulate a new plan that saved its equity interest.

18.     With plan negotiations in shambles, Defendants still in control of the LP Debt, and LightSquared's financial position quickly deteriorating, LightSquared was pressed dangerously close to the forced liquidation that Defendants had always envisioned.  Having its power stripped away, Harbinger was forced to resign from its now worthless board seats to explore alternative ways to salvage its billions of dollars in investments in the company free of accusations of bias.  Ultimately, Harbinger participated in negotiating the Second Amended Joint Plan to allow LightSquared to emerge from bankruptcy, but due to the weakened financial condition of the company caused by Defendants' wrongdoing and Harbinger's resulting lack of control over the process, the Second Amended Joint Plan provided that equity holders would receive no recovery on account of their interests.  Harbinger contributed its secured claim and certain litigation rights to reorganized LightSquared to mitigate its damages in exchange for a

new equity stake in the reorganized company.  But Harbinger has not eliminated its damages –
its recovery is far worse than what it would have recovered absent Defendants' misconduct.

19.     The actions of the RICO Enterprise, in the words of the Bankruptcy Court,
breached the "outer limits" of what would be tolerated by a creditor in a bankruptcy.  Among
other egregious conduct, the RICO Enterprise blatantly provided false testimony and made
numerous misrepresentations, including, as alleged in further detail herein:  (a) misrepresenting
that DISH employees were not involved in the purchase of LP Debt, (b) lying to the Bankruptcy
Court that the RICO Enterprise had legitimate reasons to leave trades of LP Debt hanging for
months when, in fact, Defendants merely sought to further disrupt negotiations with creditors, (c)
misrepresenting the involvement of RICO Enterprise member Sound Point in keeping trades
open, (d) misrepresenting to the Bankruptcy Court the value of the LBAC and Stalking Horse
Bids, (e) misrepresenting to the parties and the Bankruptcy Court the reasons for terminating the
Stalking Horse Bid, and (f) causing a former FCC official to illegally submit evidence to
influence the Bankruptcy Court.

20.     Abusing the judicial process to trample upon the legal rights of others is part of
Ergen's *modus vivendi*.  He has stated that "[y]ou can live in a bubble, and you're probably not
going to get a disease.  But you can play in the mud and the dirt, and you're probably not going
to get a disease either, because you get immune to it.  You pick your poison, and I think we
choose to go play in the mud."  As part his philosophy of "playing in the mud," Ergen has shown
repeated contempt for legal ethics and the judicial process.  He believes that attorneys should
figure out "how can I do this, as opposed to what the law says."  Practices of the kind Defendants
utilized here have led numerous courts in case after case to sanction Ergen's companies for
spoliation, contempt, and even perjury.

21.     Moreover, data produced by Verizon, T-Mobile, and AT&T to the FCC reveals that front companies used by Ergen and DISH improperly coordinated bids throughout the FCC's Auction 97 in order to obtain spectrum licenses for less than fair value.  Ergen and DISH went so far as to have their front companies attempt to obtain an unmerited discount on winning bids for spectrum licenses that was reserved for small businesses, rural telephone companies, and businesses owned by minorities and women.  An FCC commissioner characterized DISH's bad-faith conduct as making a "mockery" of the discount program.

22.     While Harbinger and other stakeholders were able to save LightSquared from liquidation, the cost to Harbinger was steep.  Through this concerted pattern of illegal acts, the RICO Enterprise intentionally and through wrongful means orchestrated a scheme to deprive Harbinger of its rights under the Stockholders' Agreement, causing Harbinger to lose its property rights in the form of its equity interests in LightSquared – a loss disproportionate to that of other equity holders because Harbinger also lost its contractual voting rights pursuant to the Stockholders' Agreement – and forced Harbinger to incur legal and professional fees in defending against Defendants' illegal conduct in the Bankruptcy Proceeding.  Absent Defendants' misconduct, Harbinger's equity interests and control rights would have been substantially unimpaired.

23.     Accordingly, Harbinger seeks damages in an amount to be determined at trial, (i) pursuant to the federal and state racketeering statutes predicated on Defendants' mail and wire fraud, bankruptcy fraud, and obstruction of justice, (ii) for Defendants' tortious interference with the Stockholders' Agreement, and (iii) for Defendants' abuse of process.

24.     Harbinger files the Complaint before this Court in light of the April 28, 2015 decision of United States District Court for the District of Colorado, which dismissed

Harbinger's earlier filed claims in the Colorado Action (as defined below) without prejudice to refiling in an appropriate forum.  Harbinger's claims will inure to the benefit of the newly reorganized LightSquared upon the effective date, as those claims will be assigned to the reorganized LightSquared upon the effective date of the Second Amended Joint Plan. Harbinger's claims are properly before this Court as (i) they require the adjudication of rights under the federal RICO statute, and (ii) they have no effect upon the Second Amended Joint Plan, or upon distributions to LightSquared's stakeholders.  The Complaint differs in certain respects from the one in the Colorado Action in that it incorporates more recent facts, alleges more predicate acts over an extended period of time, and also seeks additional unique damages that Harbinger has suffered to date.

## PARTIES

25.     Plaintiff Harbinger Capital Partners LLC is a Delaware limited liability company with its principal place of business in New York.

26.     Plaintiff HGW US Holding Company LP is a Delaware limited partnership with its principal place of business in New York.

27.     Plaintiff Blue Line DZM Corp. is a Delaware corporation with its principal place of business in New York.

28.     Plaintiff Harbinger Capital Partners SP, Inc. is a Delaware corporation with its principal place of business in New York.  Together, Harbinger Capital Partners LLC, HGW US Holding Company LP, Blue Line DZM Corp., and Harbinger Capital Partners SP, Inc. are the majority shareholders of LightSquared, which, prior to Defendants' misconduct, possessed expansive management, voting rights, and the ability to appoint directors and committee members pursuant to the Stockholders' Agreement among Harbinger, LightSquared, and other shareholders.

29.     Defendant Ergen is a natural person and a citizen of the state of Colorado.  Ergen is the founder, Executive Chairman of the board of directors, majority owner, and an employee of Defendant DISH and non-party EchoStar.  As of November 30, 2012, Ergen controlled approximately 88% of DISH's voting shares.  Ergen stepped down as the CEO of DISH in 2011 to become the Executive Chairman of DISH in order to focus on "the strategic responsibilities of . . . DISH," such as acquisition and business development, though he has resumed the position of President and CEO as of March 2015, "in addition to his continued focus on long-term business development."  The scheme alleged herein to acquire LightSquared's spectrum by disrupting the Bankruptcy Proceedings fits comfortably within the scope of the "strategic responsibilities" that Ergen has publicly stated are his intent to pursue on behalf of DISH.  Through his control of DISH, Ergen also controls Defendant LBAC.  Ergen is also the sole member and managing member of SO Holdings, which in turn is the sole member and managing member of SPSO.

30.     Defendant DISH is a publicly traded company organized under the laws of Nevada, with its principal place of business in Colorado.  DISH is a competitor of LightSquared and Harbinger.  It is a provider of broadband and satellite television services and aims to expand its broadband offerings, including by building out an integrated terrestrial network, similar to that which LightSquared intends to offer.  Ergen, who founded DISH in or about 1995 as a service of Ergen-controlled EchoStar, serves on DISH's board of directors as Executive Chairman, and controls a majority of DISH's voting shares.  In 2008, DISH was spun off from EchoStar, with EchoStar controlling the technology and infrastructure aspects of the businesses, such as set top boxes and satellite operation, and DISH retaining the pay television business.

31.     Defendant LBAC is a limited liability company organized under the laws of Delaware with its principal place of business in Colorado.  LBAC was initially formed by Ergen

for the sole purpose of bidding on LightSquared's spectrum assets, both through the LBAC Bid and as the stalking horse bidder in the Ad Hoc Plan.  LBAC was sold to DISH for $1 shortly after its formation and now is a wholly-owned subsidiary of DISH.

32.     Defendant SPSO is an investment vehicle organized under the laws of Delaware as a limited liability company, with its nominal headquarters in New York and operated by Ergen, directly and through his agents, in Colorado.  SPSO's sole member and manager is SO Holdings, which in turn has Ergen as its sole member and managing member.  SPSO acquired LP Debt on behalf of the DISH Defendants in Colorado.  SPSO was formed by Sound Point on or about May 16, 2012, at Ergen's direction.  SPSO has been acquiring debt in LightSquared since at least April 2012, directly and through its predecessor-in-interest Bal Harbour Capital Management LLC ("Bal Harbour Capital") and currently holds over $1 billion of LightSquared's LP Debt.

33.     Defendant SO Holdings is a holding company organized under the laws of Delaware as a limited liability company, with its nominal headquarters in New York, and operated by Ergen, directly and through his agents, in Colorado.  Ergen, who resides in Colorado, is the sole member and managing member of SO Holdings, and SO Holdings in turn is the sole member and manager of SPSO.  Like SPSO, SO Holdings was formed on or about May 16, 2012, at Ergen's direction, by Sound Point.

34.     Defendant Sound Point is an investment management and advisory firm organized under the laws of Delaware as a limited liability company, with its headquarters in New York. Sound Point's founder and managing member is defendant Ketchum.  Sound Point serves as trading manager and investment advisor for SPSO and facilitates and advises SPSO on its investments and investment strategies, as described further herein, in exchange for lucrative fees.

Sound Point and Ketchum further provided material advice to the RICO Enterprise regarding

acquiring LightSquared's assets, including, upon information and belief, its ability to gain

control of the proceedings and depose Harbinger of its contractual rights over LightSquared.  At

all times relevant herein, Sound Point transacted business through and within Colorado and New

York with respect to the claims alleged herein for the benefit of the DISH Defendants, which

reside in Colorado.

35.     Defendant Ketchum is a natural person and citizen of the state of New York.

Ketchum is the founder and managing member of Sound Point, and serves as the trading

manager of SPSO.  Ketchum is a former banker to DISH and has a longstanding relationship

with Ergen, having worked with DISH and its predecessor, EchoStar, in various capacities since

its founding.  Ketchum's work has focused on media and telecommunications since at least 1991.

He was the global head of Banc of America Securities LLC's ("Bank of America") Media &

Telecom Group, and before that, the head of satellite telecommunications investment banking

and a managing director of cable and satellite investment banking at UBS Warburg LLC, and a

founding member and a managing director of the Satellite Financing Group for Donaldson

Company, Inc.  At all relevant times, Ketchum conducted business through and within Colorado

and New York with respect to the claims alleged herein for the benefit of the DISH Defendants,

which reside in Colorado, and traveled from New York to Colorado for the purpose of furthering

the RICO Enterprise's scheme.

## JURISDICTION AND VENUE

36.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 and 18 U.S.C. § 1961 et seq. (the "RICO Act") because Plaintiffs' claims arise under the

laws of the United States.  Supplemental jurisdiction over the state law claims is proper under 28

U.S.C. § 1367(a).

37.     The venue of this action is proper in this judicial district pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391, as the Southern District of New York is the district where one or more of Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.  More specifically,  Defendants transacted their affairs in the Southern District of New York, including: (i) making the surreptitious purchases of LP Debt; (ii) submitting grossly undervalued bids for the spectrum assets; (iii) terminating a bid for the spectrum assets under false pretenses; and (iv) committing acts of bankruptcy fraud and obstruction of justice in LightSquared's bankruptcy cases through, among other things, misrepresentations to the Bankruptcy Court, interference with its exclusivity order, failure to produce critical evidence, perjury, filing a false motion, and knowingly causing a former FCC official to illegally submit evidence in violation of a criminal federal statute.  Venue is also proper in this judicial district pursuant to 18 U.S.C. § 1965(b) because, to the extent any Defendant may reside outside of this district, the ends of justice require that such Defendant or Defendants be brought before this Court.

38.     This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§ 1965(a) and (b), as Defendants reside, have agents and/or transact their affairs in New York, and because, to the extent any Defendant does not reside, have agents, or transact its affairs in New York, and cannot be served in New York, the ends of justice require that such Defendant or Defendants be brought before this Court.  This Court further has personal jurisdiction over Defendants pursuant to N.Y. C.P.L.R. 301 and 302(a) because either (a) Defendants engaged in a continuous and systematic course of doing business in the State of New York, or (b) they directly or through their agents, transacted business and engaged in the commission of tortious acts in the State of New York from which the claims alleged herein arise and committed tortious acts

outside of the State of New York causing injury to Harbinger within the State and (i) regularly

do or solicit business, and derive substantial revenue from services rendered or consumed, in the

State of New York, and (ii) expect or should reasonably expect their tortious actions to have

consequences in the State of New York and derive substantial revenue from interstate and

international commerce.

### HISTORY OF LITIGATION AMONG THE PARTIES

39.     On August 6, 2013, Harbinger filed its initial complaint, and on September 30,

2013, filed the First Amended Complaint ("FAC") in an adversary proceeding as part of the

Bankruptcy Proceedings  ("Adversary Proceeding"),[4] alleging claims against Defendants for

equitable disallowance, fraud, tortious interference with prospective economic advantage,

tortious interference with the Jefferies[5] relationship, unfair competition, civil conspiracy,

disallowance of SPSO's claim under 11 U.S.C. § 502 ("Section 502") of the Bankruptcy Code

and aiding and abetting fraud against Sound Point Defendants.  The FAC's allegations arise out

of Defendants' wrongful actions with respect to the LP Debt that were known as of the date of

that filing.

40.     Following its Order Granting Motions to Dismiss the Amended Complaint, dated

November 14, 2013 [Adv. Dkt. No. 65] (the "November Order"), the Bankruptcy Court, in a

decision dated November 21, 2013 (the "November Decision")[6] – not having the benefit of much

of the evidence described below, particularly related to the involvement of other DISH

employees in SPSO's purchases of the LP Debt and the Sound Point Defendants' involvement in

---

[4]       *Harbinger Capital Partners LLC et al. v. Ergen et al.*, 13-01390-scc (2013).

[5]       "Jefferies" refers to the investment bank Jefferies LLC, and its subsidiaries and affiliates.

[6]       Citations to the "November Decision" are to the published decision of *In re LightSquared, Inc.*, 504 B.R. 321 (Bankr. S.D.N.Y. 2013).

the furtherance and concealment of the scheme – dismissed Harbinger's FAC, but granted Harbinger leave to replead its Section 502 claim.

41.     The November Decision, which was issued prior to much of Defendants' bankruptcy-related misconduct and prior to the Second Amended Joint Plan that actually deprived Harbinger of its property rights, was primarily premised upon Harbinger's lack of standing to assert the non-Section 502 claims.  The Bankruptcy Court found:  (i) as to the fraud claim, Harbinger was not a party to the Credit Agreement or any of the LP Debt trades such that Defendants would have a duty to disclose to Harbinger; (ii) as to the aiding and abetting fraud against the Sound Point Defendants, Harbinger did not "allege conduct by the Sound Point Capital Defendants that would constitute 'substantial assistance' in the alleged fraud"; (iii) as to the tortious interference claims, Harbinger did not have "an independent and protectable relationship with LightSquared's creditors or with Jefferies, or a protectable interest in or right to negotiate with LightSquared's creditors' during LightSquared's exclusive periods"; (iv) as to the unfair competition claim, Harbinger did not plead a commercial advantage with respect to the loss of the economic value from its majority equity holdings in LightSquared that resulted from its inability to propose a plan of reorganization within the exclusivity period, particularly where it had proposed a competing plan that would maintain those rights, noting that Harbinger's "allegations about 'forced sales' and loss of control over the reorganization process [were] rather undercut by the terms of the proposed plan of reorganization it [had] recently filed, which contemplate[d] a plan in which Harbinger would maintain its equity stake in the reorganized Debtors"; (v) as to the equitable disallowance claim, such a remedy does not exist as a matter of law under the Bankruptcy Code; and (vi) as to the civil conspiracy claim, it could not survive without the underlying claims.  Although the Bankruptcy Court found Harbinger's claims did not

survive for these and other reasons, its decision, based on the facts and allegations at the time, was rooted in the premise that these claims should be dismissed for lack of standing for those claims.  Upon its determination at that time that Harbinger did not have standing on those particular facts, the Bankruptcy Court was without subject matter jurisdiction to decide the remaining aspects of Harbinger's claims.

42.     On November 15, 2013, LightSquared filed a complaint in intervention ("LightSquared Complaint") in the Adversary Proceeding.  The LightSquared Complaint sought (i) a declaratory judgment that SPSO was not an "Eligible Assignee" under the Credit Agreement; (ii) damages for breach of contract against SPSO; (iii) disallowance of SPSO's claim under Section 502; (iv) equitable disallowance against SPSO; and (v) damages for tortious interference with contractual relations against SPSO, DISH, EchoStar, and Ergen.  The LightSquared Complaint similarly involved Ergen's misconduct in purchasing the LP Debt.

43.     On December 2, 2013, Harbinger filed a limited Second Amended Complaint ("SAC").  The SAC did not assert direct claims in Harbinger's own right.  Rather, it repeated and amplified the allegations in the LightSquared Complaint based on additional discovery and asserted claims of the bankruptcy estate for, among other things, disallowance and equitable subordination of SPSO's claims pursuant to Sections 502 and 510 of the Bankruptcy Code.  The SAC made clear that Harbinger was acting for the benefit of LightSquared's estate and pursuing claims solely on behalf of LightSquared.  The SAC expressly states that it does "not seek redress for direct harm to itself, but as a party-in-interest in these proceedings, as a secured creditor and the majority equity holder of LightSquared Inc., and an unsecured creditor of LightSquared L.P."

44.     At the December 10, 2013 hearing concerning motions to dismiss the LightSquared Complaint and SAC, the Bankruptcy Court expressly noted that new allegations,

relating to the involvement of DISH Treasurer Jason Kiser ("Kiser") in the LP Debt purchases and SPSO's fault in not closing the trades, "call[ed] out for the development of a factual record." The Bankruptcy Court specifically asked Defendants whether pleading "[t]hat the treasurer. . . is spending this time executing hundreds of millions of dollars of trades is not something that is different from what Harbinger pled?"  Thus, based on the newly discovered and alleged facts, the Bankruptcy Court permitted Harbinger and LightSquared to pursue claims under Section 502 to benefit LightSquared's estate, and permitted LightSquared to pursue its direct claims for damages based on violations of the Credit Agreement.  These holdings were set forth in an order by the Bankruptcy Court dated December 12, 2013 (the "December Order").  No opinion accompanied the December Order.

45.    In the December Order, the Bankruptcy Court also dismissed Harbinger's claims for declaratory judgment, breach of contract, and equitable disallowance with prejudice, finding again that equitable disallowance was not a viable claim and, with respect to the remainder of the claims, stating that "[t]hese are, in essence, derivative claims" belonging to LightSquared. Harbinger's claim for equitable subordination was dismissed subject to the Bankruptcy Court's reservation of the option to consider it in the context of a plan of reorganization providing for such relief.  The only claim in Harbinger's SAC that survived was its claim against SPSO for legal disallowance under Section 502(b), which Harbinger brought solely for the benefit of LightSquared's estate.  Thus, Harbinger's remaining participation in the Adversary Proceeding was solely in the capacity of providing support for LightSquared.

46.    Defendants have engaged in a continuing series of wrongful acts since the FAC and SAC that has resulted in new injuries to Harbinger.  Since the FAC, November Decision and December Order, (i) the Bankruptcy Court has made rulings that have materially modified the

November Decision, including with respect to the Sound Point Defendants' culpability and Defendants' liability under the Credit Agreement; (ii) Harbinger has sustained new injuries separate and apart from the injuries suffered by LightSquared – the *complete* loss of its equity interests and rights under the Stockholders' Agreement – as a result of the RICO Enterprise's continuing scheme and violation of the RICO and COCCA statutes; (iii) fraudulently-concealed evidence has been discovered that could not have been previously discovered through due diligence, including, for example, the Valuation Materials and evidence concerning the Sound Point Defendants' role in the Fraudulent Scheme; and (iv) Defendants have committed and conspired to commit additional predicate acts in furtherance of their scheme, including illegally submitting an expert report by a former FCC official.

47.      After a seven-day evidentiary trial on LightSquared's claims and the Section 502 claim brought by LightSquared and Harbinger in support of LightSquared's estate, on June 10, 2014, the Court issued its Post-Trial Findings of Fact and Conclusions of Law regarding the Adversary Proceeding (the "June Decision").  The June Decision concluded, *inter alia*, (a) that DISH, EchoStar, Ergen, Sound Point, and Ketchum made repeated misrepresentations throughout the Bankruptcy Proceeding, (b) that SPSO's purchases of LP Debt breached the Credit Agreement's implied covenant of good faith and fair dealing, (c) by keeping the LP Debt trades open for no economic reason, Defendants had intentionally and maliciously interfered with efforts to achieve a consensual plan of reorganization, and (d) Defendants' actions harmed LightSquared and its creditors and warranted the equitable subordination of an undetermined amount of SPSO's claim.

48.      On June 19, 2014, Harbinger filed a motion in the United States District Court for the Southern District of New York for leave to appeal the Bankruptcy Court's June Decision,

November Order, November Decision, and December Order.  On July 7, 2015, the District Court denied Harbinger's motion for leave to appeal, while stating that the orders were non-final and not appealable as of right.

49.    Although some of the predicate acts in the instant Complaint were the subject matter of the November and June Decisions, the allegations in Harbinger's FAC and SAC primarily focused on a narrow aspect of the RICO Enterprise's scheme – Defendants' wrongful purchases of the LP Debt – at a time when the full extent of Harbinger's injuries were not known or knowable.  Since Harbinger's direct claims in the FAC were dismissed, (a) new facts came to light related to Defendants' misconduct, and in particular the substantial role the Sound Point Defendants played, and (b) as alleged further herein as the basis of Harbinger's present claims, Harbinger suffered concrete monetary injuries when Defendants' Harbinger-directed misconduct caused Harbinger to lose its contractual rights and all of its equity interest.  Thus, where the FAC sought narrow relief in connection with Harbinger's ability to propose a plan of reorganization that kept its equity interest intact within the exclusivity period, the current Complaint involves monetary damages arising from Defendants' broad scheme of predicate acts and tortious conduct that Defendants have undertaken both before and since the dismissal of Harbinger's claims, resulting in new injuries to Harbinger, based on losing specific rights it once had under the Stockholders' Agreement and the loss of all of its equity interests (and not simply a diminution in its value) – events that had not yet occurred at the time of the FAC and SAC and were not before the Bankruptcy Court.  Although Harbinger mitigated its losses to the extent possible under the Second Amended Joint Plan, significant damage to Harbinger's interests remain.

50.    Further, the Complaint is separate from the June Decision because the SAC was brought only against SPSO and solely to support LightSquared's own claims and for the benefit

of the estate and did not seek to redress Harbinger's own injuries that are the subject matter of this Complaint.

51.     On July 8, 2014, Harbinger commenced an action (the "Colorado Action") in the United States District Court for the District of Colorado before Judge William J. Martinez by filing a complaint against Defendants seeking damages for violations of RICO (18 U.S.C. § 1962(c)), RICO conspiracy (18 U.S.C. § 1962(d)), violations of COCCA (Colo. Rev. Stat. § 18-17-104(3)), COCCA conspiracy (Colo. Rev. Stat. § 18-17-104(4)), tortious interference with contract, and abuse of process.  On October 2, 2014, Defendants moved to dismiss Harbinger's Colorado Action.

52.     On April 28, 2015, without addressing the sufficiency of Harbinger's racketeering and tort claims, the District Court granted Defendants' motion to dismiss.  The dismissal was without prejudice to Harbinger re-filing its claims in an appropriate forum.

53.     The Complaint is based, in part, on the conduct alleged in the Colorado Action and includes additional predicate acts Defendants have undertaken over the span of approximately five years which have resulted in new injuries to Harbinger as alleged herein, including Harbinger's loss of its equity interest in LightSquared.  The Complaint seeks solely monetary damages for injuries sustained to Harbinger (a party who is separate from LightSquared and the Debtors' estate) and does not seek to invalidate, modify and/or alter any orders of the Bankruptcy Court.

54.     The Complaint has no effect on the Second Amended Joint Plan, or distributions to LightSquared's stakeholders.  Indeed, the Second Amended Joint Plan provides that the claims asserted herein will become the property of the newly-reorganized LightSquared when the Second Amended Joint Plan becomes effective.  The Second Amended Joint Plan does not

provide the Bankruptcy Court with jurisdiction over the instant action, and none of the

Defendants herein were released from liability under the Second Amended Joint Plan.

**FACTS**

55.     Prior to Harbinger sustaining its injuries as a result of Defendants' wrongdoing as

alleged herein, Harbinger indirectly owned in excess of 82% of LightSquared's common equity.

However, the RICO Enterprise has caused the complete extinguishment of Harbinger's equity

interests, which Harbinger has attempted to mitigate through reaching an agreement pursuant to

the Second Amended Joint Plan.  Under the Second Amended Joint Plan, Harbinger will receive,

among other value, 44.45% of the common equity of the reorganized entity.

56.     LightSquared has been delivering satellite-based mobile voice and data service

since 1995 to hundreds of thousands of devices used in the public safety, security, transportation,

fleet management and asset tracking sectors.  Over the course of many years, Harbinger has

invested significant capital and labor to develop, through LightSquared, a unique, next-

generation ancillary terrestrial network ("ATC Network") that would employ both satellite

service and ground-based antennas to provide nationwide state-of-the-art "4G-LTE" (Fourth

Generation – Long Term Evolution) broadband mobile services.

57.     Under the Stockholders' Agreement among LightSquared and its shareholders,

including Harbinger, Harbinger is granted expansive rights with respect to LightSquared –

including voting rights, management rights, and the ability to appoint the majority of directors

and chair committees – that are intended to protect the significant amounts of capital and

resources that Harbinger has invested in its position in LightSquared.  Upon information and

belief, at all relevant times herein, Defendants were aware of the Stockholders' Agreement and

understood the importance of Harbinger's rights thereunder.

58.     In particular, the Stockholders' Agreement gives Harbinger the right to elect and remove a majority of the board of directors and committees and to chair all board committees. Specifically, Section 1.1(a) of the Stockholders' Agreement gives Harbinger the right to designate all directors other than the chief executive officer.  Section 1.1(b) provides that "the Stockholders agree to take all actions to provide [Harbinger] with the right and ability at all times to designate a majority of the directors on the Board and each Committee in all cases and any increase of the size of the Board shall increase the number of [Harbinger] Directors accordingly."  Section 1.1(c) requires that "each Committee shall have a[] [Harbinger] Director as its chairperson."  Section 1.1(d) allows for the removal or replacement of Harbinger-appointed directors only by Harbinger.

59.     Additionally, under Section 1.4(b) and Annex A, Harbinger has the right to dictate management decisions with respect to, *inter alia*, "approval of any business plans," "reorganization, recapitalization, reclassification or like transaction," "[l]iquidation, dissolution or winding up," "[a]ny sale, transfer, lease or other disposition by the Company of any assets having a fair market value in excess of $250 million," the making of certain capital expenditures and entering into employment agreements with LightSquared's CEO, CFO, or other senior officers.  Further, Section 4.10 forbids LightSquared from entering into any agreement that violates the rights granted to Harbinger.  Finally, under Section 7.16, Harbinger has the right to take action to enforce the terms and provisions of the Stockholders' Agreement in addition to the remedies and relief to which it is entitled at law or in equity.  These contractual rights to appoint board members and otherwise control LightSquared have value independent of, and incremental to, the value of Harbinger's equity interests.  Prior to the injuries complained of herein,

Harbinger had exercised its contractual rights under the Stockholders' Agreement, including by appointing a majority of LightSquared's board of directors.

60.     Relying on the rights it obtained through the Stockholders' Agreement, Harbinger diligently worked with the FCC and other public and federal agencies – while investing substantial equity and providing hundreds of millions of dollars in debt financing to build out the ATC Network – to gain authorization to use LightSquared's spectrum for its innovative 4G-LTE satellite and terrestrial network.  In 2010, in connection with Harbinger's acquisition of its controlling equity interest in LightSquared, Harbinger entered into an agreement with the FCC to have LightSquared build out the ATC Network and provide coverage to at least 260 million people by the end of 2015 (the "2010 FCC Agreement").

61.     In February 2012, the FCC issued a formal notice (the "FCC Notice") – contrary to the terms of the 2010 FCC Agreement with Harbinger – proposing to suspend indefinitely LightSquared's authorization to build out its ATC Network.

62.     On May 14, 2012, LightSquared and several of its affiliates (collectively, the "Debtors") commenced the Bankruptcy Proceedings by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code").  LightSquared continues to operate its businesses and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

63.     Even after the Chapter 11 filing, Harbinger's rights as an equity holder and pursuant to the Stockholders' Agreement, including its ability to appoint LightSquared's directors, persisted, and, in many respects, became more important and valuable.

## I.     DEFENDANTS HAVE HAD THEIR SIGHTS ON LIGHTSQUARED'S SPECTRUM ASSETS FOR YEARS.

### A.     DISH's Past Acquisitions Of Spectrum Assets.

64.     DISH is a purveyor of satellite television.  Ergen is the founder, Executive Chairman of the boards of directors, an employee, and majority owner, of both DISH and its predecessor and former parent company, EchoStar.  In his role as Executive Chairman, Ergen has been diversifying DISH away from its core Pay-TV business and expanding into the terrestrial wireless business.  Ergen's stated strategic goal is to compete with telecommunications giants, like AT&T and Verizon, which requires a great deal of wireless spectrum.  As Ergen readily acknowledges, spectrum is a scarce and finite resource, with the amount of data flowing over available spectrum doubling every year.  Indeed, in August 2014, when discussing the upcoming Auction 97, Ergen explained "the bottom line is there is just not enough spectrum in the auction to feed everybody."

65.     To further its plan to launch its own wireless business to compete in the integrated broadband network, DISH, EchoStar and Ergen are desperate to acquire as much spectrum as possible.  To this end, DISH and EchoStar regularly monitor the activities of mobile satellite service ("MSS") companies that hold spectrum, and in particular, DBSD, TerreStar Corp. ("TerreStar"), and LightSquared.  DISH and EchoStar, with Ergen at the helm, for years have been attempting to acquire, or merge with, numerous spectrum-owning companies, including actual and potential transactions involving DBSD, TerreStar, Sirius XM Holdings, Inc. ("Sirius"), Clearwire Corp. ("Clearwire"), Sprint Corp. ("Sprint"), and Inmarsat plc ("Inmarsat").

66.     Ergen is in charge of the strategic direction of DISH and EchoStar and in this capacity has managed the companies' efforts in connection with their mergers and acquisitions.

Substantially assisting Ergen is Kiser, the Treasurer and a Vice President of DISH, who reports directly to Ergen pursuant to DISH's bylaws and practices.

67.     DISH, at Ergen's direction and with Kiser's assistance, has a history of purchasing distressed or discounted debt of their targets, including acquiring a blocking position in distressed satellite companies in bankruptcy, such as DBSD and TerreStar, as a step toward acquiring the companies' spectrum assets at a discount.

68.     In DISH's acquisition of TerreStar through bankruptcy, Ergen and DISH employed a three-step strategy – similar to the strategy employed here for LightSquared.  *First*, EchoStar became the largest secured creditor of TerreStar Networks and the second-biggest shareholder in the parent, TerreStar Corp., to gain influence over the bankruptcy process.  *Second*, DISH became the ultimate purchaser of TerreStar as a stalking horse bidder, repaying EchoStar in its position as a creditor in full.  *Third*, DISH entered into a purchase agreement with TerreStar whereby both the debt-buyer (EchoStar) and the acquirer (DISH) – both represented by SPSO's counsel in the Bankruptcy Proceeding, Willkie Farr & Gallagher LLP ("Willkie") – obtained broad releases that ensured EchoStar's claims would be paid in full.

69.     In their acquisition of DBSD, another spectrum-owning company, DISH and Ergen again employed a similar strategy, and flagrantly abused the bankruptcy process by engaging in a fraudulent scheme through the use of the wires to further their acquisition.  The Second Circuit, in explaining DISH's scheme, stated:  "DISH, as an indirect competitor of [the lead debtor] and part-owner of a direct competitor, bought a blocking position in (and in fact the entirety of) a class of claims, after a plan had been proposed, with the intention not to maximize its return on the debt but to enter a strategic transaction with [the lead debtor] and 'to use [its] status as a creditor to provide advantages over proposing a plan as an outsider, or making a

traditional bid for the company or its assets.'" *In re DBSD North America, Inc.*, 634 F.3d 79, 104 (2d Cir. 2011) (citation omitted).  Upon information and belief, after acquiring DBSD's debt, Colorado-based DISH, through the use of the wires, and foreseeing that the wires would be used in furtherance of its scheme, directed its counsel in New York to seek to terminate the exclusivity period as quickly as possible in order to force a sale, just as Defendants did here. Then, in or around August 2009, DISH again instructed its counsel via the wires to vote its wrongly-obtained holdings against the plan, in what the Second Circuit ultimately concluded was part of a bad-faith scheme to acquire DBSD's property.

70.     The Second Circuit, in affirming the bankruptcy court's finding that DISH acted in bad faith and its designation of DISH's vote in DBSD's bankruptcy proceeding, concluded that "DISH purchased the claims as votes it could use as levers to bend the bankruptcy process toward its own strategic objective of acquiring DBSD's spectrum rights, not protecting its claim." *Id.*  This is strikingly similar to how the Bankruptcy Court explained Defendants' conduct in the Adversary Proceeding, when it stated that Defendants' "purchase of LP debt in order to preserve a strategic option for the benefit of DISH, a disqualified company, violated the spirit of the credit agreement's restrictions on competitors owning LP debt," and characterized Defendants' actions as "inequitable conduct sufficient to warrant equitable subordination of the SPSO claim."  In DBSD's bankruptcy proceedings, like here, DISH's ultimate goal was to "control the bankruptcy process for this potentially strategic asset." *Id.*

71.     As a result of these tactics, in March 2012, DISH gained control of DBSD and TerreStar's spectrum, now known as AWS-4 spectrum, which, as of at least January 17, 2014, DISH still has not deployed.  As DISH itself has acknowledged, it is not content with the spectrum it currently owns and continues to pursue additional spectrum assets.

72.      In 2013, Ergen set his sights on acquiring the assets of Clearwire after it had

entered into a merger agreement with Sprint.  By use of the wires, Ergen caused DISH to make a

tender offer for Clearwire's stock, which violated the shareholder rights of Sprint and other

equity holders and tortiously interfered with the pending merger agreement.  According to a

complaint Sprint filed against DISH at the time, DISH duped Clearwire's minority shareholders

into believing that DISH would pay them a higher price for their stock than they would receive

through a Sprint merger in an effort to cause the minority shareholders to vote against the Sprint

merger or create the perception that the merger could be defeated.  DISH made a series of non-

binding or otherwise unactionable offers for Clearwire's minority shares which allegedly were

conditioned on untenable terms that would induce breaches of Clearwire's existing agreements.

Soon after Sprint sued for this misconduct, DISH withdrew its misleading tender offer.

**II.      DEFENDANTS DEVISE A SCHEME TO ILLEGALLY PURCHASE THE LP
            DEBT AND TAKE OVER LIGHTSQUARED.**

> **A.      Ergen, Kiser, And Ketchum Investigate Whether DISH Or EchoStar Can
>             Directly Purchase The LP Debt, And Determine That Neither Company
>             Can Purchase LP Debt.**

73.      At the center of the RICO Enterprise was Ergen, who perpetrated the Fraudulent

Scheme to strip Harbinger of its rights under the Stockholders' Agreement and acquire

LightSquared's assets with the substantial assistance of DISH's Treasurer and Vice President of

DISH and EchoStar, Kiser, his long-time banker, Ketchum, and Ketchum's firm, Sound Point.

As DISH, EchoStar and Ergen were unwilling or unable to expend the time and resources

necessary to license and build their own network, they hatched a scheme to disenfranchise

Harbinger as the majority and controlling shareholder of LightSquared in order to acquire

LightSquared's assets at a discount.

74.     In the fall of 2011, Ergen considered, for at least the second time, an acquisition

of LightSquared.[7]  Ergen believed that LightSquared's spectrum was very similar to DBSD and

TerreStar's spectrum and therefore could fit with DISH's existing spectrum in the long-term.  As

a means to acquiring these assets, Ergen sought to repeat his DBSD and TerreStar strategy and

began looking into acquiring LightSquared's LP Debt.  Ergen knew that a controlling position in

LP Debt would provide him with a platform from which he could prevent Harbinger from

maximizing the value of its investment by shepherding LightSquared out of bankruptcy.  If

LightSquared emerged with Harbinger in control, Harbinger would never agree to sell the

company or its spectrum assets at the fire-sale prices that Ergen desired.  He wanted Harbinger

out of the picture, and he needed a seat at the table from which he could corrupt and manipulate

the bankruptcy process in order to get rid of Harbinger.

75.     In the period beginning in at least as early as February 2012, DISH's Vice

President of Corporate Development, Thomas Cullen, continually emailed Ergen and Kiser news

of LightSquared and its progress toward bankruptcy.  At or around that time, Ergen asked Kiser

to provide him with information concerning a potential purchase by DISH of the LP Debt.  Kiser,

acting as an agent of DISH, compiled information for Ergen on LightSquared's spectrum and

capital structure to pass on to Ergen.

76.     In April 2012, Kiser and Ergen retained Sound Point to facilitate purchases of the

LP Debt and asked Sound Point's founder, Ketchum – a long-standing investment banker for

Ergen's companies, who had worked with Kiser for over twenty years on DISH-related

transactions – if DISH was permitted to purchase the LP Debt.  Ketchum had formed the asset

management company Sound Point in 2009 after being fired from Bank of America.  Ketchum

---

[7]        Years earlier, EchoStar had been interested in LightSquared's predecessor company, SkyTerra.

was desperate for Ergen's potentially extremely profitable business and viewed this as a first step

in the relationship.  Indeed, SPSO's ultimate purchases of the LP Debt resulted in a significant

increase in Sound Point's assets under management.  At the time that it was retained, Sound

Point understood that the LP Debt purchases were part of a "loan-to-own" scheme.  Kiser

transacted business on behalf of SPSO from his DISH office, using DISH's computers, phone

lines, email, and outside investment bankers during general business hours.

77.     In 2011, Ergen first set out to determine whether his companies, DISH or

EchoStar, could purchase the LP Debt based on the provisions of the governing Credit

Agreement.  As Defendants learned, the Credit Agreement contains transfer restriction

provisions clearly intended to exclude LightSquared's and Harbinger's competitors from

entering its capital structure (the "Transfer Restrictions").  Specifically, Section 10.04(b) of the

Credit Agreement provides that a "Lender" – or holder of LP Debt – can only "assign to one or

more Eligible Assignees all or a portion of its rights and obligations under this Agreement."

(Credit Agreement § 10.04(b).)  The Credit Agreement proscribes that an "Eligible Assignee"

"shall not include . . . any natural person or any Disqualified Company," with "Disqualified

Company" defined as "any operating company which is a direct competitor of [LightSquared]"

that is designated as such, as well as "any known subsidiary thereof."  (Credit Agreement

§ 1.01.)  The designated Disqualified Companies include both EchoStar (designated in the

original Credit Agreement) and DISH (designated by amendment on May 9, 2012).  Thus, under

the unequivocal terms of the Credit Agreement, both EchoStar and DISH are barred from

purchasing the LP Debt.

78.     Companies commonly restrict competitors from purchasing their debt because

competitors – like DISH here – would not be interested in maximizing value for the debtor

company, but instead would have the incentive to diminish the estate's value as an adversary and possibly to purchase the debtor's valuable assets at the lowest possible price.  A competitor in a debtor's capital structure would have a natural incentive to derail any viable reorganization plan that ensures the debtor's survival and competitive strength, and may use its role as a creditor to access non-public information about the debtor's business for its competitive advantage.  Indeed, under the Credit Agreement, LP Debt holders are entitled to receive substantial non-public information about LightSquared and are granted access to LightSquared's officers, agents, and employees who are compelled to provide them sensitive information regarding LightSquared's ongoing business and operations.  (Credit Agreement §§ 3.04-3.09; 5.01(a)-(b), (h), (j); 5.07(a); 10.01(d).)  Therefore, competitors holding LP Debt would be able to obtain sensitive non-public information related to LightSquared's operations.

79.     On behalf of the RICO Enterprise, both Ketchum and Kiser, upon consultation with Sullivan & Cromwell LLP ("S&C"), DISH's outside securities counsel, determined that under the Credit Agreement DISH and EchoStar were restricted from buying the LP Debt.  Upon consultation with S&C, Kiser also concluded that Ergen could not buy the LP Debt personally, because he was a "natural person" barred from buying the LP Debt under the Credit Agreement.  Thus, at all relevant times the RICO Enterprise was aware that DISH, EchoStar, and Ergen personally were barred from purchasing the LP Debt.  Ergen relied on S&C's advice for months and did not retain personal counsel until the spring of 2013, after SPSO had obtained a blocking position.

**B.     Ergen And Kiser, Through The Sound Point Defendants, Create Fronts To Evade The Credit Agreement's Transfer Restrictions.**

80.     After learning that DISH, EchoStar, and Ergen were restricted under the Credit Agreement from purchasing LP Debt, Ergen and Kiser nevertheless decided to create a special

purpose vehicle ("SPV") to serve as a front to surreptitiously purchase the LP Debt.  In the Bankruptcy Court's words, it was "important" to the DISH Defendants and Sound Point Defendants "that the public not know that they were behind Sound Point's purchases."  Although Ergen used his own personal funds to purchase the LP Debt, he did so knowing, upon information and belief, that he could at any time force DISH to purchase the assets in an amount that would repay him at a profit.  Thus, the Bankruptcy Court found that Defendants sought to "undercut what Mr. Ergen certainly knew the restrictions were designed to prevent," and "to do indirectly what he knew was not permitted directly," thereby breaching the implied covenant of good faith and fair dealing in the Credit Agreement.

81.     To surreptitiously purchase the LP Debt for the benefit of DISH, on December 21, 2011, Ketchum and Sound Point set up Bal Harbour Capital and its sole managing member and holding company, Bal Harbour Holdings, LLC ("Bal Harbour Holdings," and together with Bal Harbour Capital, "Bal Harbour"), so that Ergen could begin to purchase the LP Debt without alerting UBS AG Stamford Branch ("UBS"), the administrative agent under the Credit Agreement, LightSquared, or Harbinger that it was not an "Eligible Assignee."  However, after forming Bal Harbour, Kiser realized that the Colorado address on the formation documents might lead the public back to DISH and Ergen, both based in Colorado, as the source of the purchases.  Kiser therefore directed Sound Point to create new SPVs without the Colorado address to replace Bal Harbour.  On May 11, 2012, Ketchum proposed to Kiser that the new entity's name be SP Special Opportunities, LLC – a name, which as the Bankruptcy Court found, "suggest[ed] Sound Point ownership."

82.     Each of the entities that Ergen created – Bal Harbour, SO Holdings and SPSO – were thinly capitalized instrumentalities used for the sole purpose of acquiring the LP Debt.

Sound Point nevertheless traded on behalf of Ergen's minimally-funded fronts between April 2012 and April 2013 because, as the Bankruptcy Court found, Ketchum understood that SPSO was "identical to Mr. Ergen," whom Ketchum knew to have the money to stand behind the trades.

**C.    The RICO Enterprise Secretly And Fraudulently Purchases The LP Debt.**

83.    Defendants were fully aware of the Transfer Restrictions in the Credit Agreement, and knew that SPSO was purchasing the LP Debt for the benefit of DISH, as a competitor of LightSquared and Harbinger.  Nevertheless, between April 13, 2012 and April 26, 2013, RICO Enterprise members Ergen, Kiser, SPSO, Ketchum, and Sound Point contracted to purchase over $1 billion in par value of LP Debt, initially through Bal Harbour, and, later, through SPSO.  Of this amount, only $844,323,097.83 in par value actually closed.  All of the LP Debt trades were settled through SPSO.  Kiser transacted business on behalf of SPSO from his DISH office, using DISH's computers, phone lines, and email and outside investment bankers during general business hours.

84.    In purchasing the LP Debt, Defendants engaged in a pattern of deception using interstate wires.  At Ergen's instruction and with Kiser's supervision, the money for the purchases was sent by wire transfer from Ergen's personal accounts in Colorado to Sound Point in New York.  With each purchase, Sound Point in New York, at the direction of Ergen and Kiser in Colorado, was required to deliver to administrative agent UBS in Stamford, Connecticut an "Assignment and Assumption" agreement and "Administrative Questionnaire" (collectively, the "Purchase Documentation"), pursuant to and incorporated by reference into the Credit Agreement.  Defendants represented in the Purchase Documentation for each purchase that SPSO meets the requirements of an Eligible Assignee, in an attempted end-run around the restrictions of the Credit Agreement, and in breach of the implied covenant of good faith and fair

36

dealing.  Under the Credit Agreement, any information furnished by SPSO in connection with the Purchase Documentation could neither contain any material misstatement of fact nor omit any material fact necessary to make the statements therein not misleading.  (Credit Agreement § 3.14.)  UBS could only approve the transfer of LP Debt to an Eligible Assignee with properly executed Purchase Documentation, and thus UBS acted in a non-discretionary capacity as a gatekeeper to LightSquared's capital structure on LightSquared and Harbinger's behalf.

85.     Pursuant to the Credit Agreement, UBS – acting explicitly for these purposes "as an agent of Borrower" – accepted the Purchase Documentation and, based on the information therein, recorded on a register ("Register") the names and addresses of each Lender, including SPSO, and its interest in the LP Debt.  (*Id*. §§ 10.04(b), 10.04(c).)  It was imperative to Harbinger and LightSquared that they know at all times the true identity of the Lenders holding LightSquared's LP Debt and that such investors were Eligible Assignees.  Therefore, UBS created a list of LP Debt holders and their interests in the LP Debt ("Lender List"), which it provided to LightSquared from time to time.  LightSquared in turn sent the Lender List to Harbinger.  Harbinger vigilantly monitored the Register and the Lender List.

86.     Upon information and belief, Defendants knew LightSquared and its largest shareholder, Harbinger, had access to the Register and the information contained therein.  Thus, in connection with each purchase of the LP Debt, Sound Point in New York – acting on behalf of SPSO and SO Holdings and for the benefit of the DISH Defendants in Colorado – transmitted via the wires representations in the Purchase Documentation to UBS in Connecticut, that SPSO was an Eligible Assignee to deceive LightSquared and Harbinger into believing the purchases were legal and to conceal SPSO's true identity in furtherance of the Fraudulent Scheme. Moreover, in the Purchase Documentation, the RICO Enterprise specifically designated a contact

person at Sound Point to receive the confidential information to which LP Lenders were entitled under the Credit Agreement.

87.     Even beyond the misleading statements in the Purchase Documentation, Defendants went to great lengths to conceal their scheme and SPSO's true ownership from Harbinger and LightSquared.  For example, on May 2, 2012, Ketchum advised a Sound Point employee to make certain trades through Seaport Capital ("Seaport") – a "riskless principal" that acted as middleman – to "protect [the] identity of the buyer."  A few days later on May 5, 2012, Ketchum emailed Kiser alerting him of inquiries from the press and informing Kiser that he "obviously" would not reply.  Similarly, on May 7, 2012, after receiving a press inquiry, Ketchum reached out to Kiser and asked whether they should "employ a more strenuous strategy around" denying that Ergen was behind SPSO to the press.  Indeed, Sound Point was not even willing to disclose the identity of SPSO to a middleman who offered to create an ethical wall to prevent a possible leak of information.

**D.     Defendants Orchestrated The Purchases Of The LP Debt To Eliminate Harbinger In Order To Seize LightSquared's Spectrum Assets.**

88.     From the outset of Ergen's interest in LightSquared, and at all times throughout the Bankruptcy Proceeding, the RICO Enterprise's strategy in acquiring the LP Debt was *first*, to ensure that LightSquared would go into bankruptcy, *second*, to remove Harbinger from controlling LightSquared to disable the sole obstacle that would prevent the discounted sale of LightSquared's assets, *third*, to purchase LP Debt in an amount necessary to establish a blocking position to obtain leverage in the Bankruptcy Proceeding such that the spectrum assets could be purchased for DISH, destroying Harbinger's controlling equity position, and *fourth*, to push the company into liquidation to exploit a fire sale of its assets.

89.     Harbinger was keenly aware of the substantial value of LightSquared and its spectrum assets, and Ergen knew that Harbinger, through its control powers, would never have allowed LightSquared or its assets to be sold "on the cheap."  By deceptively infiltrating LightSquared's capital structure, severing Harbinger's control rights, and forcing a sale of LightSquared's assets to Ergen's companies, Defendants could expropriate the significant time and resources that Harbinger had invested to build out LightSquared's innovative networks.

90.     In early 2012, Ergen and Kiser knew that there was a strong possibility that LightSquared would file for bankruptcy, in part because other DISH employees and Sound Point closely monitored LightSquared's progress and communicated that information to Ergen and Kiser.  Indeed, Defendants actively took steps to force LightSquared's bankruptcy filing.  On May 4, 2012, the seller in a trade of LP Debt that SPSO had entered into, but not yet closed asked SPSO, through Sound Point, whether SPSO would vote to approve an amendment that would give LightSquared a one-week extension to continue negotiations with creditors and potentially forestall a bankruptcy filing.  Kiser relayed the request to Ergen the same day, explaining that the seller was inclined to approve the extension.  Sound Point offered to provide additional information about the terms of the extension, but Ergen simply directed to "have them vote no," which Kiser conveyed to Ketchum the same day.  When Kiser reported the decision, Ketchum stated internally within Sound Point that it was "[n]o surprise" that they would favor bankruptcy, because the RICO Enterprise's plan was for LightSquared to enter bankruptcy.

91.     Ergen falsely testified under oath in the Adversary Proceeding that he "voted no" because he did not have the documents necessary to decide how to vote, despite having asked Kiser to find out the details, because Kiser was not able to get any more information.  But, as the Bankruptcy Court found, Ergen made no attempt to obtain and review this documentation even

though Sound Point offered to provide the documents to Kiser.  Kiser also conceded that before

voting no as per Ergen's directive, he made no effort to discuss with any of the LP Debt holders

why they wanted to extend the default deadline.  As the Bankruptcy Court commented, ***"[t]hat***

***Messrs. Kiser and Ergen failed to testify truthfully about the reasons for the no vote is***

***significant . . . and is part of a troubling pattern of noncredible testimony."***  (Emphasis added.)

92.    Once LightSquared filed for Chapter 11 protection, the RICO Enterprise began

implementing the next step of their scheme:  obtain at least 33% of the LP Debt – known as a

blocking position – that would allow it to control and destabilize the Bankruptcy Proceeding,

undermine Harbinger, and position DISH as the stalking horse bidder for LightSquared's assets.

A few months after LightSquared's May 14, 2012 bankruptcy filing, on October 4, 2012, Ergen,

aware of the significance of a blocking position, instructed Kiser that "[i]f we can't be sure

[DISH] can buy [the LP Debt], then I am interested to increase my position at the 75 [cents to the

dollar] level at least up to a 33% ownership level of the class."  Sound Point, at Kiser's direction,

thereafter regularly tracked SPSO's ownership to see how close SPSO was to reaching its goal.

The Bankruptcy Court thus found that by at least as early as October 4, 2012, "the preferred

purchaser of the LP Debt was DISH."

93.    To acquire LightSquared's assets, Defendants' scheme required SPSO to achieve

a blocking position in the LP Debt.  In purchasing the LP Debt, SPSO did not act with the

behavior of a creditor seeking to maximize its return, paying close to par for the LP Debt.  The

Bankruptcy Court found that "Mr. Ergen's substantial near par purchases of LP debt in April

2013 are consistent with a plan to obtain a blocking position in order to acquire the underlying

company."

94.    Additionally, from the outset, Ketchum described the RICO Enterprise's initial SPV, Bal Harbour, set up in 2011, as "focused primarily on . . . loan-to-own situations," or a situation in which the purchaser expects the credit to be exchanged into equity.  On March 28, 2013, when the RICO Enterprise believed it had achieved a blocking position by purchasing a bundled trade of LP Debt and LightSquared LP preferred stock, Ketchum warned his colleague that "[t]here may be a bunch of press since we now control the company" and congratulated Kiser for their scheme coming to fruition, saying, "You just bought a spectrum company."  In fact, SPSO went on to acquire more than 50% of the LP Debt, leading the Bankruptcy Court to comment that the purchases "achieved by indirection, something that it could not have achieved directly – the creation of leverage for DISH to acquire LightSquared's assets."

95.    Upon information and belief, Sound Point and Ketchum were in an agreement with Ergen, SPSO and Kiser, as DISH and EchoStar's agent, to play a critical role in the Fraudulent Scheme, and they knew the Fraudulent Scheme could not be secretly carried out without their assistance.  Sound Point and Ketchum knew, among other things, that:  the Credit Agreement prohibited purchases of the LP Debt by DISH; that the purchases were part of a "loan-to-own" scheme for DISH to acquire LightSquared's assets; that the purchases were made to benefit DISH (which Ketchum sometimes referred to as "EchoStar"); that the trades were being directed by agents of DISH and EchoStar; and that Bal Harbour and SPSO were owned and controlled by DISH's Executive Chairman, Ergen.  In furtherance of the Fraudulent Scheme, Sound Point and Ketchum, among other things:  helped create straw-man companies to mask DISH's involvement in the purchase of the LP Debt; conferred with DISH's Treasurer and EchoStar's Vice President on trading strategy; represented in purchase documentation that SPSO was an "Eligible Assignee"; identified counterparties and executed trades; worked to conceal the

involvement of DISH and Ergen in the trades; monitored whether SPSO had obtained the

blocking position that was critical to the acquisition plan; intentionally delayed the closing of

large blocks of trades to interfere with the bankruptcy proceedings and Harbinger's critical

negotiations to reach a plan of reorganization; advised the RICO Enterprise on matters related to

the bids; and Ketchum repeatedly gave false testimony in the Adversary Proceeding in order to

mask and further the interests of the RICO Enterprise.

      **E.**      **DISH's Board Members And Senior Management Tacitly**
               **Approved Of, And Were Complicit In, Ergen's Illegal**
               **Acquisition Of The LP Debt.**

      96.      Kiser was not the only DISH and EchoStar senior executive that was complicit in

the Fraudulent Scheme.  DISH's board members and management, including its CFO and

General Counsel, facilitated and tacitly approved the RICO Enterprise's scheme to eliminate

Harbinger and obtain LightSquared's assets, which were ultimately for their benefit.  Prior to and

throughout the period Ergen and Kiser were amassing a substantial position in the LP Debt, the

RICO Enterprise members used DISH's offices, email, phone lines, employees, counsel, and

outside investment bankers to carry out the LP Debt trades.  SPSO went so far as to use DISH's

address as its own in a Trading Management Agreement with Sound Point and in correspondence

with Sound Point.

      97.      In May 2012, when news reports began speculating that Ergen might be behind

Sound Point's purchases of LP Debt, DISH board members and management remained silent,

despite their fiduciary obligations to determine whether a corporate opportunity was being

usurped.  The limited inquiries that they did make were met with vague answers or obfuscation.

For example, in response to inquiries from a DISH board member about whether Ergen was

buying the LP Debt, DISH's general counsel merely replied misleadingly that "***[t]he company***

***did not buy any LightSquared bonds***" – without explaining that Ergen himself was buying it up

on DISH's behalf.  (Emphasis added.)  When directly questioned by DISH executives about his purchases of the LP Debt, Ergen gave the same refrain that there "might be some truth" to the rumors.

98.     Moreover, the evidence reflects that numerous officers and directors were in fact aware of the truth, but, as the Bankruptcy Court remarked, the evidence "reveal[s] a striking lack of candor between Mr. Ergen and members of DISH's board of directors and senior management.  In addition to demonstrating that Mr. Ergen directed the actions of the DISH Board, as stated by one of its members, the inquiries (or lack thereof) posed to Mr. Ergen also suggest that the DISH Board and senior executives may have been unconcerned about Mr. Ergen's personal LightSquared debt purchases (and later, his LBAC Bid) because they had confidence that his strategy would inure to the benefit of DISH."

### F.     News Of The FCC's Auction 97 Causes Defendants To Move Quickly.

99.     The RICO Enterprise had to move swiftly to acquire LightSquared's assets before the FCC's Auction 97, which, Defendants knew no later than early 2013, was initially scheduled for the early fall of 2014.  In February 2013, the National Telecommunications and Information Administration ("NTIA") publicly announced that the 1695-1710 MHz band was being reallocated for commercial use subject to proper bidding procedures.  On March 20, 2013, the FCC additionally announced plans to auction licenses in the 1695-1710 and 1755-1780 bands. With their hunger for spectrum, Ergen and DISH intended to participate in Auction 97 as principal bidders, driving up the cost of spectrum precipitously.

100.    In February 2013, as he directed SPSO to accumulate LP Debt, Ergen knew that LightSquared's spectrum was far more valuable than he publicly led on.  Although the value of LightSquared and its spectrum assets had been difficult to assess because of the lack of an active market and, later, because of Ergen's active attempts to tarnish its value, Ergen knew that once

Auction 97 took place, parties assessing the value of LightSquared could readily use the values paid for spectrum at auction to value LightSquared's spectrum.  After the real value of LightSquared's spectrum became known, the price that Ergen's companies would have to pay for it would be astronomically higher.  Moreover, the higher valuation would allow Harbinger to attract "white knight" lenders and investors who would make it possible for Harbinger to guide the company out of bankruptcy.  Thus, if they wanted to purchase LightSquared's spectrum "on the cheap," the RICO Enterprise would have to move quickly.

101.    Like Ergen, Harbinger also knew that LightSquared and its spectrum were vastly undervalued.  Consistent with its fiduciary duty to LightSquared stakeholders, and in defense of its substantial equity investment, Harbinger worked diligently to attract investors and lenders to allow LightSquared to emerge from bankruptcy.  It also strenuously resisted calls to throw the company into liquidation, where its valuable assets would be squandered.

102.    Ergen understood that Harbinger – as the only stakeholder who posed a threat to the RICO Enterprise's acquiring LightSquared's assets – had to be eliminated quickly with the impending Auction 97.  No other stakeholder had a large enough position or sufficient economic control to stand up to Ergen.  The RICO Enterprise, thus, began to target Harbinger more forcefully.

## III.    THE RICO ENTERPRISE SEEKS TO DISLODGE HARBINGER FROM ITS CONTROL OF LIGHTSQUARED BY MAKING A LOW-BALL BID TO CREATE A FALSE CONFLICT.

103.    Having secretly obtained a blocking position in the LP Debt through front-company SPSO, the RICO Enterprise – with material advice and assistance from their investment advisors, the Sound Point Defendants – shifted to the next part of the Fraudulent Scheme:  sever Harbinger – which as the majority equity holder was the only significant party with an incentive to maximize the value of LightSquared – from its corporate governance rights

over LightSquared so that it would be unable to make critical decisions about LightSquared during the Bankruptcy Proceeding. Defendants' efforts were directed solely at Harbinger because neither LightSquared nor any of the other stakeholders were viewed as a substantial threat to Defendants' efforts to acquire LightSquared's assets. Therefore, by displacing Harbinger and its control over the LightSquared board, Defendants believed that orchestrating a sale of LightSquared's assets to DISH would be easier to accomplish by sidelining the most fervent believer in the value of LightSquared's assets – a belief vindicated by Auction 97.

104. Defendants were keenly aware of Harbinger's belief that LightSquared's assets had tremendous value above the amount of the LBAC and Stalking Horse Bids, and indeed had continually made false claims to the Bankruptcy Court that this value did not exist and Harbinger was exercising its rights to the detriment of LightSquared and its secured creditors. As LightSquared became increasingly hesitant to adopt the Stalking Horse Bid in connection with its own plan of reorganization, Defendants became increasingly nervous and saw Harbinger as an impediment to accomplishing its Fraudulent Scheme. Thus, Defendants formed a plan to overcome their obstacles by blaming Harbinger for the Debtors' conduct with the goal of having Harbinger removed and divested of its control of LightSquared's board to ease the acceptance of the Stalking Horse Bid and the acquisition of LightSquared's assets for use in DISH, EchoStar and Ergen's businesses.

105. DISH and Ergen acted quickly to make the low-ball LBAC Bid in May 2013 of $2 billion for LightSquared's assets. To garner the support of the Ad Hoc Secured Group, Defendants made the LBAC Bid (which subsequently became the marginally increased $2.2 billion Stalking Horse Bid that was the centerpiece of the Ad Hoc Plan filed in July 2013) at just

the amount necessary to satisfy the claims of the LP Debt holders, including the Ad Hoc Secured Group and Ergen himself.

106.    Defendants knew full well that the LBAC and Stalking Horse Bids represented a mere fraction of LightSquared's true value, but nonetheless through repeated use of the mail and wires, led the Bankruptcy Court and the Ad Hoc Secured Group to believe that their bids were fair and that LightSquared's failure to jump at the bids demonstrated LightSquared's lack of independence from Harbinger.  Indeed, DISH and Ergen had performed valuations, which they concealed during the Adversary Proceeding, that placed a value of LightSquared's spectrum assets to DISH in excess of $7 billion.  However, without the benefit of the Valuation Materials establishing Defendants' own high valuation of LightSquared, the Ad Hoc Secured Group and the Bankruptcy Court, in accordance with Defendants' plan, adopted Defendants' position and forced LightSquared to appoint the LightSquared Special Committee to consider accepting the grossly inadequate Stalking Horse Bid.

107.    Under the terms of its appointment and the Court's orders, the LightSquared Special Committee was invested with power over issues related to reorganization – the only issues that truly mattered then for Harbinger.  This diminished Harbinger's contractual control rights and left Harbinger impotent to affect the direction of the Bankruptcy Proceedings and maximize the value of the estate.  With the LightSquared Special Committee in place, Defendants had comfort that LightSquared's objective would be aligned with theirs in achieving a consensus among the stakeholders who had no knowledge of the true worth of the company or its spectrum assets.  Indeed, Harbinger's power was usurped so much by the LightSquared Special Committee that it ultimately resigned from LightSquared's board.

46

108.    As the truth later revealed, Defendants were well aware that the LBAC and
Stalking Horse Bids did not create a conflict between the interests of LightSquared's estate and
Harbinger because it was too low to warrant serious consideration by LightSquared.  Absent
Defendants' misrepresentations and other wrongdoing detailed herein, Harbinger would not have
lost its valuable control rights and equity interests.

**A.    Harbinger Progresses Toward A Consensual Plan Of Reorganization.**

109.    On February 13, 2013 – after months of negotiations between Harbinger,
LightSquared and the Ad Hoc Secured Group to extend LightSquared's exclusivity period – the
Bankruptcy Court entered the Exclusivity Order extending LightSquared's exclusivity period to
July 15, 2013.  The Exclusivity Order required the parties to engage in good faith negotiations
regarding the terms of a consensual Chapter 11 plan and stated that if a consensual plan was not
reached by July 15, a sales process of LightSquared's assets would ensue.  The Exclusivity Order
also provided that it could be terminated if the Ad Hoc Secured Group, collectively, ceased to be
the largest holders of the LP Debt.

110.    Between April and May 2013, prior to Ergen submitting the LBAC Bid for
LightSquared's assets, the Ad Hoc Secured Group, Harbinger and LightSquared worked towards
a plan of reorganization of LightSquared that would avoid a sale of its assets and exchanged term
sheets reflecting those negotiations.  One term sheet contemplated a plan in which all creditors
and preferred equity classes would receive a full recovery and LightSquared would emerge from
bankruptcy with Harbinger's equity interest intact.  A subsequent term sheet provided for a
LightSquared reorganization in which Harbinger and/or LightSquared would obtain an infusion
of new capital.

111.    Harbinger spearheaded these negotiations – as Defendants openly admit in public
filings – focusing on Harbinger retaining its majority equity position and corporate governance

rights in the reorganized LightSquared.  LightSquared's CEO, Doug Smith, in fact, testified in connection with the confirmation of the first plan that "obviously Mr. Falcone wants to recover as much of his investment as he can.  I think – I'm sure he's said things like that."  As Defendants were well aware at that time and later admitted in public filings:  It was important to Harbinger in protecting the interests of the investors in its fund that Harbinger preserve its equity holdings in LightSquared.

112.     A critical part of Harbinger and LightSquared's negotiations with the Ad Hoc Secured Group was to obtain, prior to the expiration of the Exclusivity Period on July 15, 2013, a commitment for exit financing in an amount sufficient to satisfy the Ad Hoc Secured Group's claims in full.  To that end, Harbinger negotiated and supported LightSquared's retention of Jefferies to secure a senior secured term loan for LightSquared that would repay all of LightSquared's creditors in full and leave Harbinger's controlling equity interest intact (the "Exit Loan").  Harbinger even agreed to pay fees associated with the Exit Loan financing, anticipated to be up to approximately $80 million.  Jefferies expressly confirmed that it was "highly confident" it could raise the full amount of the Exit Loan.  Although that commitment was subject to a number of conditions, as is customary in any commercial financing transaction, it is highly likely that those conditions would have been satisfied and the financing achieved absent Defendants' interference.  On June 7, 2013, the Bankruptcy Court authorized Jefferies to act as the sole manager and placement agent or arranger for the Exit Loan.

**B.     Ergen Submits A Low-Ball Bid To Usurp Harbinger's Rights In LightSquared Under The Stockholders' Agreement.**

113.     Knowing that it was essential to remove Harbinger from its control of LightSquared's board so that Harbinger could not obtain an Exit Loan, reach a consensual plan, or continue to pursue plans that would avoid a sale or drive up the price of LightSquared's assets

in accordance with their true value, Defendants had to act quickly.  Defendants knew that with

Harbinger in control of LightSquared it would not accept their fire-sale bids, and instead fight to

maximize the value of the estates for all of the stakeholders.  Therefore, Defendants hatched a

plan to make a bid for LightSquared's assets for an amount they knew that the LP Debt holders

would embrace but that Harbinger, aware of the true value of LightSquared's assets, would

reject, thereby driving a wedge between Harbinger and the secured creditors, and allowing them

to manufacture a false conflict of interest.

114.    Acting quickly, in April 2013, SPSO engaged Willkie as its bankruptcy counsel,

which, as Ergen testified, was done in order to pursue LightSquared's assets.  Then, on May 2,

2013, Ergen made a presentation to DISH's board, officially presenting it with information about

the LightSquared LP Debt purchases and proposing that DISH acquire LightSquared's assets for

$2 to $2.1 billion (the "Ergen Presentation").  The Ergen Presentation to the board reiterated that

"[Ergen's] substantial interests in L2 debt and preferred stock compliment any acquisition

strategy and could have significant influence in L2's chapter 11 cases."  Ergen believed that

DISH's immediate adoption of his plan was a foregone conclusion, proposing:  (i) an immediate

bid accepted by May 15, 2013 "before [LightSquared's] marketing process get[s] underway," –

*i.e.*, before LightSquared sought out potential bidders and Harbinger raised exit financing; (ii)

execution of the purchase agreement by May 31; and (iii) early funding on August 15.

115.    As part of the RICO Enterprise's scheme, on May 15, 2013, Willkie submitted the

LBAC Bid for LightSquared's spectrum for $2 billion on behalf of the yet unformed LBAC,

owned by Ergen.[8]  A key feature of the illusory LBAC Bid – which was non-binding and expired

within a mere two weeks on May 31, 2013 – was LBAC's apparent "willingness to fund the

---

[8]      LBAC did not exist at the time the offer was made and was not formed until six weeks later, on May 28,
2013.

Purchase Prices [of $2 billion], on a non-refundable basis," prior to regulatory approval.  The LBAC Bid was intentionally set at $2 billion to garner serious consideration by the Ad Hoc Secured Group even though Ergen never intended for the bid to succeed.  The LBAC Bid, which expressly stated the buyer of the LightSquared assets would be "owned by one or more of Charles Ergen, affiliated companies and/or other third parties," was meant to be adopted by DISH or EchoStar.  While Ergen testified that he made the LBAC Bid as a personal investment, the Bankruptcy Court found this contention was "not credible."

116.    Although the bid was marked "confidential," Defendants, upon information and belief, immediately leaked it to the press with the goal of further disrupting ongoing negotiations and sowing confusion and doubt among potential investors as to whether the spectrum assets had sufficient value to serve as adequate collateral for raising exit financing or other investment capital.  Upon information and belief, members of DISH in Colorado leaked the LBAC Bid via the wires to *Bloomberg*, *Reuters*, and *Wall Street Journal* reporters based in New York.

117.    Ergen, however, had no intention to ever consummate the LBAC Bid.  Rather, the LBAC Bid was intended to drive a wedge between Harbinger and LightSquared before Harbinger's "marketing process [*i.e.* financing] was underway."

**C.    Ergen Causes DISH To Adopt The Bid.**

118.    As the Bankruptcy Court found, Ergen had no intention of purchasing LightSquared's assets on his own, but took action to cause DISH to adopt his bid for LightSquared's assets.  However, on May 8, 2013, unbeknownst to Ergen, DISH's board passed a resolution forming a special committee consisting of the two directors purportedly independent of Ergen tasked with examining the propriety of Ergen's purchases of the LP Debt and the prospect of a DISH bid for LightSquared's assets ("DISH's Special Committee").

119.    When Ergen initially learned about the formation of DISH's Special Committee, he was livid, and objected to their engagement of professionals.  However, months later when Ergen became increasingly afraid that his opportunity would be lost – believing that LightSquared was "going to get [the financing] done," he began pushing DISH's Special Committee.  Thus, the Bankruptcy Court concluded that "[d]espite being in existence for three months, the special committee was forced to work under a compressed timetable because of Mr. Ergen's interference with their ability to begin their task."

120.    Under these intense time pressures, on July 21, 2013, DISH's Special Committee presented its conclusions to the board, recommending that DISH pursue the LBAC Bid for $2.2 billion, but subject to five express conditions, four of which necessitated further review and decision making by the Special Committee.  Immediately after DISH's Special Committee delivered its conditional approval, however, the DISH board abruptly disbanded DISH's Special Committee without advance notice.  DISH's Special Committee was disbanded despite the fact that the conditions had not been satisfied and that the resolutions creating it only allowed it to disband *itself* while a bid remained viable.  Thus, as the Bankruptcy Court put it, DISH's Special Committee was "little more than window dressing" and Ergen's "bullying" made it "clear that Mr. Ergen believed that, after making the LBAC bid, he could and would get DISH to step in as purchaser."  The Bankruptcy Court found that Ergen directed and controlled "virtually every aspect of the process leading to the formation of the LBAC bid and its ultimate pursuit by DISH" as Ergen is "in every sense, the controlling shareholder of DISH and wields that control as he sees fit."

121.    On July 23, 2013, immediately after the expiration of the exclusivity period, DISH announced that it would act through LBAC as a stalking horse bidder in an Ad Hoc Plan.

As the Bankruptcy Court later recognized, DISH – as the stalking horse bidder and largest holder of LP Debt with control over the proceedings – was in a unique position to dissuade others from participating in the auction for LightSquared's assets.  Moreover, as described below, Defendants required supporters of the Ad Hoc Plan, including the Ad Hoc Secured Group, to enter into a plan support agreement ("PSA") foreclosing them from negotiating on alternate plans.

122.    The Sound Point Defendants had encouraged the Stalking Horse Bid, motivated by potential advisory fees that they could receive which would be paid by LightSquared, and by the desire to maintain a relationship with Ergen and DISH and attract more of their business.  Moreover, the Sound Point Defendants had earlier encouraged the RICO Enterprise to engage bankruptcy counsel and consulted with the RICO Enterprise regarding joining the Ad Hoc Secured Group.

123.    By bidding substantially less than what the market believed LightSquared and its spectrum were worth, Defendants sought to drive down the public perception of the value of the company and its assets.  Ergen's blocking position, the misperception created by the low-ball bids, and Ergen's reputation for litigiousness and "playing in the mud," served to dissuade other potential bidders from coming forward.  Defendants' tactics also dissuaded any strategic investors from partnering with Harbinger because they believed Ergen owning LightSquared was a *fait accompli* given his blocking position.

124.    Unbeknownst to Harbinger, LightSquared and the Ad Hoc Secured Group, the Stalking Horse Bid was completely illusory.  As discussed further herein, Defendants had negotiated ways to disavow the Stalking Horse Bid and ultimately manufactured a pretextual reason to cancel it in order to further extend the Bankruptcy Proceedings until the point where

LightSquared and its creditors would run out of cash and the DISH Defendants could obtain LightSquared's assets for even less.

       **D.**       **Defendants Knew LightSquared's Assets Were Worth Far More Than The LBAC And Stalking Horse Bids.**

      125.    At all times, Defendants knew that LightSquared's assets were worth far in excess of the amount of the LBAC and Stalking Horse Bids based on Valuation Materials prepared by Ergen and DISH's Special Committee's financial advisors that attributed values in excess of $7 billion to LightSquared's assets.  However, during the time of the trial in the Adversary Proceeding between January 9 and 17, 2014, Defendants withheld the Valuation Materials and therefore the parties were deprived of the ability to ask Defendants questions about the Valuation Materials.  It was not until *after the close of evidence on the Adversary Proceeding*, that SPSO produced the Valuation Materials in connection with the subsequent confirmation trial that established how valuable the LightSquared assets were in general and in particular to DISH. While the Bankruptcy Court cited to the Valuation Materials in its Adversary Proceeding decision, Harbinger did not have the opportunity to confront Defendants' witnesses with that evidence in the Adversary Proceeding and expand the scope of the trial to include claims relating to Harbinger's direct injuries.

      126.    The Valuation Materials and earlier drafts thereof were disseminated among Defendants in 2013.  *First*, on July 3, 2013, Ergen sent an email to DISH board members, an in-house attorney, and a Senior Vice President for DISH, attaching a six-page presentation dated July 8, 2013, that he had prepared, entitled "Strategic Investment Opportunity – L-Band Acquisition, LLC" (the "Ergen July 8 Presentation").  The Ergen July 8 Presentation was delivered via the wires to DISH's Special Committee and to Perella Weinberg Partners ("PWP"), financial advisor to DISH's Special Committee, some members of whom were based in New

York, among others.  In it, Ergen highlighted the "unique opportunity" that LBAC had "to acquire spectrum assets through an on-going bankruptcy process."  Consistent with the scheme implemented throughout the Bankruptcy Proceeding, Ergen's end-game for the LightSquared spectrum assets, which could be uniquely combined with DISH's spectrum, was revealed:  "The [LightSquared] low band spectrum is uniquely positioned due to its excellent propagation characteristics."

127.    The Ergen July 8 Presentation assigned a range of value of LightSquared's assets to DISH of between $5.174 and $8.996 billion, with a mid-range of $7.085 billion.  This valuation included a range of values between $1.521 billion and $2.223 billion, with a mid-point of $1.872 billion, solely attributable to what Ergen considered to be synergistic value that DISH could unlock by purchasing LightSquared's spectrum.  As the Bankruptcy Court concluded, "[s]uch an enormous value could not have simply occurred to Mr. Ergen in an epiphany in the days or weeks before making such a detailed presentation"; rather, Ergen must have perceived the "synergistic value reflected in this presentation much earlier, as he monitored the actions of the FCC and the movement of the pieces on the wireless spectrum chessboard, some of which he himself was moving."

128.    *Second*, the DISH Defendants also failed to timely produce PWP's nine-page presentation dated July 21, 2013 that was presented to the DISH board (the "PWP July 21 Summary").  In a section captioned "Illustrative Value of DISH's Use Cases Related to LightSquared," the PWP July 21 Summary concludes that "[t]he cumulative value of the illustrative use cases that leverage the LightSquared LP acquisition is estimated to be $4.4-$13.3bn."

129.    *Finally*, the DISH Defendants withheld PWP's 69-page presentation, dated July 2013 and entitled "Project Discus Discussion Materials" (the "PWP Report").  The PWP Report was transmitted via email by PWP in New York to DISH in Colorado and others.  The PWP Report also concludes that "[t]he cumulative value of the illustrative use cases that leverage the LightSquared LP acquisition is estimated to be $4.4-$13.3bn."  The PWP Report further recites: "In June 2013, [SPSO] joined the Ad Hoc Secured Group to prevent termination of LightSquared LP's obligation of the Exclusivity stipulation."

130.    The foregoing conclusively establishes that DISH and Ergen were aware at all times of the inherent value in LightSquared's spectrum and its actual and potential synergies with DISH's spectrum, and that this value far exceeded Defendants' illusory bids.  Indeed, the Bankruptcy Court refused to allow the DISH Defendants in the Bankruptcy Proceeding to back away from their strong valuations of the spectrum:  "The [Ergen July 8 Presentation] offers strong support for the proposition that LightSquared's assets have tremendous value in the hands of DISH . . . ."  As the Bankruptcy Court realized, "[b]ased on all of the valuation evidence in the record, it is clear that LightSquared is indeed the owner of valuable spectrum assets, unbuilt beachfront property that has yet to be put to its highest and best use."

**E.    SPSO Misrepresents The Value Of The LBAC And Stalking Horse Bids.**

131.    Despite knowing the true value of LightSquared's assets – as reflected in the Valuation Materials and Ergen's testimony – SPSO concealed this information, instead repeatedly making knowing misrepresentations to the parties and the Bankruptcy Court that the bids were for a fair value.  In reality, not only were the bids well below true market value, but also the bids were illusory.  They had not been proffered in a legitimate attempt to purchase LightSquared's assets, and Ergen had no intention of making good on them.  Instead, the bids were part of the RICO Enterprise's scheme to eliminate Harbinger's equity and control rights

and undermine the bidding process so that DISH could ultimately obtain LightSquared's assets at a price far lower than it would have had to pay in a fair and competitive auction.

132.    The RICO Enterprise's goal was to convince the parties and the Bankruptcy Court that Harbinger was causing LightSquared to violate its fiduciary duties by not taking the grossly undervalued LBAC and Stalking Horse Bids seriously.  The RICO Enterprise thereby sought to create the impression of a conflict between, on the one hand, LightSquared, which was obligated by its fiduciary duties to indulge the holders of LP Debt in addition to its other stakeholders, and, on the other, Harbinger, which would naturally seek to reject this inadequate and illusory bid. However, in fact there was no conflict whatsoever, because as Defendants knew, both LightSquared and Harbinger were correct to oppose the grossly undervalued LBAC Bid.

133.    Immediately after making the LBAC Bid – and despite knowing that it was unreasonably low – Defendants in Colorado by use of the wires, and knowing that further use of the wires and mail would be likely, directed Willkie in New York to email counsel for LightSquared, seeking quick action on the LBAC Bid.  Defendants thereby sought to create a misleading record to establish that LightSquared was not taking the – grossly insufficient – bid sufficiently seriously.

134.    Then, on July 9, 2013, in connection with litigation related to Harbinger and LightSquared's attempt to further extend the exclusivity period based in part on Defendants' improper interference with creditor negotiations, SPSO sought to convince the Bankruptcy Court that the LBAC Bid created a conflict of interest between Harbinger and LightSquared. Specifically, SPSO argued that "LightSquared [was not] governed by a typical, non-conflicted fiduciary. . . .  Were a non-conflicted fiduciary in charge of the LP estates, litigation and protracted negotiations would not have been required to induce the LP Debtors to maximize the

value of its estates for the benefit of their stakeholders."  At the behest of SPSO, drawn in by Defendants' misrepresentations and illusory and undervalued Stalking Horse Bid, the Ad Hoc Secured Group echoed these arguments, stating that because LightSquared was "admittedly controlled by Harbinger, not only as a matter of law and through the board and through the equity holdings but also as a matter of their affirmative pleadings," Harbinger was not "in a position to be the party that operates an auction."  These statements – as Ergen's own valuation created less than one week prior conclusively shows – were false.  Instead, the LBAC and Stalking Horse Bids severely undervalued LightSquared's assets and Harbinger's interests were therefore aligned with LightSquared's estate in seeking to obtain a higher bid.

135.     On July 23, 2013, immediately after making the Stalking Horse Bid, counsel for SPSO, at the direction of Ergen, began objecting to the Bankruptcy Court about LightSquared's failure to act fast enough in submitting a nondisclosure agreement and stating that "[w]hen you offer a company that is in Chapter 11 two billion dollars of cash, and at this point, no meeting, no NDA offered, no phone call, whatsoever . . . that is huge – when you've got a bag [of] two billion dollars in cash sitting on your front porch, that speaks volumes."  SPSO repeatedly referred to the Stalking Horse Bid as a "bag of cash" and emphasized its importance, stating, "our asset purchase agreement isn't a fantastical, Swiss cheese, meaningless document.  It's a very real offer for very real green money."  Indeed, despite knowing that the bid was far below the value that would be paid in a fair and competitive process that was not tainted by Defendants' wrongdoing, Defendants accused Harbinger of initiating litigation solely to block what they characterized as a "good faith" bid.  These representations again were false, misleading and deceptive in light of Ergen and DISH's own valuations which concluded the value of LightSquared's assets far exceeded the Stalking Horse Bid.  These representations were

further false because, as detailed herein, Defendants in fact had no intention of consummating their offer.

## IV.    THE RICO ENTERPRISE'S SCHEME CAUSES HARBINGER TO LOSE ITS CONTRACTUAL RIGHTS AND EQUITY INTEREST IN LIGHTSQUARED.

136.    As the RICO Enterprise intended, Defendants' bids and related misrepresentations had a threefold effect meant to bring Defendants closer to acquiring LightSquared's assets by removing Harbinger from the board.  *First*, the illusory bids placed Harbinger at odds with the Ad Hoc Secured Group with which it had been negotiating a plan, which, as the Bankruptcy Court acknowledged and the RICO Enterprise knew, would naturally want to pursue the bids because it satisfied their own interests, if not the interests of the other stakeholders.  *Second*, SPSO placed a taint on LightSquared's value and Harbinger's conduct in opposing SPSO, making it difficult for Harbinger to access capital markets.  *Third*, SPSO's illusory bids along with its misrepresentations as to their adequacy and false accusations as to the propriety of Harbinger's opposition created the appearance of a false conflict between Harbinger and LightSquared that could only be resolved through the appointment of the LightSquared Special Committee.  Defendants' actions had the intended effect of stripping Harbinger of its valuable contractual rights pursuant to the Stockholders' Agreement, which are independent and incremental to the value of its equity holdings.  These unique contractual rights were essential for Harbinger to protect its massive investment in LightSquared.

### A.    The RICO Enterprise's Scheme Causes Creditors To Oppose Harbinger's Control Over LightSquared.

137.    Negotiations with the Ad Hoc Secured Group began to devolve immediately upon issuance of the LBAC Bid on May 15, 2013.  These creditors, who previously were willing to negotiate with Harbinger, began agitating for a swift sale process that would cash them out in full.  Indeed, as the Bankruptcy Court acknowledged, and the RICO Enterprise knew, it was

"economically rational" for the Ad Hoc Secured Group to want to close on the bid as quickly as possible.

138.     On June 13, 2013, SPSO joined the Ad Hoc Secured Group to (i) keep the sale provisions of the Exclusivity Order in effect by ensuring the Ad Hoc Secured Group collectively remained the largest holders of LP Debt as the Exclusivity Order required; (ii) drive a wedge between Harbinger and the Ad Hoc Secured Group, such that the Ad Hoc Secured Group would support Defendants' efforts to remove Harbinger from the board of LightSquared and support a sale of LightSquared's assets at fire-sale prices; and (iii) as the Bankruptcy Court found, interfere with the purpose of the Exclusivity Order by stymieing Harbinger and LightSquared's ability to engage in the good faith negotiations contemplated therein.  Within days of joining the Ad Hoc Secured Group, several hundreds of millions of dollars in "hung" trades closed, as discussed further herein, making SPSO the controlling member by virtue of the size of its holdings.

139.     As the Bankruptcy Court found, "SPSO's decision to join the Ad Hoc Secured Group was undoubtedly made for the strategic purpose of controlling the sale process for the Debtors' assets, with DISH as the buyer, and the fact that it rendered the negotiated and Court-ordered exclusive period meaningless was ignored."  Defendants' actions – acquiring a controlling position in the LP Debt through SPSO and then delaying the close of hundreds of millions in LP Debt while "fine-tuning its acquisition strategy" – "subvert[ed] the intended operation of a court-approved exclusivity termination arrangement, and . . . prevent[ed] the Court from directing and having visibility into events unfolding in the case."  The Bankruptcy Court therefore found that "SPSO failed to act in a way that is consistent with the most basic concepts of good faith that are fairly to be expected of chapter 11 creditors, especially those who voluntarily join the capital structure of a debtor well after distress has set in."

140.     Just seven days after the expiration of the Exclusivity Period, on July 23, 2013,
SPSO had successfully convinced the Ad Hoc Secured Group to file an SPSO-backed Ad Hoc
Plan, pursuant to which the Ad Hoc Secured Group signed onto the PSA.  The PSA bound the
Ad Hoc Secured Group to support LBAC's Stalking Horse Bid and forbade them from
negotiating on other plans, stating that the parties thereto "[s]hall not directly or indirectly seek,
solicit, support, or vote in favor of any other plan, sale, proposal, or offer of dissolution, winding
up, liquidation, reorganization, merger, or restructuring of the Debtors other than the Plan[.]"  In
essence, negotiations with the LP Debt Lenders were rendered a "moot point" once the Ad Hoc
Secured Group signed the PSA.  Indeed, a representative for the Ad Hoc Secured Group testified
that with Defendants in the picture, it could no longer negotiate a common plan with Harbinger
or LightSquared:  "It was just clear to me that the Ergen participation meant that there was a
creditor in the capital structure that we thought made sense to deal with separately."

141.     The Ad Hoc Secured Group, through their lead advisor from the Blackstone
Group LP, testified that absent being bound by the PSA, however, it would have reached an
agreement with Harbinger:  "[W]e would have continued negotiating with the Harbinger and
debtor parties on a resolution and we would have picked an alternative path.  This company had
to emerge from bankruptcy just given its capital structure and liquidity profile.  And we would
have worked to have found a resolution, one of which would have been – could have been the
Harbinger parties."

142.     Further, the PSA included broad releases insulating DISH, Ergen, and SPSO from
liability and ensuring that Ergen would be paid in full on the account of SPSO's LP Debt
holdings.

143.    The RICO Enterprise had therefore successfully executed the portion of its
scheme to disrupt Harbinger's negotiations with creditors and drive the Ad Hoc Secured Group
to oppose Harbinger's efforts to create a plan of reorganization, instead supporting SPSO's effort
to displace Harbinger from the board of LightSquared.

**B.      The RICO Enterprise's Scheme Causes Harbinger
        To Lose Its Board Seats.**

144.    Misled by the artificial conflict raised by SPSO, the Bankruptcy Court held a
series of hearings in September 2013 related to whether Harbinger should be able to dictate
decisions related to LightSquared during the reorganization proceedings and assessment of the
Stalking Horse Bid.  Ultimately Defendants succeeded in displacing Harbinger by having the
LightSquared Special Committee appointed and eventually stripping Harbinger of its rights
under the Stockholders' Agreement.

145.    The Bankruptcy Court itself noted that LightSquared had a duty to "try to do
better" than the bid, as Harbinger had been trying to do.  However, the Bankruptcy Court
nonetheless sided with Defendants that – based on their misrepresentations that the Stalking
Horse Bid was adequate – Harbinger was conflicted in opposing the bid.  The Court explained
that "[t]he reason that we're going to a special committee is so we can have someone exercising
business judgment unconnected or influenced by the equity in this case.  That's the point of this."
The Bankruptcy Court wanted a LightSquared Special Committee to "let the debtor operate
completely independently" of Harbinger and "neutralize the concern about the control of the
equity holder."

146.    Thus, as directed by the Bankruptcy Court, LightSquared's board of directors had
no choice but to appoint three independent LightSquared Special Committee members on
September 16, 17, and 27, 2013.  The specter of the false conflict hung over the appointment

process, with the Bankruptcy Court threatening that if "you're uncomfortable that members of the special committee will be beholden to anyone, then I won't ask any of you and I'll pick the members myself."  After the appointment of the Special Committee, the Bankruptcy Court on October 1, 2013 ordered in a bid procedures order that all actions and decisions on behalf of LightSquared related to the plan process, an auction, or a sale, be made by a LightSquared Special Committee.  On October 2, 2013, the Bankruptcy Court endorsed the appointment of the LightSquared Special Committee, entering an order providing for its members' compensation and indemnification.

147.    The LightSquared Special Committee was ultimately vested with the power to make all material decisions related to reorganization.  Specifically, the purpose of the LightSquared Special Committee is:

> (i) to oversee the potential sale of the Company's assets . . . in connection with any auction process . . . and (ii) to evaluate potential restructuring or plans of reorganization, including with respect to any financing involving the Company and its subsidiaries, filed by the Company . . . in each case in connection with the Company's and its subsidiaries' Chapter 11 cases.

148.    The Bankruptcy Court itself, relying on Defendants' false and misleading representations regarding the adequacy of the Stalking Horse Bid, ordered bidding procedures on October 1, 2013 that required "any decision to be made by LightSquared under these Bid Procedures, or in connection with the plan process . . . shall be made by the independent committee of LightSquared's board of directors."  Further usurping Harbinger's right to govern LightSquared, the LightSquared board was forced to resolve that the LightSquared Special Committee members could not be removed without Bankruptcy Court approval.

149.    The LightSquared Special Committee – independently of Harbinger – did in fact proceed to make decisions with respect to all matters important to LightSquared (and Harbinger), including evaluating proposed reorganization plans, running the auction process, participating in

meetings with stakeholders and the FCC, and entering into discussions with potential purchasers of LightSquared's spectrum.  The LightSquared Special Committee continually filed progress reports with the Bankruptcy Court regarding the numerous actions as to which it had displaced Harbinger, including:  (i) approval of LightSquared's action against SPSO and its affiliates; (ii) approval of the GPS litigation; (iii) negotiation of bidding procedures; (iv) evaluation of various plans; and (v) approval of various plans.  Notably, the LightSquared Special Committee's takeover of all negotiations related to the auction and its proposal of its own plan of reorganization, deprived Harbinger of the credibility and support behind its own plan.  Moreover, once the LightSquared Special Committee had displaced Harbinger's control over the board, LightSquared's management went so far as to demand that Harbinger cease all communications with the FCC, even those made on behalf of itself  – communications that Harbinger deemed necessary to protect its own interests.

150.    Accordingly, as a result of the RICO Enterprise's Fraudulent Scheme, Harbinger was stripped of its ability to protect its substantial equity investment through the loss of its contractual rights under the Stockholders' Agreement, including its rights to appoint and remove the majority of directors, appoint committee members, chair committees, and dictate key management decisions.  Harbinger lost the ability to participate in *all* material decisions related to LightSquared necessary to protect its investment.  Indeed, with its ability to control LightSquared's board gone and after receiving LightSquared's demand that it stop speaking to the FCC, Harbinger was forced to resign from the board in order to preserve other courses of action to protect its investment that otherwise might potentially be viewed as a conflict, despite Harbinger's complete absence from LightSquared's decision-making.  With its board seats rendered worthless, Harbinger was forced to discard them and seek to influence the company

from the outside, where it continued to face challenges as the target of Defendants' ongoing

Fraudulent Scheme.

**V.     DEFENDANTS' CONDUCT AND PRESENCE IN THE CAPITAL STRUCTURE
        DAMAGES HARBINGER'S ABILITY TO PUT TOGETHER A PLAN OF
        REORGANIZATION.**

        151.    After the conclusion of the exclusivity period, Harbinger had the right to propose

its own plan to bring LightSquared out of bankruptcy.  However, in accordance with Ergen's

plan, the RICO Enterprise's false representations that Harbinger was acting contrary to the

interests of LightSquared, as well as its loss of control of the LightSquared board, had a chilling

effect on Harbinger's ability to find receptive investors and lenders.  As a direct result of the

RICO Enterprise's wrongdoing, Harbinger's ability to originate a plan to preserve its equity

interest in LightSquared was harmed.

        152.    Moreover, the presence of Ergen in LightSquared's capital structure impeded

Harbinger's ability to find strategic investors and lenders willing to support a reorganization

plan.  As Omar Jaffrey testified in connection with the first confirmation hearing, the presence of

a competitor in the capital structure affected his investment thesis and what consideration he

required to account for the additional risk.  The fact that he figured that it was 90% likely that

Ergen or one of his affiliated companies would end up acquiring LightSquared's assets also

adversely impacted Harbinger's efforts to reorganize.  Similar testimony was provided by Steven

Zelin, financial advisor to the Ad Hoc Secured Group, who stated that he advised his clients that

he did not recommend investing a minority position in a capital structure controlled by Ergen.

        153.    The RICO Enterprise's assault on Harbinger's integrity and the presence of a

competitor with a blocking position in LightSquared's capital structure increased Harbinger's

cost of capital while decreasing the amount of capital that strategic lenders were willing to loan,

diminishing Harbinger's ability to raise sufficient funds to allow LightSquared to emerge from

bankruptcy. The chaos caused by the RICO Enterprise's wrongful conduct chilled Harbinger's ability to find and negotiate with lenders and investors, and due to the general impression that Ergen was on his way to acquiring LightSquared, few strategic lenders or investors were willing to get involved.

## VI.   THE RICO ENTERPRISE TERMINATES THE BID UNDER FALSE PRETENSES AND ENGAGES IN FURTHER WRONGDOING.

### A.   DISH Terminates The Stalking Horse Bid Under False Pretenses.

154.   After successfully forcing the appointment of the LightSquared Special Committee and upending Harbinger's negotiations with the creditors, the RICO Enterprise sought to interfere with Harbinger's efforts to realize a plan of reorganization that kept its controlling equity interest intact by deceiving potential bidders into believing that Defendants no longer had interest in LightSquared because the assets were purportedly flawed.

155.   The RICO Enterprise members, under false pretenses, abruptly terminated the Stalking Horse Bid on January 9, 2014, as trial in the Adversary Proceeding commenced. By terminating the Stalking Horse Bid, Defendants could push LightSquared into liquidation and acquire the spectrum assets below $2.2 billion without interference from Harbinger. Indeed, Defendants' behavior here strikingly resembles its conduct in acquiring the assets of DBSD – discussed above – in which DISH was willing to play a "long game" to acquire the assets at the lowest price possible. There, Ergen's original bid – placed via the wires in September 2009 – was litigated for over a year until DISH came forward in February 2011 with a subsequent offer for the assets. During that entire intervening time – as Defendants did with LightSquared – DISH steadfastly denied that it would make any further, more reasonable offers. In fact, once its hand was forced by the Second Circuit, it turned out that DISH was ultimately willing to acquire DBSD's assets for a higher price.

156.    In December 2013, as part of the bidding process for LightSquared's assets under the Ad Hoc Plan, an auction was scheduled with SPSO serving as the stalking horse bidder. However, Ergen never intended to consummate the Stalking Horse Bid.  Instead, he sought to ensure no other bidders materialized at the auction, paving the way for himself to pursue an even more favorable deal for the spectrum.  Ergen's plan to make a bid he knew was not viable may be inferred from the Ergen Presentation, in which he noted that "[i]f proposal not accepted, Newco will have the ability to see results of marketing process and, if process is unsuccessful, revert with a different bid later."

157.    In furtherance of this scheme, in or around November 2013, Ergen pushed for a public disclosure of a fabricated "technical issue" that the DISH Defendants claim to have "discovered" through due diligence.  Such a disclosure is contrary to market practice, whereby potential bidders conduct their own due diligence without disclosing their findings.  However, by falsifying a purported "technical issue," Ergen could dissuade any interested bidders.  In driving away legitimate bidders, Ergen undermined any prospect of a competitive bidding process, in which fair value for the company could be obtained, and undermined Harbinger's efforts in keeping its controlling equity interest.  When LightSquared did not receive any other qualified bids, as Ergen planned, the December auction was cancelled.  Ergen then attempted to renegotiate the terms of his offer, proposing a new, discounted proposal for the acquisition of substantially all of LightSquared's assets for DISH, including assets not previously included in the LBAC or Stalking Horse Bids.  These efforts were ultimately unsuccessful.

158.    Accordingly, on the eve of trial in the Adversary Proceeding, to wreak further havoc on Harbinger's chances to obtain a plan of reorganization, DISH cancelled its bid by letter dated January 9, 2014, sent via email from S&C in New York to counsel for the Ad Hoc Secured

Group in Miami, copying DISH in Colorado.  DISH cited a purported "technical issue" as the

reason for its termination.  The "technical issue," however, was clearly a pretext manufactured

by the DISH Defendants.  In fact, weeks before an auction occurred, the DISH Defendants had

purportedly uncovered the "technical issue," but were still willing to move forward with the

auction and the DISH board approved raising the bid to include certain assets of LightSquared

Inc., previously excluded from the prior bid.  As the Bankruptcy Court found, "no attempt was

ever made by DISH to solve, let alone quantify, the technical issue, which allegedly stood in the

way of the realization by DISH of billions of dollars of supplemental asset value.  It is indeed a

curious thing."  As a result, the Bankruptcy Court noted that there was "credible and compelling

testimony that the technical issue is unlikely to exist at all," while "Mr. Ergen's testimony on this

point was not credible."

159.    Indeed, the termination of the Stalking Horse Bid was merely another trick up

Ergen's sleeve to manipulate the Bankruptcy Proceeding to the RICO Enterprise's advantage by

staying on the sidelines until LightSquared's operating cash ran out so it could snatch

LightSquared's assets at bargain basement prices.

**B.      The RICO Enterprise Falsely Accuses Falcone Of Wrongdoing.**

160.    In order to further sabotage Harbinger's standing with the Bankruptcy Court, the

LightSquared Special Committee, and negotiating partners interested in taking LightSquared out

of bankruptcy, on April 4, 2014, Ergen, through SPSO, publicly filed a specious motion seeking

leave to assert claims on behalf of the Debtors' estates for breach of fiduciary duties against

Philip Falcone, Harbinger's founder and Senior Managing Director.  *See Motion of SP Special*

*Opportunities, LLC for Entry of an Order Granting Leave, Standing and Authority to*

*Commence, Prosecute and/or Settle Certain Claims of the Debtors' Estates Against Philip*

*Falcone* [Bankr. Dkt. No. 1473].  Ergen's bad-faith motion falsely claimed that Mr. Falcone

violated his fiduciary duties as a LightSquared board member by favoring Harbinger's interests over those of LightSquared.  Upon information and belief, Ergen's goal was not to prevail on this baseless motion or to vindicate any right of the Debtors, but to further derail Harbinger's rights under the Stockholders' Agreement and undermine Harbinger's credibility with the Bankruptcy Court, the LightSquared board, and potential partners in a reorganization plan for LightSquared. While the Bankruptcy Court refused to even entertain the frivolous motion, the damage was done.  The unfounded and malicious allegations set forth in Defendants' baseless motion further damaged Harbinger's ability to influence the direction of the LightSquared board and undermined its ability to maximize the value of its equity interest.

## VII.   THE RICO ENTERPRISE – CONSISTENT WITH THEIR PAST CONDUCT – OBSTRUCTED THE BANKRUPTCY PROCEEDING TO FURTHER ITS SCHEME TO ACQUIRE LIGHTSQUARED'S ASSETS.

161.    The DISH Defendants have a history of abusing the judicial process in courts around the country by committing perjury and destroying evidence to achieve their own ends. Indeed, it has been reported that "Dish employees, adversaries and analysts say no one exploits the judicial system like Ergen does to gain a competitive advantage."  (Eriq Gardner, *Dish Network's Charlie Ergen is the Most Hated Man in Hollywood*, Hollywood Reporter (Apr. 2, 2013) ("*Hollywood Reporter*") at 4.)  In Ergen's own words:  "I may be the only CEO who likes to go to depositions . . . You can live in a bubble, and you're probably not going to get a disease. But you can play in the mud and the dirt, and you're probably not going to get a disease either, because you get immune to it.  You pick your poison, and I think we choose to go play in the mud."  (Caleb Hannan, *Dish Network, the Meanest Company in America*, Bloomberg Businessweek (Jan. 2, 2013) at 6.)  Ergen admits, "[w]hen I talk to lawyers it's . . . more about, you know, how can I do this, as opposed to what the law says."

162.    These tactics have led numerous courts to sanction and reprimand Ergen and his

companies year after year:

- In 2005, in a sexual harassment suit against EchoStar, DISH's predecessor and former parent, the United States Court for the District of Maryland found EchoStar guilty of bad-faith spoliation, calling its behavior "indefensible," and awarding sanctions against it.  *See Broccoli v. EchoStar Commc'ns Corp.*, 229 F.R.D. 506 (D. Md. 2005).

- The same year, the Tenth Circuit affirmed the imposition of fees and costs against EchoStar in a separate action, finding that "the District Court did not abuse its discretion in awarding . . . attorneys' fees and costs" stemming from sanctions against "EchoStar's attorneys."  *Dominion Video Satellite, Inc. v. EchoStar Satellite L.L.C.*, 430 F.3d 1269, 1280-81 (10th Cir. 2005).  The District Court had "determined that EchoStar had unreasonably and vexatiously extended the arbitration hearings and court proceedings."  *Id.*  It found that "the arguments presented on behalf of EchoStar were completely meritless" and that EchoStar's "attorneys need not have filed lengthy briefs at every stage of the arbitration and court proceedings in order to preserve EchoStar's arguments for appeal."  *Id.* at 1279.  Further, "the District Court noted that EchoStar's arguments . . . were 'disingenuous,' 'exceedingly fanciful,' and based on 'a gross contortion' of governing law."  *Id.* at 1273.

- In 2006, the Eleventh Circuit upheld an injunction against EchoStar for its retransmission of certain programs in violation of the Copyright Act.  *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 450 F.3d 505 (11th Cir. 2006).  The court found "no indication that EchoStar was ever interested in complying with the Act.  Indeed, based on the district court's findings, we seem to have discerned a 'pattern' and 'practice' of violating the Act in every way imaginable.  Importantly, the court noted that "[i]n an effort to dissuade the district court from issuing the original injunction in this case, **EchoStar's CEO, Charles Ergen, made a formal pledge under penalty of perjury in September 1999 . . . [to] terminate all ineligible subscribers.**"  *Id.* at 513 (emphasis added).  **Yet, "[c]ontrary to Ergen's promise, the district court found no evidence that EchoStar terminated service to any of these subscribers for compliance-related purposes.**"  *Id.* at 514 (emphasis added).

- In *TiVo Inc. v. Dish Network Corp.*, 655 F. Supp. 2d 661 (E.D. Tex. 2009), the court granted in part plaintiff's request for "appropriate contempt sanctions" because "EchoStar had failed to comply with the plain directives of this Court's order."  The court further "noted the contentious nature of this case and . . . expressed disapproval for some of the tactics used by the parties" and described EchoStar's behavior as "distasteful."  *Id.* at 665.

- In *VOOM HD Holdings LLC v. EchoStar Satellite L.L.C.*, 93 A.D.3d 33 (1st Dep't 2012), the court again sanctioned EchoStar for spoliation, finding that

"[t]he record shows that EchoStar acted in bad faith in destroying electronically stored evidence" and was at best "grossly negligent, if not intentional." *Id.* at 46.

163.     Consistent with their past conduct, the DISH Defendants in attempting to eviscerate Harbinger's equity interests and acquire LightSquared's assets, breached the "outer limits" of what would be tolerated in the LightSquared Bankruptcy Proceeding, as the Bankruptcy Court noted.  To further their Fraudulent Scheme, the RICO Enterprise not only illegally entered LightSquared's capital structure but were an "affront" to the Chapter 11 process, keeping trades open to disrupt negotiations and violating the Bankruptcy Court's Exclusivity Order, repeatedly giving false testimony under oath, filing false statements with the Bankruptcy Court, concealing critical evidence to mislead the Bankruptcy Court and terminating their bid under false pretenses to force a liquidation of LightSquared's assets so they could acquire the spectrum assets at fire-sale prices.

164.     For example, Defendants' wrongful failure to disclose the Valuation Materials in a timely manner was intended to – and did in fact – harm Harbinger.  The Valuation Materials revealed that contrary to Defendants' misrepresentations concerning Harbinger's purported "conflict of interest," Harbinger had been acting in the best interests of LightSquared by opposing the Stalking Horse Bid at the time that its control rights were abrogated.  Defendants' wrongful withholding of this critical evidence allowed Defendants to prolong the misimpression that Harbinger had acted contrary to LightSquared's interests, further undermining the ability of Harbinger to influence the direction of LightSquared in the bankruptcy process.

165.     Although the RICO Enterprise was not successful in acquiring LightSquared's assets, Defendants' wrongdoing and misconduct has harmed Harbinger, as detailed herein.  The RICO Enterprise's Fraudulent Scheme continues to evolve in their quest to acquire spectrum assets through wrongful means and they pose a substantial threat in the future.

A.      **Defendants Repeatedly Made Misrepresentations Throughout
        The Bankruptcy Proceeding.**

166.    In an effort to conceal the Fraudulent Scheme and mislead the parties and the

Bankruptcy Court, Defendants knowingly and repeatedly filed false statements with the

Bankruptcy Court and made false statements under oath.

167.    *First*, Defendants made misrepresentations related to DISH's knowledge of and

role in SPSO's trades – information critical to linking the RICO Enterprise members' role in the

scheme.  For instance, SPSO, through its counsel, falsely claimed in its stipulation filed on July

9, 2013 with the Bankruptcy Court ("SPSO Stipulation"), that "Ergen has not disclosed to DISH

or EchoStar the amounts, prices or dates of SPSO's purchases of Prepetition LP Obligations."

This statement in the SPSO Stipulation was entirely false.  Kiser, Treasurer of DISH, was

entirely familiar with the details of the LP Debt trades having managed SPSO's trading

activities.  Also, Ergen had already explicitly disclosed his holdings of more than $1 billion of

LP Debt to the DISH board through the Ergen Presentation which predated the SPSO

Stipulation.  The Bankruptcy Court found SPSO's "stunning lack of candor" was an "affront to

the duty of good faith imposed on those who participate in Chapter 11 proceedings."

168.    *Second*, as discussed above, Defendants made repeated misrepresentations to the

parties and the Bankruptcy Court that the LBAC and Stalking Horse Bids were valid and fair

bids when in fact Defendants knew the bids represented a fraction of the LightSquared's value

and that they had no intention of executing the bids.  Defendants later terminated the bids,

manufacturing a pretextual reason for its termination under what the Bankruptcy Court found to

be "curious" circumstances.

169.    *Third*, as part of the RICO Enterprise's scheme, Defendants purposefully delayed

the closing trades of LP Debt, seeking "to defer settlement as long as possible," and "effectively

sidelin[ing] hundreds of millions of dollars of LP debt during the weeks and months leading to the court sanctioned termination of exclusivity[] on July 15, 2013, all while SPSO, Mr. Ergen and eventually LBAC and DISH fine-tuned their bid strategy."  After interfering with the provision of the Exclusivity Order requiring good-faith negotiations with creditors at minimal cost to Defendants, Defendants suddenly joined the Ad Hoc Secured Group and closed its trades so that it could uphold the provision of the Exclusivity Order requiring a sale at the close of the exclusivity period.  This activity breached the "outer limits" of acceptable behavior in a bankruptcy proceeding and violated the Exclusivity Order.

170.   When called to task for their misconduct, however, Defendants obstructed justice and further disrupted Harbinger's relationship with creditors by making repeated material misrepresentations to the Bankruptcy Court related to the trade closings.  On July 9, 2013, SPSO submitted the SPSO Stipulation, falsely proclaiming "the timing of closing of each of SPSO's acquisitions of [LP Debt] was primarily driven by the sellers of such claims" when in fact, as the Bankruptcy Court found, the delays were entirely the result of Defendants' stonewalling.

171.   Then, at an October 29, 2013 hearing, counsel for Sound Point falsely claimed that "Sound Point [did not] act as the driver of when the closing dates occur[ed]" and was only "involved in documentation of closing trades . . . [b]ut again, solely in a nondiscretionary . . . capacity."  However, evidence emerged that Sound Point repeatedly manufactured excuses to counterparties to delay the closing of the trades and in fact Ketchum drafted a proposed list of predetermined settlement closing dates to suggest to Kiser that went well beyond the average time frame a trade would close.  This led the Bankruptcy Court to reprimand Sound Point for its misrepresentations about being an innocent broker that had no involvement in Defendants'

misconduct, stating that the Bankruptcy Court "relied on that in dismissing [Sound Point] from this lawsuit."

172.    Moreover, to conceal their respective roles in intentionally delaying the closing of the LP Debt trades, the individual RICO Enterprise members provided wildly divergent and inconsistent explanations for the delays at the Adversary Proceeding Trial:  (i) Kiser testified that the "upstreams" needed to be verified and that he and Ergen were not in any rush to close them because there were legitimate economic benefits to delaying the settlement of the LP Debt trades; (ii) Ketchum testified that Ergen did not have immediate liquid funds available to settle the trades but Kiser did not tell him why the money was not available, nor did Ketchum have any understanding of what assets could have taken months to liquidate; and (iii) Ergen testified that the necessary paperwork or "upstreams" did not happen on a particular schedule and were not complete to enable settlement of the trades but that he never purposefully delayed closing of trades in order to impact LightSquared's bankruptcy proceedings.  As the Bankruptcy Court explicitly found, none of these excuses were credible.

173.    Contrary to Defendants' perjurious testimony, the delays were not caused by difficulty completing the necessary paperwork or "upstreams" but because Ketchum – at Kiser's direction – gave false excuses to SPSO's counterparties to delay closing of the trades, despite those counterparties' repeated entreaties to settle the outstanding trades.  Additionally, there were hundreds of millions of dollars in liquid assets in Ergen's account, contrary to Ketchum's testimony that trades were delayed because Ergen lacked liquid funds to settle.

174.    *Finally*, Defendants, as discussed above, also gave perjurious testimony during the Bankruptcy Proceeding concerning:  (i) Ergen's motivation for purchasing the LP Debt and the circumstances surrounding the LP Debt purchases and (ii) the reason for the DISH

Defendants voting against a forbearance agreement in May 2012 that would forestall

LightSquared's bankruptcy filing.

**B.    Defendants Wrongfully Submit The Peters Report To Further Obstruct Justice In The Bankruptcy Proceeding.**

175.    In early 2015, LightSquared was poised to present the widely-supported Second

Amended Joint Plan to finally emerge from bankruptcy as a reorganized entity.  During this same

period, in an effort to drive LightSquared into liquidation and acquire LightSquared's spectrum

at a steep discount for use in Ergen and his companies' business, Defendants, through Ergen and

SPSO, retained Tom Peters as a hired gun to illegally submit evidence regarding LightSquared's

spectrum in the Bankruptcy Proceeding in blatant violation of a federal criminal statute, 18

U.S.C. § 207 ("Section 207").  Section 207 prohibits executive branch workers, such as Peters,

from testifying as experts in certain circumstances regarding matters on which they worked

while employed by the government in which the United States is a party or has a "direct and

substantial interest."

176.    Peters was employed by the FCC from 2009 to 2014, and served as Chief

Engineer of the Wireless Telecommunications Bureau ("WTB") of the FCC from April 2010 to

February 2014.  While at the FCC, the WTB and Peters were instrumental in decisions that

drastically affected LightSquared.  Specifically, in 2010, the WTB approved Harbinger's

application to build out its ATC Network that would greatly increase the value of LightSquared's

spectrum.  After the FCC granted its approval, however, manufacturers and sellers of global

positioning systems ("GPS") suddenly claimed that the proposed use of the ATC Network would

interfere with their GPS devices' ability to function, jeopardizing critical infrastructure, aviation,

and defense equipment.  In response, the FCC, on February 15, 2012, indefinitely suspended

LightSquared's terrestrial use license (the "Suspension Order").  As Defendants knew, Peters,

and the WTB that he oversaw, participated personally and substantially in meetings regarding LightSquared's license modifications and the concerns regarding GPS interference.

177.    Upon information and belief, Defendants were well aware of Peters' role in LightSquared's proceedings before the FCC, based on Defendants' intimate knowledge of the workings of the FCC and their investigation of LightSquared's interference issues in connection with their investment and attempts to acquire LightSquared.  Nevertheless, aware of Peters' role in these proceedings and that this involvement prevented Peters from submitting evidence, Ergen and SPSO attempted to do an end-run around the criminal statute.

178.    On February 25, 2015, Ergen and SPSO sought again to do indirectly what they could not do directly, submitting the expert testimony of Peters (the "Peters Report") in the hope that testimony from a former FCC member who sat in judgment over LightSquared's technical issues would persuade the Bankruptcy Court to undervalue LightSquared's spectrum assets and rule in its favor in denying confirmation of the Second Amended Joint Plan.  Indicative of their knowledge of the restrictions on Peters from testifying as an expert, Ergen and SPSO deceitfully attempted to submit the Peters Report by submitting it under the guise of a "paper" attached as an appendix to the report of their valuation expert, James Millstein.  Ergen and SPSO relied upon portions of the Peters Report in submissions they made to the Bankruptcy Court to object to the confirmation of the Second Amended Joint Plan.

179.    The Peters Report opines on technical aspects of LightSquared's spectrum in relation to spectrum sold in other transactions and concerns the same issues pending before the FCC regarding LightSquared's ability to use its terrestrial spectrum.[9]  Specifically, the Peters

---

[9]        The United States is a party to both the FCC proceedings – through the FCC – and the Bankruptcy Proceedings, through the Office of the United States Trustee and the FCC.  The United States had a direct and substantial interest in the FCC proceeding and Bankruptcy Proceedings given the scarcity of spectrum, its status as a regulated commodity and the urgent national need to put more spectrum into use for wireless broadband use as

Report, among other things, comments on the value and impairment of LightSquared's spectrum and the likelihood of success of its plans to reconfigure its spectrum.  Peters ultimately concluded that "a small band such as LightSquared's proposed pairing . . . is unlikely to be successful in the hands of a new entrant or regional operator . . . ."  The Peters Report also opines on the likelihood of success of a petition for rulemaking currently pending before the FCC and brought while Peters was at the FCC, stating:  "[t]here are a number of complications associated with this pairing."  Ergen and SPSO knowingly and substantially assisted in Peters' preparation of the Peters Report in violation of Section 207.

180.    LightSquared moved to exclude the Peters Report on the grounds that it was not a timely submitted expert report and it violated Section 207 and the Federal Rules of Evidence.

181.    At a hearing on March 4, 2015 (the "March 4 Hearing"), the Bankruptcy Court excluded the Peters Report and Peters' testimony, ordering references to it stricken, because the submission was untimely and violated the Federal Rules of Evidence.  The Bankruptcy Court did not rule on whether the Peters Report violated Section 207.

182.    SPSO claimed at the March 4 Hearing that it had obtained clearance for Peters to testify from the FCC's General Counsel office, which upon information and belief, it received based on material misrepresentations or omissions to the FCC's General Counsel's office.  On March 6, 2015, the DOJ wrote to inform SPSO's counsel that "in light of additional information it subsequently received relating to Mr. Peters' involvement with LightSquared while he worked at the FCC," the FCC was reviewing its decision to give Peters clearance to testify.  This was quickly followed by a letter on March 12, in which the DOJ warned SPSO's counsel that "[t]he FCC's [General Counsel office] is now of the opinion that 18 U.S.C. § 207 may preclude him

reflected in the FCC's National Broadband Plan.  *See generally* Federal Communications Commission, Connecting America:  The National Broadband Plan, available at http://transition.fcc.gov/national-broadband-plan/national-broadband-plan.pdf.

from appearing before the court," and reminding that "the restrictions are contained in the criminal code enforced by the [DOJ]" (the "March 12 DOJ Letter").

183.    SPSO had filed for an emergency appeal of the Bankruptcy Court's decision to exclude the Peters Report, in which they submitted the Peters Report on the District Court for the Southern District of New York's public docket.  However, they immediately withdrew the appeal upon receipt of the March 12 DOJ Letter.

184.    In deceiving the Bankruptcy Court and the District Court, Defendants used the Peters Report to object to the Second Amended Joint Plan without disclosing that (a) Peters was involved in LightSquared-related proceedings while at the FCC such that submitting the expert report was a clear violation of a federal criminal statute, 18 U.S.C. § 207, and (b) Defendants' expert concealed information to mislead the FCC into granting permission to submit the Peters Report to the Bankruptcy Court.  Defendants' recent attempt to obstruct justice and improperly influence the Bankruptcy Court by illegally submitting evidence is part of their continued pattern of racketeering activity that is aimed at acquiring LightSquared's spectrum.

## VIII.   THE RICO ENTERPRISE'S MISCONDUCT DURING AUCTION 97.

185.    Auction 97, which covered 1,614 licenses in bands with similar frequencies to the spectrum owned by LightSquared, the 1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz bands (collectively, the "AWS-3" bands), began on November 13, 2014 and closed on January 29, 2015.  The auction ultimately raised a record $44.9 billion in gross winning bids for AWS-3 spectrum licenses, and consistent with their past conduct, the RICO Enterprise came to play in the mud.

186.    During the course of the auction, DISH, under the direction of Ergen, used front companies to manipulate the bidding process and obtain an unmerited discount on winning bids for spectrum licenses.  Through the extensive use of the interstate wires, DISH used the straw-

man companies American AWS-3 Wireless ("American AWS-3"), Northstar Wireless LLC

("Northstar") and SNR Wireless License Co LLC ("SNR") to place bids totaling $13.3 billion.

American AWS-3, a wholly-owned, direct subsidiary of DISH, did not win any spectrum in the

auction.  However, Northstar and SNR made $13.3 billion in gross bids with Northstar winning

345 licenses (out of 1,614) and SNR winning 357 licenses.  DISH owns an 85% interest in both

Northstar and SNR.  According to analysis by Verizon, these two DISH front companies bought

702 licenses – 44% of the total and more than any other party.

187.    Funneling its bids through these shills, DISH, with a $33 billion market cap,

applied to receive an over $3 billion taxpayer-funded discount as Northstar and SNR technically

qualified for the FCC's "designated entity" ("DE") program, which grants a 25% discount on

asset sales like Auction 97 to small businesses, rural telephone companies, and businesses owned

by minorities and women.  DISH's bad-faith conduct was characterized by FCC Commissioner

Ajit Pai as "a mockery of the [designated entity] program."  The Commissioner explained:

> Last Friday, the FCC's Wireless Telecommunications Bureau disclosed
> that two companies in which DISH Network Corp. (DISH) has an 85%
> ownership stake claimed over $3 billion dollars in taxpayer-funded
> discounts when purchasing spectrum in the AWS-3 auction.  Those
> discounts came through the FCC's designated entity (DE) program, which
> is intended to make it easier for small businesses to purchase spectrum and
> compete with large corporations.  DISH, however, has annual revenues of
> almost $14 billion, a market capitalization of over $32 billion, and over 14
> million customers.  Its participation makes a mockery of the DE program.

188.    Data produced by Verizon, T-Mobile, and AT&T to the FCC reveal that DISH

used its front companies to improperly coordinate their bids throughout the auction.  According

to T-Mobile, this coordinated bidding "had the effect of unfairly disadvantaging other bidders

and of jeopardizing the Commission's mandate to maximize the efficient use of valuable

spectrum resources."  AT&T's analysis of auction data revealed that DISH and its front

companies were "able to coordinate bidding in a way that effectively accorded them advantages

in terms of buying power, bidding eligibility and reduced exposure risk that no other bidder

could achieve."  Through its improper use of the FCC's DE program, DISH reduced auction

revenues to the government by $3.3 billion.  This enabled DISH to pay only $10.0 billion for

spectrum its front companies had won for $13.3 billion.  In reality, the front companies were

almost entirely funded by DISH, and according to a DISH Form 8-K, DISH provided

approximately 98 percent of the funding for the licenses won by SNR and Northstar.

189.    Auction data submitted to the FCC by AT&T reveals that the collusion between

DISH and its front companies occurred on thousands of bids, for hundreds of licenses,

throughout the auction process.  Bidding patterns indicated the coordinated activity went beyond

conduct engaged in by bidders that participate in bidding agreements or bidding consortia, in

which smaller bidders pool their money and form a single entity to buy spectrum.  According to

a Verizon analysis submitted to the FCC:

> the data show that DISH and the DEs frequently placed *identical* bids for
> the *same* amount on the *same* licenses.  These patterns are unlikely to have
> occurred by chance (if, for example, they were making independent
> decisions as to when, where and how much to bid).  The data also reveal
> that coordinated bidding allowed DISH to exit the auction abruptly once
> bidding reached a certain level without risk, because the DEs bid on top of
> it.  Switching licenses from DISH to its DEs not only relieved DISH of
> liability for any payments – it also reduced the group's overall payment
> liability through the use of DE bidding credits, which ultimately saved it
> (but cost taxpayers) $3.3 billion.

190.    The improper collusive bidding by DISH and its front companies deterred

competition among the bidders.  A Verizon expert concluded that "the auction data reveal

extensive evidence of collusion by DISH, Northstar and SNR, which violates antitrust law and

the Commission's rules and policies."  Among other things, Verizon presented evidence of

suppression of competitive bids, distortion of information available to other bidders, wrongful

coordination of bids, and allocation of licenses.  Verizon's analysis also found that "[i]n the

absence of competition from other bidders, Dish, Northstar, and SNR largely avoided bidding against one another," and "[w]hen other bidders dropped out, Dish and its DEs stopped bidding as well."  According to AT&T documents submitted to the FCC, DISH and its front companies used double- and triple-bidding to create a false impression that there was more competition for certain licenses than was actually the case, distorting the bidding of others in response, deterring some from bidding, and causing others to drop out.  In a submission to the FCC, Verizon noted that:

> Frequent "bid stacking" also enabled DISH and its DEs to engage in "free parking" of bidding eligibility, an advantage no other bidder enjoyed. By submitting triple bids, for example, they knew that only one of the three would risk ending up with the license – reducing their risk by two-thirds. They also gained advantages over other bidders through the Commission's random tie-breaking procedure.  Data suggest the DEs later used that eligibility to bid jointly and simultaneously on dozens of long-inactive licenses, which may have further deterred competitors. And the data indicate that the DEs' coordinated bidding enabled them to ensure that, between them, they acquired licenses in every market nationwide.

191.    Thus, during Auction 97, the RICO Enterprise, through the actions of DISH and Ergen, once again repeated their near decade-long pattern of using front companies, deceit, manipulation of legal/regulatory processes, unfair bidding practices and wrongful means to purchase spectrum assets "on the cheap" at great expense to other spectrum holders.

192.    As Ergen expected, despite the RICO Defendants' improper conduct, Auction 97 demonstrated the substantial demand for spectrum, revealing to a broad market the true value of LightSquared's spectrum assets.  The high prices paid for spectrum licenses at the auction drove the value of LightSquared's spectrum to a point beyond which Ergen was willing to pay.  No longer able to acquire LightSquared "on the cheap," the RICO Enterprise switched to an alternative plan of seeking a full payout on the account of SPSO's LP Debt holdings.

**IX.     THE RICO ENTERPRISE'S SCHEME INJURED HARBINGER.**

193.     While indirectly owning 82% of the LightSquared's common stock, Harbinger invested significant capital, labor, resources and expertise in developing LightSquared's spectrum assets and building out an ATC Network.  Harbinger entered into the Stockholders' Agreement with LightSquared and other shareholders to protect its unique interests in LightSquared, including its equity interests, and continued to augment its investment in LightSquared and expend its resources in reliance on the protections afforded by the Stockholders' Agreement.  As set forth above, the Stockholders' Agreement provided Harbinger with expansive rights with respect to LightSquared as a majority shareholder.  For example, under the Stockholders' Agreement, Harbinger had a right to:  (i) appoint and remove the majority of the LightSquared board; (ii) designate committee members; (iii) chair committees; and (iv) approve critical management business decisions through its board votes.  These contractual rights were paramount to Harbinger protecting its equity investment in LightSquared and even more so post-petition when Defendants, certain of which are direct competitors, deceptively infiltrated LightSquared's capital structure to snatch LightSquared's assets and wipe out Harbinger's equity interest.

194.     Defendants knew that removing Harbinger – the party most aware of the true value of LightSquared's assets and most concerned with maximizing LightSquared's reorganization value – both as the principal equity holder and the party with the unique contractually-created right to control the LightSquared board was essential to forcing down the price of LightSquared's assets.  Indeed, the Fraudulent Scheme required the marginalization of Harbinger from a key player in the LightSquared Bankruptcy Proceedings into just another equity holder, to ensure that its position regarding LightSquared's value appeared fanatical and ultimately would strip Harbinger of its equity holdings.

81

195.    Harbinger's equity interests in LightSquared, which carried a valuable control premium and were accompanied by valuable bargained-for contractual rights, were lost as a direct result of Defendants' wrongful and fraudulent conduct in, *inter alia*, (a) illegally purchasing the LP Debt, (b) making knowingly undervalued and illusory bids to drive a wedge between Harbinger and LightSquared to create the false appearance of conflict and to disrupt Harbinger's repeated attempts to raise a sufficient amount of capital to enable a restructuring rather than a sale of assets, (c) misrepresenting that Harbinger was conflicted by opposing what they stated was a "good faith" bid, (d) obstructing justice and engaging in bankruptcy fraud through concealing and misrepresenting material evidence related to the foregoing to prevent Harbinger from uncovering their scheme and prolong the Bankruptcy Proceeding to make reorganization difficult as LightSquared's negative cash flow weakened, (e) filing a meritless STN Motion to undermine Harbinger's reorganization efforts, and (f) fraudulently misrepresenting that there were technical problems with the spectrum assets to hinder Harbinger's ability to raise capital and/or partner with other investors to protect its investment.

196.    And, even though the Fraudulent Scheme did not result in the RICO Enterprise obtaining control of LightSquared's assets and Harbinger's statements of value were vindicated, the damages caused by Defendants' conduct still resulted in Harbinger receiving zero recovery on account of its common equity interests and lost the bargained-for control rights it once had under the Stockholders' Agreement.

197.    Ultimately, to save LightSquared and to salvage at least a portion of its investment, Harbinger supported the Second Amended Joint Plan, pursuant to which it accepted a massive reduction in its equity interests.  The fact that Harbinger was able to mitigate a portion of its damages does not detract from the substantial damages Harbinger sustained as a direct and

proximate result of Defendants' misconduct.  Upon the effective date, pursuant to the Second

Amended Joint Plan, Harbinger will receive 44.45% of the common equity of reorganized

LightSquared, but is receiving such consideration on account of its secured claim and certain

litigation claims that it agreed to contribute to the reorganized entity, and not on account of its

old common equity interests.

198.     Additionally, Defendants' actions unnecessarily prolonged the LightSquared

Bankruptcy Proceedings and, as was Defendants' goal, resulted in LightSquared incurring

billions of dollars of additional debt to successfully reorganize.  This additional debt further

subordinated Harbinger's equity interest and ultimately, upon the effective date of the Second

Amended Joint Plan, will deprive Harbinger of the rights that it once had under the Stockholders'

Agreement and the control premium it had through its ownership of the overwhelming majority

of LightSquared's common stock.  In fact, the Second Amended Joint Plan, confirmed by the

Court, states that "[t]he New LightSquared Board shall not include any Harbinger employees,

affiliates or representatives."  Absent the RICO Enterprise's egregious misconduct, Harbinger's

ownership interest and control rights would have been substantially unimpaired.  Further,

Defendants' delay cost Harbinger millions of dollars more in otherwise unnecessary legal fees.

199.     The claims asserted herein seek redress for Harbinger's own unique injuries

related to the loss of its control rights and total loss (not dilution) of its equity interests that are

separate and apart from LightSquared's injuries and have no bearing on LightSquared's estate or

other equity holders, who did not suffer the same loss of control and voting rights as Harbinger.

Harbinger also suffered unique injuries in the form of legal fees.  Harbinger is entitled to a jury

trial on its non-core claims, which involve the substantial interpretation of the federal RICO

statute that is independent of the Bankruptcy Code.  Harbinger seeks solely monetary damages

for the injuries it sustained as a result of Defendants' misconduct and does not seek to invalidate, change and/or modify any order of the Bankruptcy Court.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### RACKETEERING VIOLATION OF 18 U.S.C. § 1962(c)
### (AGAINST ALL DEFENDANTS)

200.    Plaintiffs restate each and every allegation of paragraphs 1 through 199 as if fully set forth herein.

201.    Defendants are persons as that term is defined in 18 U.S.C. § 1961(3).

202.    Between the summer of 2009 through March 2015 (the "Relevant Period"), each of Defendants and EchoStar were associated with the RICO Enterprise, which constituted an associated-in-fact "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The RICO Enterprise was engaged in, or participated in, activities which affected interstate commerce through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), and 1962(c).

203.    The common purpose of Defendants' actions in furtherance of the RICO Enterprise was to use artifice, deceit, misinformation, and dishonest means to wrest away from LightSquared the valuable wireless spectrum assets held by LightSquared while in bankruptcy, and strip Harbinger of its equity in LightSquared and the valuable rights it held pursuant to the Stockholders' Agreement.

204.    While operating outside of a unified corporate structure, each of Defendants DISH, SPSO, SO Holdings, and LBAC were, at some or all times during the Relevant Period, solely-owned or controlled by Defendant Ergen.  These Defendants, along with Ketchum and Sound Point, engaged in a coordinated effort to use criminal and deceitful means to gain an unfair strategic advantage in the Bankruptcy Proceeding to acquire LightSquared's assets for

DISH, strip Harbinger of its equity in LightSquared, and deprive it of its contractual control rights, including the right to maintain a majority of LightSquared's board seats.  By displacing Harbinger from the LightSquared board, Harbinger was unable to stop Defendants from influencing the Chapter 11 process with the goal of acquiring LightSquared's assets through wrongful means.  In exchange for fees from Ergen and the promise of a lucrative future business, the Sound Point Defendants knowingly engaged in conduct in furtherance of the RICO Enterprise by (i) executing LP Debt trades in furtherance of the scheme at the direction of the DISH Defendants; (ii) creating fronts to facilitate the illegal purchases of the LP Debt; (iii) assisting to manipulate the closing of hundreds of millions of LP Debt trades; (iv) communicating false and deceitful representations to counterparties and UBS; and (v) providing false testimony in the Bankruptcy Proceeding.

205.    The association-in-fact enterprise has had sufficient longevity to allow Defendants to pursue the RICO Enterprise's purpose, including through, among others, the following actions:  (1) acquiring DBSD's spectrum assets and the LP Debt in bad faith; (2) tracking LightSquared's movement towards bankruptcy as a possible acquisition target for DISH; (3) forming the undercapitalized entities, Bal Harbour and SPSO, to knowingly conceal the true source of the LP Debt purchases to circumvent the transfer restrictions in the Credit Agreement; (4) purchasing the LP Debt in breach of the Credit Agreement; (5) acting as a competitor rather than an ordinary creditor in voting against an amendment that would have allowed LightSquared to avoid bankruptcy; (6) making the LBAC and Stalking Horse Bids for LightSquared's assets for far less than they are worth to gain the allegiance of the Ad Hoc Secured Group; (7) concealing and misrepresenting the sufficiency of the LBAC and Stalking Horse Bids in order to claim that Harbinger was breaching its fiduciary duties and strip

Harbinger of its right to control LightSquared's board and committees; (8) terminating the Stalking Horse Bid under false pretenses in order to obtain an even lower price for LightSquared's assets for DISH; (9) obstructing justice in the Bankruptcy Proceeding through (a) bankruptcy fraud, (b) violating the Exclusivity Order, (c) lying under oath, (d) misrepresenting to the Bankruptcy Court the existence of a conflict by virtue of Harbinger's opposition to their "good faith bid," (e) withholding material evidence, and (f) causing a former-FCC official to illegally submit evidence in violation of a criminal federal statute, and mislead the FCC to wrongfully obtain clearance, all in order to influence the Bankruptcy Court's valuation of LightSquared's spectrum and prevent the confirmation of LightSquared's Second Amended Joint Plan; and (10) engaging in wire fraud and wrongful and corrupt bidding practices to undermine the bidding process during the FCC's Auction 97 in order to acquire spectrum at less than fair value.

206.    As set forth above, while participating in the conduct of the RICO Enterprise, Defendants have undertaken actions with same or similar purposes, results, participants, victims, and methods.  DISH used the interstate mails and/or wires in furtherance of a deceitful scheme to defeat a reorganization plan that would have permitted DBSD to emerge from bankruptcy so that DISH could purchase DBSD's assets in liquidation for less than their fair market value.  With respect to LightSquared, the participants in the RICO Enterprise (which had grown in size since the DBSD misconduct to include Ergen, SPSO, LBAC, Sound Point, and Ketchum) also committed wire and mail fraud, bankruptcy fraud, and obstruction of justice to (a) obtain a majority of LightSquared's LP Debt and thereby control of LightSquared's bankruptcy proceeding, (b) strip Harbinger of its rights under the Stockholders' Agreement by making false bids for LightSquared's assets and then claiming that Harbinger was in breach of its fiduciary

duties by opposing the bids, despite knowing that the value of LightSquared's assets far exceeded the bids, and (c) attempt to influence the Bankruptcy Court into undervaluing LightSquared's spectrum assets so as to defeat confirmation of the plan and push LightSquared into liquidation.  With respect to Auction 97, the RICO Enterprise, through the actions of DISH and Ergen, engaged in wire fraud to undermine the bidding process in order to acquire spectrum at less than fair value.  The racketeering activity of the RICO Enterprise consisted of multiple, related acts perpetrated during the Relevant Period that are within the scope of 18 U.S.C. §§ 1961(1)(B) and (5).

207.    Defendants' misconduct carries the threat of continuing wrongdoing extending indefinitely into the future.  DISH is in the business of, among other things, acquiring spectrum assets, including through the bankruptcy process, and admits that it will continue to acquire more spectrum assets in the future.  As a matter of the routine conduct of their businesses, the DISH Defendants have engaged in systematic and ongoing misconduct, including undermining the FCC auction process and manipulating the bankruptcy process to acquire spectrum, including through the use of wire fraud, bankruptcy fraud, and obstruction of justice in the underlying bankruptcy proceedings.  There is a substantial threat that these Defendants will continue these practices into the future beyond the LightSquared bankruptcy given their past practices and their admitted desire to acquire more spectrum assets.

208.    Additionally, Defendants have engaged in a series of related acts of misconduct, including wire and mail fraud, bankruptcy fraud, and obstruction of justice extending over several years.  In furtherance of the RICO Enterprise, DISH first engaged in wire fraud during the summer of 2009 in furtherance of a scheme to wrongfully prevent DBSD from emerging from bankruptcy.  Similarly, in December 2011, the DISH Defendants used the wires to

communicate concerning the creation of Bal Harbour – a front used to deceitfully and illegally purchase the LP Debt.  Beginning in at least as early as January 2012, the DISH Defendants tracked LightSquared's progress in bankruptcy via the wires.  Defendants thereafter engaged in a continuous series of actions constituting racketeering activity, including acts in violation of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 152 (bankruptcy fraud), and 18 U.S.C. § 1503 (obstruction of justice).  These ongoing acts of malfeasance extend at least as far as March 4, 2015, when Defendant SPSO advocated for the Bankruptcy Court's consideration of the illegal Peters Report, which was submitted to influence and undermine the plan confirmation process.

209.    Each Defendant acted in violation of the federal wire fraud statute (18 U.S.C. § 1343) when they used the interstate wires to engage in communications in furtherance of their Fraudulent Scheme to use artifice, fraud, and deceit to prevent LightSquared's emergence from bankruptcy in order to purchase its spectrum assets at below market value, and to strip Harbinger of its equity in LightSquared and its valuable rights under the Stockholders' Agreement.  It was reasonably foreseeable that the wires would be used to execute the Fraudulent Scheme.  As the RICO Enterprise's goal was to obtain LightSquared's valuable spectrum rights and deprive Harbinger of its equity and its contractual control rights, the Fraudulent Scheme involved money or property as its object.  As there are numerous communications within the exclusive control of Defendants which reveal Defendants' use of the mail and wires in furtherance of the Fraudulent Scheme, the Plaintiffs do not have access to all those communications.  The following table sets forth some of the communications via interstate wires used by Defendants in furtherance of their scheme, and Plaintiffs allege, including upon information and belief as to matters peculiarly within Defendants' knowledge, the following acts of wire fraud:

| Table 1 | | | |
|---|---|---|---|
| **Acts of Wire and Mail Fraud** | | | |
| **DATE** | **FROM** | **TO** | **DESCRIPTION** |
| Approximately Spring to Summer 2009 | Ergen | DISH board | Ergen used the wires to state or cause to be stated, regarding DBSD, that "[w]e believe there is a strategic opportunity to obtain a blocking position in a second priority convertible note and control the bankruptcy process for this potentially strategic asset. And we are seeking board approval to invest up to an incremental one hundred million to purchase securities necessary to gain control of the unsecured impaired class," in furtherance of their fraudulent scheme to acquire DBSD's assets. |
| Approximately Spring to Summer 2009 | Ergen | DISH board | Ergen used the wires to state or cause to be stated, regarding DBSD that "[w]e believe there is a strategic opportunity to obtain the remaining convertible bonds outstanding in an attempt to convert to equity and acquire control of ICO North America. . . . We are seeking board approval for up to [$200M] to acquire the remaining convertible bonds outstanding and establish control of this strategic asset," in furtherance of their fraudulent scheme to acquire DBSD's assets. |
| In or around July 2009 | Ergen and DISH | DISH's counsel, the parties, and the court | Ergen and DISH used the wires to instruct their counsel to send via electronic filing an objection to a DBSD plan in which counsel stated that DISH was a "model bankruptcy citizen" and that "it has not moved to terminate exclusivity, and it has not proposed a competing plan," despite the fact that it was planning to and did in fact do both of these soon after, in furtherance of their fraudulent scheme to acquire DBSD's assets. |
| On or around July 6, 2009 | Ergen and DISH | Canpartners Investments IV, LLC, HB Regas, Inc., and Special Situations Investing Group, Inc. | Ergen and DISH used the wires to instruct, either through counsel or directly, the former holders of DBSD's first lien claims to make objections to the DBSD plan as a condition precedent to DISH and Ergen's purchase of those claims, and those holders foreseeably did use the wires to object to the DBSD plan, in furtherance of Ergen and DISH's fraudulent scheme to acquire DBSD's assets. |
| July 9, 2009 | Ergen and DISH | Canpartners Investments IV, LLC, HB Regas, Inc., and Special Situations | Ergen and DISH used the wires to purchase the first lien debt of DBSD in furtherance of their fraudulent scheme to acquire DBSD's assets. |

| Table 1 | | | |
| **Acts of Wire and Mail Fraud** | | | |
| **DATE** | **FROM** | **TO** | **DESCRIPTION** |
| | | Investing Group, Inc. | |
| On or around September 21, 2009 | Ergen and DISH | DISH's counsel, the parties, and the court | Ergen and DISH used the wires to instruct their counsel to send via electronic filing a motion to terminate DBSD's exclusivity period and for authority to propose a competing plan in furtherance of their fraudulent scheme to acquire DBSD's assets. |
| November 2009 | Ergen and DISH | DBSD parties and the court | Ergen and DISH used the wires to seek to terminate the exclusivity period in furtherance of their fraudulent scheme to obtain DBSD's assets. |
| Various dates from June 2011 through April 13, 2012 | Thomas Cullen (DISH) | Jason Kiser and Charles Ergen | Cullen used the wires to monitor news stories related to LightSquared and reported on those events to Ergen and Kiser. |
| Fall 2011 | Charles Ergen | Jason Kiser (DISH) | At Ergen's request, through the use of the wires, Kiser compiled information on LightSquared's spectrum and capital structure, which he shared with Ergen. |
| Fall 2011 | Jason Kiser (DISH) | The Sound Point Defendants | Kiser at Ergen's request, used the wires to retain Sound Point to facilitate purchases of the LP Debt and asked Sound Point's founder, Ketchum if DISH was permitted to purchase the LP Debt. |
| Fall 2011 | Jason Kiser (DISH) | Sullivan & Cromwell LLP (counsel to DISH) | Kiser used the wires to consult with Sullivan & Cromwell LLP in New York to determine whether DISH could purchase the LP Debt. |
| Fall 2011 | Jason Kiser (DISH) | The Sound Point Defendants | Kiser used the wires to ask the Sound Point Defendants to monitor the prices and volume of the LP Debt despite the transfer restrictions, and Sound Point communicated the information to Kiser via the wires. |
| November 14, 2011 | Jason Kiser (DISH) | Mark Jackson (EchoStar) | Kiser had Mark Jackson, the President of EchoStar Technologies L.L.C., sign and mail a non-disclosure agreement with Jefferies related to acquiring confidential information about LightSquared. |
| December 21, 2011 | Jason Kiser (DISH) | The Sound Point Defendants | Kiser used the wires to instruct the Sound Point Defendants to create a new special purpose vehicle to purchase the LP Debt. |
| Early 2012 to May 14, 2012 | Stephen Ketchum (Sound Point) | Jason Kiser (DISH) | Throughout early 2012, Ketchum used the wires to keep Kiser apprised of LightSquared's progress towards bankruptcy. |
| February 20, 2012 | Thomas Cullen (DISH) | Jason Kiser (DISH) & | On February 20, 2012, Cullen emailed Ergen and Kiser an article on LightSquared's default |

| Table 1 | | | |
|---|---|---|---|
| **Acts of Wire and Mail Fraud** | | | |
| **DATE** | **FROM** | **TO** | **DESCRIPTION** |
| | | Charles Ergen | on $56 million payment to Inmarsat, monitoring for an opportunity to execute the Fraudulent Scheme. |
| Various dates from April 13, 2012 through April 26, 2013 | The Sound Point Defendants on behalf of the RICO Enterprise | UBS | SPSO repeatedly used the wires to deceitfully and illegally acquire the LP Debt by representing that it was an "Eligible Assignee" in each Assignment and Assumption agreement that SPSO submitted to UBS in connection with its LP Debt purchases and specifically identified individuals to receive confidential information. |
| Various dates from April 13, 2012 through May 21, 2013 | Rachel Strickland (Willkie) | Mark Hootnick (Moelis) | Counsel for SPSO at the implicit or explicit instruction of Ergen via the wires was instructed to conceal, by use of the wires, Ergen's involvement from LightSquared's financial advisor Hootnick. |
| Various dates from April 13, 2012 through July 2013 | Jason Kiser (DISH and SPSO) and Stephen Ketchum (Sound Point) | Various trade counterparties | At the instruction of Kiser via the wires, Sound Point and Ketchum repeatedly used the wires to make misrepresentations and rebuff requests by SPSO's counterparties to settle the hundreds of millions of dollars in open LP Debt trades. |
| April 17, 2012 | Steven Ketchum (Sound Point) | Jason Kiser (DISH) | On April 17, 2012, in connection with executing the purchases of LP Debt, Ketchum emailed Kiser that, "[w]e need to get the Citi account open for BH Holdings and get $500,000 in the account before we do any more LightSquared trades." |
| April 27, 2012 | Thomas Cullen (DISH) | Jason Kiser (DISH) | Cullen emailed Kiser enclosing a *Wall Street Journal* article discussing bankruptcy as an imminent possibility, monitoring for an opportunity to execute the Fraudulent Scheme. |
| April 30, 2012 | Jason Kiser (DISH) | Charles Ergen | Kiser emailed Ergen enclosing a *Wall Street Journal* article discussing Mr. Falcone's attempt to get a one-week "extension on default," monitoring for an opportunity to execute the Fraudulent Scheme. |
| Various dates from May 2012 to July 2013 | Jason Kiser (DISH) | Bear Creek Asset Management | With the closing of each trade, Kiser used the wires to contact Bear Creek to tell it how much money was needed to close the trade, and at the behest of Ergen, Bear Creek, as Defendants could foresee, used the wires to liquidate investments and wire the funds to Sound Point. |
| May 2, 2012 | Stephen Ketchum (Sound Point) | Sound Point | Ketchum used the wires to arrange for purchases of LP Debt on behalf of SPSO and coordinate with another Sound Point employee |

| Table 1 | | | |
|---|---|---|---|
| Acts of Wire and Mail Fraud | | | |
| DATE | FROM | TO | DESCRIPTION |
| | | | to ensure that SPSO's identity remain secret. |
| May 3, 2012 | Sound Point | Stephen Ketchum (Sound Point) | Sound Point employees used the wires to discuss the risk of Ergen's identity being revealed through Bal Harbour's trade documentation. |
| May 4, 2012 | Jason Kiser (DISH) | The Sound Point Defendants | Kiser used the wires, at Ergen's instructions, to direct Ketchum to vote no on the extension for negotiations to avoid LightSquared's bankruptcy per Ergen's instructions, which direction Ketchum executed via the wires. |
| May 5, 2012 | Stephen Ketchum (Sound Point) | Jason Kiser (DISH) | Ketchum used the wires to strategize with Kiser with regard to inquiries from the press concerning SPSO's LP Debt purchases. |
| May 7, 2012 | Stephen Ketchum (Sound Point) | Jason Kiser (DISH) | Ketchum used the wires to strategize with Kiser with regard to inquiries from the press concerning SPSO's LP Debt purchases, and rumors that Ergen was behind those purchases. |
| May 9, 2012 | Stephen Ketchum (Sound Point) | Jason Kiser (DISH) | Ketchum used the wires to notify Kiser that DISH and others had been added to the Disqualified Company list of the Credit Agreement, but that Ergen personally had not been named. |
| May 10, 2012 | Stephen Ketchum (Sound Point) | Jason Kiser (DISH) | Ketchum used the wires to notify Kiser that the definition of "Disqualified Company" in the Credit Agreement included "any known subsidiary thereof." |
| May 2012 | Jason Kiser (DISH) | The Sound Point Defendants | Kiser used the wires to direct the Sound Point Defendants to create new SPVs to replace Bal Harbour after realizing Bal Harbour could be traced back to Colorado. |
| May 11, 2012 | Stephen Ketchum (Sound Point) | Jason Kiser (DISH) | Ketchum used the wires to suggest to Kiser that the new entity's name be SP Special Opportunities, LLC – a name suggesting Sound Point ownership. |
| May 16, 2012 | Jason Kiser (DISH) | The Sound Point Defendants | Kiser used the wires to direct the Sound Point Defendants to set up SPSO and SO Holdings. |
| May 2012 | Jason Kiser (DISH) | Charles Ergen | Kiser, Ketchum, and Ergen used the wires to strategize on how best to conceal the source of the trades, with Ketchum stating that "[t]here might just be a lot of people fishing all over the place based on speculation (they're [sic] weren't a lot of other logical buyers)." |
| October 4, 2012 | Charles Ergen | Jason Kiser (DISH) | Ergen used the wires to direct Kiser to purchase LP Debt sufficient to establish a blocking position for SPSO. |
| December 6, 2012 | Charles Ergen and DISH | Clearwire | Ergen and DISH used the wires or mail to preliminarily and deceptively propose an |

| Table 1 Acts of Wire and Mail Fraud | | | |
|---|---|---|---|
| **DATE** | **FROM** | **TO** | **DESCRIPTION** |
| | | | acquisition of certain Clearwire spectrum assets in furtherance of their fraudulent scheme to acquire Clearwire's spectrum assets. |
| December 12, 2012 | Charles Ergen and DISH | Clearwire | Ergen and DISH used the wires or mail to deceptively propose an acquisition of certain Clearwire spectrum assets in furtherance of their fraudulent scheme to acquire Clearwire's spectrum assets. |
| December 28, 2012 | Charles Ergen and DISH | Clearwire | Ergen and DISH used the wires or mail to deceptively present a revised non-binding proposal for an acquisition of certain Clearwire spectrum assets and illegal tender offer for Clearwire's stock to induce stockholders into voting down the merger in furtherance of their fraudulent scheme to acquire Clearwire's spectrum assets. |
| January 11, 2013 | Charles Ergen and DISH | Clearwire | Ergen and DISH used the wires or mail to deceptively present a revised non-binding proposal for an acquisition of certain Clearwire spectrum assets and illegal tender offer for Clearwire's stock to induce stockholders into voting down the merger in furtherance of their fraudulent scheme to acquire Clearwire's spectrum assets. |
| February 8, 2013 | Charles Ergen and DISH | Clearwire | Ergen and DISH used the wires or mail to deceptively present a revised non-binding proposal for an acquisition of certain Clearwire spectrum assets and illegal tender offer for Clearwire's stock to induce stockholders into voting down the merger in furtherance of their fraudulent scheme to acquire Clearwire's spectrum assets. |
| February 25, 2013 | Charles Ergen and DISH | Clearwire | Ergen and DISH used the wires or mail to deceptively present a revised highly conditional proposal for an acquisition of certain Clearwire spectrum assets and illegal tender offer for Clearwire's stock to induce stockholders into voting down the merger in furtherance of their fraudulent scheme to acquire Clearwire's spectrum assets. |
| Various dates from January 14, 2013 to May 9, 2013 | Sound Point | UBS | Sound Point made repeated misrepresentations through the wires to SPSO's trade counterparties in order to delay closing on SPSO's LP Debt trades. |

| Table 1 | | | |
| --- | --- | --- | --- |
| **Acts of Wire and Mail Fraud** | | | |
| **DATE** | **FROM** | **TO** | **DESCRIPTION** |
| February 12, 2013; April 4, 2013 | Sound Point | Stephen Ketchum (Sound Point) | Sound Point employees used the wires to strategize on how to achieve stalking horse bidder status for Ergen. |
| April 25, 2013 | The Sound Point Defendants | Jefferies | Sound Point used the wires to conceal the reason for delayed trades to Jefferies. |
| April-May 2013 | The Sound Point Defendants | Jefferies | Sound Point used the wires to falsely claim to Jefferies that they are "still waiting on the funds" as a pretext for intentionally delaying the closure of trades. |
| Various dates from May 2013 onward | The RICO Enterprise | The RICO Enterprise | The RICO Enterprise used the wires to conspire to conceal the Valuation Materials. |
| May 2, 2013 | Charles Ergen | DISH Board of Directors | Ergen used the wires to transmit a presentation to DISH setting forth his strategy for acquiring LightSquared's assets using as leverage his recent acquisition of significant amounts of LP Debt and LP Preferred Equity in breach of their governing agreements. |
| May 23-29, 2013 | Charles Ergen and DISH | Clearwire | DISH and Ergen used the wires to secretly acquire shares of Clearwire stock in furtherance of their fraudulent scheme to acquire Clearwire's spectrum assets. |
| May 29, 2013 | Charles Ergen and DISH | Clearwire | Ergen and DISH used the wires and mail to deceptively present an illegal tender offer for Clearwire in furtherance of their fraudulent scheme to acquire Clearwire's spectrum assets. |
| June 12, 2013 | Charles Ergen and DISH | Clearwire | Ergen and DISH used the wires and mail to deceptively extend their illegal tender offer for Clearwire in furtherance of their fraudulent scheme to acquire Clearwire's spectrum assets. |
| June 2013 | The RICO Enterprise | The RICO Enterprise | In June 2013, the RICO Enterprise conspired, using the wires, to join the Ad Hoc Secured Group to avoid termination of the exclusivity period, after frustrating its provisions, in violation of the Exclusivity Order. |
| June-July 2013 | The RICO Enterprise | The Ad Hoc Secured Group | The RICO Enterprise induced the Ad Hoc Secured Group to negotiate a plan based on the RICO Enterprise's misrepresentations regarding the viability and intent to consummate the LBAC and Stalking Horse Bids. |
| June-September 2013 | The RICO Enterprise | Willkie | The RICO Enterprise instructed counsel via use of the wires to argue that Harbinger was conflicted, and counsel used the wires to |

| DATE | FROM | TO | DESCRIPTION |
|---|---|---|---|
| | | | **Table 1** |
| | | | **Acts of Wire and Mail Fraud** |
| **DATE** | **FROM** | **TO** | **DESCRIPTION** |
| | | | repeat this misrepresentation to the parties and the Bankruptcy Court. |
| June-September 2013 | The RICO Enterprise | Harbinger, LightSquared, the Ad Hoc Secured Group, the parties to the Bankruptcy Court | The RICO Enterprise used the wires to misrepresent that Harbinger was conflicted. |
| July 3, 2013 | Charles Ergen | Steve Goodbarn (Special Committee), Gary Howard (Special Committee), and David Moskowitz (DISH) | On July 3, 2013, Ergen used the wires to transmit to Messrs. Goodbarn, Howard, and David Moskowitz, an in-house attorney and a Senior Vice President for DISH and EchoStar, the Ergen July 8 Presentation setting forth the true value of LightSquared's assets. |
| July 9, 2013 | SPSO | Harbinger | On July 9, 2013, SPSO, at the direction of Ergen via the wires, used the wires to transmit the "SPSO Stipulation" stating that "the timing of closing of each of SPSO's acquisitions of Prepetition LP Obligations was primarily driven by the sellers of such claims." A prior July 3, 2013 stipulation, which was modified and amended by the SPSO Stipulation, had stated that "SPSO's trade counterparties did not request that SPSO settle or close the trades for several months" and that "SPSO and Ergen took no action to delay" the closing of any of the trades. |
| July 9, 2013 | SPSO | Harbinger | SPSO further represented "LightSquared [was not] governed by a typical, non-conflicted fiduciary. . . . Were a non-conflicted fiduciary in charge of the LP estates, litigation and protracted negotiations would not have been required to induce the LP Debtors to maximize the value of its estates for the benefit of their stakeholders." |
| Various dates through July 23, 2013 | The Sound Point Defendants | Ergen, DISH, LBAC, and SPSO | The Sound Point Defendants used the wires to advise the RICO Enterprise about placing the LBAC and Stalking Horse Bids in furtherance of the Fraudulent Scheme. |
| July 2013 | SPSO | Charles Ergen | SPSO instructed Ergen to sell LBAC to DISH for $1. |
| July 23, 2013 | DISH | | On July 23, 2013, DISH used the wires to announce its intention to place the Stalking Horse Bid. |

| Table 1 Acts of Wire and Mail Fraud | | | |
|---|---|---|---|
| **DATE** | **FROM** | **TO** | **DESCRIPTION** |
| July 23, 2013 | DISH | | On July 23, 2013, DISH used the wires to announce that it had executed a Plan Support Agreement, pursuant to which LBAC would act as the stalking horse bidder. |
| August 6, 2013 | Charles Ergen | | Ergen used the wires during a DISH earnings call to state that the Stalking Horse Bid was beneficial to DISH such that DISH intended to pursue it. |
| Fall 2013 | Charles Ergen and SPSO | Steven Zelin (Blackstone) | Counsel for SPSO used the wires, at Ergen and SPSO's instructions via the wires, to warn LightSquared's financial advisor, Zelin, that Ergen would walk away from the bid if there were no other bidders, to gain further leverage in negotiations with LightSquared. |
| January 9, 2014 | DISH and LBAC | The Ad Hoc Secured Group | DISH, by use of the wires, terminated the Stalking Horse Bid falsely citing a purported "technical issue." |
| Various dates between November 13, 2014 and January 29, 2015 | American AWS-3 (Charles Ergen, Jeffery Blum, and Thomas Cullen of DISH) | The FCC | Submitted bids using electronic means during Auction 97, and colluded with the other DISH-DEs regarding bid strategy. |
| Various dates between November 13, 2014 and January 29, 2015 | SNR (John Muleta of Atelum LLC, Nathaniel Klipper of SDK Spectrum GP, and Patrick Q Riordan of Blackrock Inc) at the Direction of Ergen and DISH | The FCC | Submitted bids using electronic means during Auction 97, and colluded with the other DISH-DEs regarding bid strategy. |
| Various dates between November 13, 2014 and January 29, 2015 | Northstar (officers/employees of Doyon, Limited) at the Direction of Ergen and DISH | The FCC | Submitted bids using electronic means during Auction 97, and colluded with the other DISH-DEs regarding bid strategy. |

210.    During the Relevant Period, Defendants also engaged in bankruptcy fraud as

codified in 18 U.S.C. § 152.  At the direction of the DISH Defendants, Sound Point and Ketchum

purposefully delayed the closing of trades to interfere with the provision of the Exclusivity Order requiring good faith negotiations and then SPSO later joined the Ad Hoc Secured Group to preserve its majority and uphold the sale provisions, violating the Exclusivity Order. Additionally, Defendants knowingly and fraudulently made misrepresentations in filings and made false oaths or accounts in the Adversary Proceeding, when they lied under oath during critical trial testimony concerning, *inter alia*:  (i) the reasons for delaying the closing of the LP Debt trades, which were, in fact, purposely delayed in order to obstruct critical plan negotiations during LightSquared's exclusivity period; (ii) the circumstances surrounding SPSO's vote against a forbearance agreement that would have forestalled LightSquared's bankruptcy; (iii) Defendants' involvement in the manipulation of the closing of the LP Debt trades; (iv) Defendants' reasons for terminating the Stalking Horse Bid; and (v) the validity of the LBAC and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee.

211.    Defendants obstructed justice during the Bankruptcy Proceedings in violation of 18 U.S.C. § 1503.  With the intent of interfering with critical plan negotiations and confirmation, and driving a wedge between Harbinger and the Ad Hoc Secured Group, Defendants purposefully delayed the closing of trades in LP Debt, violated the Exclusivity Order and misrepresented the adequacy of the LBAC and Stalking Horse Bids, and submitted the illegal Peters Report to influence the Bankruptcy Proceedings.  Defendant DISH also failed to produce critical Valuation Materials until after the close of evidence in the Adversary Proceeding. During the course of the Bankruptcy Proceeding, in which each of them was a participant as a Defendant and/or a witness, Defendants, with the intent or purpose of influencing the outcome of the Adversary Proceeding in favor of Defendants in that proceeding, affirmatively lied, or

presented one or more witnesses who lied, under oath and engaged in "a troubling pattern of noncredible testimony."  Defendants' witnesses proffered false testimony under oath during the Adversary Proceeding and Bankruptcy Proceeding concerning (i) Ergen's motivation for purchasing the LP Debt and the circumstances surrounding Ergen and Kiser's LP Debt purchases; (ii) the reason for Ergen voting against a forbearance agreement in May 2012 that would forestall LightSquared's bankruptcy filing; (iii) Defendants' role in manipulating the closing of the LP Debt trades; (iv) Defendants' reasons for terminating the Stalking Horse Bid; and (v) the validity of the LBAC and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee.  Defendants also obstructed justice in the Bankruptcy Proceeding by causing a former-FCC official to submit the Peters Report concealing that it was  (a) submitted in violation of a criminal federal statute and (b) permitted post-hoc by the FCC based on misrepresentations regarding Peters' involvement in LightSquared matters while at the FCC, all to influence the Bankruptcy Court's valuation of LightSquared's spectrum and prevent the confirmation of LightSquared's Second Amended Joint Plan.

212.    Each of the instances of mail and wire fraud, bankruptcy fraud, and obstruction of justice detailed in this Complaint constitutes a predicate act of racketeering activity because each act furthered and executed the Fraudulent Scheme.

213.    It was specifically intended and foreseen by Defendants that the RICO Enterprise would engage in and conduct activities that affected interstate commerce.  The pattern of racketeering consisted of multiple acts of racketeering by each of Defendants.  The activities of the RICO Enterprise were interrelated, not isolated, and were perpetrated for the same or similar purposes.  The activities extended for several years, up to at least March 4, 2015, when

Defendants advocated for the Bankruptcy Court's consideration of the illegal Peters Report, which was submitted to influence and undermine the plan confirmation process.

214.    Harbinger has been injured in its business and property as a direct and proximate cause of Defendants' violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above.  Defendants' misconduct directly caused Harbinger's injury by: stripping it of its equity in LightSquared and depriving Harbinger of its bargained for rights under the Stockholders' Agreement, including in particular, its ability to appoint and remove a majority of LightSquared's board, ability to designate and chair committees, and direct certain management decisions.

215.    As a result of the actions undertaken by and among Defendants to violate 18 U.S.C. § 1962(c), pursuant to 18 U.S.C. § 1964(c), Harbinger is entitled to recover its general and special compensatory damages of not less than $1.5 billion, plus trebling, interest, costs, and attorneys' fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(c).

**SECOND CAUSE OF ACTION**
**RACKETEERING VIOLATION OF 18 U.S.C. § 1962(d)**
**(AGAINST ALL DEFENDANTS)**

216.    Plaintiffs restate each and every allegation of paragraphs 1 through 215 as if fully set forth herein.

217.    During the Relevant Period, Defendants knowingly conspired together to violate 18 U.S.C. § 1962(c) through the conduct, or participation – directly or indirectly – in the conduct, of the RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), and 1962(c) and (d).

218.    In furtherance of the conspiracy and to effectuate its objectives, each of Defendants agreed that the following predicate acts, among others, would be committed by one or more of the members of the conspiracy:  wire fraud in violation of 18 U.S.C. § 1343,

bankruptcy fraud in violation of 18 U.S.C. § 152, and obstruction of justice in violation of 18 U.S.C. § 1503.

219.    Specifically, Defendants agreed to use wire fraud, among other things, to: (i) acquire DBSD's spectrum assets and the LP Debt in bad faith; (ii) track LightSquared's movement towards bankruptcy as a possible acquisition target for DISH; (iii) form the undercapitalized entities, Bal Harbour and SPSO, to knowingly conceal the true source of the LP Debt purchases to circumvent the transfer restrictions in the Credit Agreement; (iv) purchase the LP Debt for the benefit of a Disqualified Company under the Credit Agreement; (v) act as a competitor rather than an ordinary creditor in voting against an amendment that would have allowed LightSquared to avoid bankruptcy; (vi) make the LBAC and Stalking Horse Bids for LightSquared's assets for far less than they are worth to influence the Chapter 11 process and gain the allegiance of the Ad Hoc Secured Group; (vii) conceal and misrepresent the sufficiency of the LBAC and Stalking Horse Bids in order to claim that Harbinger was breaching its fiduciary duties and strip Harbinger of its contractual right to control LightSquared's board and committees; (viii) terminate the Stalking Horse Bid under false pretenses in order to obtain an even lower price for LightSquared's assets for DISH; (ix) illegally submit expert evidence; and (x) engage in wrongful and corrupt bidding practices to undermine the bidding process during the FCC's Auction 97 in order to acquire spectrum at less than fair value.

220.    Defendants also agreed to use bankruptcy fraud, among other things, to: (i) purposefully delay the closing of trades and join the Ad Hoc Secured Group; (ii) file false representations in the Bankruptcy Court; (iii) knowingly misrepresent the validity of the LBAC and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee; (iv) lie under oath during

critical trial testimony during the Bankruptcy Proceeding; (v) violate the Exclusivity Order; and (vi) cause a former FCC official to illegally submit evidence in violation of a criminal federal statute to influence the Bankruptcy Court's valuation of LightSquared's spectrum and prevent the confirmation of LightSquared's Second Amended Joint Plan.

221.    Additionally, Defendants agreed to use obstruction of justice, among other things, to:  (i) delay the closing of trades and then later join the Ad Hoc Secured Group to interfere with Harbinger's relationship with the Ad Hoc Secured Group and create a false appearance of conflict; (ii) provide false testimony in the Bankruptcy Proceeding, including regarding the existence of a conflict; (iii) fail to produce material documents, including the Valuation Materials, in that proceeding; (iv) make false statements about the validity of the LBAC and Stalking Horse Bids to influence the Chapter 11 process; (v) violate the Exclusivity Order; and (vi) submit the illegal Peters Report to influence the Bankruptcy Proceedings.

222.    These predicate acts were performed at the direction of, and/or were foreseeable to, Defendants, and conducted for the purpose of using subterfuge, deceit, misinformation, and dishonest means to acquire LightSquared's spectrum assets.

223.    Defendants committed and caused to be committed a series of overt predicate acts of racketeering in furtherance of the conspiracy, including but not limited to the acts described in this Complaint.  The racketeering activity of the RICO Enterprise consisted of multiple, related acts perpetrated during the Relevant Period that are within the scope of 18 U.S.C. §§ 1961(1)(B) and (5).

224.    Defendants acted in violation of the federal wire fraud statute (18 U.S.C. § 1343) when they used the interstate wires to engage in communications in furtherance of a scheme to use artifice, fraud, and deceit to prevent LightSquared's emergence from bankruptcy in order to

purchase its spectrum assets at below market value.  It was reasonably foreseeable that the wires would be used to execute the Fraudulent Scheme.  As the RICO Enterprise's goal was to obtain LightSquared's valuable spectrum rights and strip Harbinger of its equity in LightSquared and deprive it of its rights under the Stockholders' Agreement, the Scheme involved money or property as its object.  As detailed in Table 1 above, each of Defendants engaged in multiple acts of wire fraud to:  (i) foster the creation of SPVs to be used as subterfuge to acquire the LP Debt; (ii) deceitfully represent that SPSO was an Eligible Assignee of the LP Debt when in fact, its purchases were undertaken to benefit Disqualified Companies; (iii) communicate with counterparties to the LP Debt purchases or their representatives, and as part of those communications, use deceit to disguise that SPSO's purchases of the LP Debt were for the benefit of LightSquared's and Harbinger's competitor, DISH; (iv) monitor and execute improper trades of the LP Debt; (v) acquire a blocking position in the LP Debt to benefit a Disqualified Company; (vi) transfer funds to support the improper trades; (vii) submit the LBAC and Stalking Horse Bids for LightSquared's assets in order to take advantage of SPSO's wrongfully-obtained blocking position and gain the support of the Ad Hoc Secured Group; (viii) knowingly misrepresent the validity of the LBAC and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee; (ix) withdraw the Stalking Horse Bid in an effort to destabilize the sale process and, ultimately, permit DISH to obtain LightSquared's assets at an even lower price; and (x) engage in wrongful and corrupt bidding practices to undermine the bidding process during the FCC's Auction 97 in order to acquire spectrum at less than fair value.  As there are numerous communications within the exclusive control of Defendants, which reveal Defendants' use of the

mail and wires in furtherance of the Fraudulent Scheme, the Plaintiffs do not have access to all those communications.

225.    During the Relevant Period, Defendants also engaged in bankruptcy fraud as codified in 18 U.S.C. § 152.  At the direction of the DISH Defendants, Sound Point and Ketchum purposefully delayed the closing of trades to interfere with the provision of the Exclusivity Order requiring good faith negotiations and then SPSO later joined the Ad Hoc Secured Group to preserve its majority and uphold the sale provisions, violating the Exclusivity Order. Additionally, Defendants knowingly and fraudulently made misrepresentations in filings and made false oaths or accounts in the Adversary Proceeding when they lied under oath during critical trial testimony concerning, *inter alia*:  (i) the reasons for delaying the closing of the LP Debt trades, which were, in fact, purposely delayed in order to obstruct critical plan negotiations during LightSquared's exclusivity period; (ii) the circumstances surrounding SPSO's vote against a forbearance agreement that would have forestalled LightSquared's bankruptcy; (iii) Defendants' involvement in the manipulation of the closing of the LP Debt trades; (iv) Defendants' reasons for terminating the Stalking Horse Bid; and (v) the validity of the LBAC and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee.

226.    Defendants also obstructed justice during the Bankruptcy Proceedings in violation of 18 U.S.C. § 1503.  With the intent of interfering with critical plan negotiations, and driving a wedge between Harbinger and the Ad Hoc Secured Group, Defendants purposefully delayed the closing of trades in LP Debt, violated the Exclusivity Order and misrepresented the adequacy of the LBAC and Stalking Horse Bids to influence the Bankruptcy Proceedings.  Defendant DISH also failed to produce critical Valuation Materials until after the close of evidence in the

Adversary Proceeding.  During the course of the Bankruptcy Proceeding, in which each of them was a participant as a Defendant and/or a witness, Defendants, with the intent or purpose of influencing the outcome of the Adversary Proceeding in favor of Defendants in that proceeding, affirmatively lied, or presented one or more witnesses who lied, under oath and engaged in "a troubling pattern of noncredible testimony."  Defendants' witnesses proffered false testimony under oath during the Adversary Proceeding and Bankruptcy Proceeding concerning (i) Ergen's motivation for purchasing the LP Debt and the circumstances surrounding Ergen and Kiser's LP Debt purchases; (ii) the reason for Ergen voting against a forbearance agreement in May 2012 that would forestall LightSquared's bankruptcy filing; (iii) Defendants' role in manipulating the closing of the LP Debt trades; (iv) Defendants' reasons for terminating the Stalking Horse Bid; and (v) the validity of the LBAC and Stalking Horse Bids.  Defendants also obstructed justice in the Bankruptcy Proceedings by causing a former-FCC official to submit the Peters Report concealing that it was (a) submitted in violation of a criminal federal statute and (b) permitted post-hoc by the FCC based on misrepresentations regarding Peters' involvement in LightSquared matters while at the FCC, all to influence the Bankruptcy Court's valuation of LightSquared's spectrum and prevent the confirmation of LightSquared's Second Amended Joint Plan.

227.    It was specifically intended and foreseen by Defendants that the RICO Enterprise would engage in, and conduct activities that affected, interstate commerce.  The pattern of racketeering consisted of multiple acts of racketeering by each of Defendants.  The activities of the RICO Enterprise were interrelated, not isolated, and were perpetrated for the same or similar purposes.  The activities extended for several years, up to at least March 4, 2015, when Defendants advocated for the Bankruptcy Court's consideration of the illegal Peters Report, which was submitted to influence and undermine the plan confirmation process.

228.     Harbinger has been injured in its business and property as a direct and proximate cause of Defendants' violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above.

229.     As a direct result of the conspiracy by and among Defendants to violate 18 U.S.C. § 1962(c), and thus 18 U.S.C. § 1962(d) as well, Harbinger has suffered substantial general and special damages in an amount to be proven at trial, but not less than $1.5 billion.  Pursuant to 18 U.S.C. § 1964(c), Harbinger is entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(d).

### THIRD CAUSE OF ACTION
### COLORADO ORGANIZED CRIME CONTROL ACT
### PURSUANT TO COLO. REV. STAT. § 18-17-104(3)
### (AGAINST ALL DEFENDANTS)

230.     Plaintiffs restate each and every allegation of paragraphs 1 through 229 as if fully set forth herein.

231.     Throughout the Relevant Period, each of the members of the RICO Enterprise were associated-in-fact and comprised an "enterprise" within the meaning of Colo. Rev. Stat. §§ 18-17-103(2) and 104(3).  Each of Defendant knowingly conducted and/or participated in the conduct of the COCCA Enterprise, as described in this Complaint, through a pattern of racketeering activity, as that phrase is defined in Colo. Rev. Stat. § 18-17-103(3).

232.     The common purpose of Defendants' actions in furtherance of the RICO Enterprise was to use artifice, deceit, misinformation, and dishonest means to wrest away from LightSquared the valuable wireless spectrum assets held by LightSquared while in bankruptcy, and strip Harbinger of its equity in LightSquared and the valuable rights it held pursuant to the Stockholders' Agreement.

233.    While operating outside of a unified corporate structure, each of Defendants DISH, SPSO, SO Holdings, and LBAC were, at some or all times during the Relevant Period, solely-owned or controlled by Defendant Ergen.  These Defendants, along with Ketchum and Sound Point, engaged in a coordinated effort to use criminal and deceitful means to gain an unfair strategic advantage in the Bankruptcy Proceeding to acquire LightSquared's assets for DISH, strip Harbinger of its equity in LightSquared and deprive it of its contractual control rights, including the right to maintain a majority of LightSquared's board seats.  By displacing Harbinger from the LightSquared board, Harbinger was unable to stop Defendants from influencing the Chapter 11 process with the goal of acquiring LightSquared's assets through wrongful means.  In exchange for fees from Ergen and the promise of a lucrative future business, the Sound Point Defendants knowingly engaged in conduct in furtherance of the RICO Enterprise by (i) executing LP Debt trades in furtherance of the scheme at the direction of the DISH Defendants; (ii) creating fronts to facilitate the illegal purchases of the LP Debt; (iii) assisting to manipulate the closing of hundreds of millions of LP Debt trades; (iv) communicating false and deceitful representations to counterparties and UBS; and (v) providing false testimony in the Bankruptcy Proceeding.

234.    The association-in-fact enterprise has had sufficient longevity to allow Defendants to pursue the RICO Enterprise's purpose including through, among others, the following actions:  (1) acquiring DBSD's spectrum assets and the LP Debt in bad faith; (2) tracking LightSquared's movement towards bankruptcy as a possible acquisition target for DISH; (3) forming the undercapitalized entities, Bal Harbour and SPSO, to knowingly conceal the true source of the LP Debt purchases to circumvent the transfer restrictions in the Credit Agreement; (4) purchasing the LP Debt in breach of the Credit Agreement; (5) acting as a

106

competitor rather than an ordinary creditor in voting against an amendment that would have allowed LightSquared to avoid bankruptcy; (6) making the LBAC and Stalking Horse Bids for LightSquared's assets for far less than they are worth to gain the allegiance of the Ad Hoc Secured Group; (7) concealing and misrepresenting the sufficiency of the LBAC and Stalking Horse Bids in order to claim that Harbinger was breaching its fiduciary duties and strip Harbinger of its right to control LightSquared's board and committees; (8) terminating the Stalking Horse Bid under false pretenses in order to obtain an even lower price for LightSquared's assets for DISH; (9) obstructing justice in the Bankruptcy Proceeding through (a) bankruptcy fraud, (b) violating the Exclusivity Order, (c) lying under oath, (d) misrepresenting to the Bankruptcy Court the existence of a conflict by virtue of Harbinger's opposition to their "good faith bid," (e) withholding material evidence, and (f) causing a former FCC official to illegally submit evidence in violation of a criminal federal statute to influence the Bankruptcy Court's valuation of LightSquared's spectrum and prevent the confirmation of LightSquared's Second Amended Joint Plan; and (10) engaging in wire fraud and wrongful and corrupt bidding practices to undermine the bidding process during the FCC's Auction 97 in order to acquire spectrum at less than fair value.

235.    As set forth above, while participating in the conduct of the RICO Enterprise, Defendants have undertaken actions with the same or similar purposes, results, participants, victims, and methods.  DISH used the interstate mails and/or wires in furtherance of a deceitful scheme to defeat a reorganization plan that would have permitted DBSD to emerge from bankruptcy so that DISH could purchase DBSD's assets in liquidation for less than their fair market value.  With respect to LightSquared, the participants in the RICO Enterprise (which had grown in size since the DBSD misconduct to include Ergen, SPSO, LBAC, Sound Point, and

Ketchum) also committed wire and mail fraud, bankruptcy fraud, and obstruction of justice to (a) obtain a majority of LightSquared's LP Debt and thereby control of LightSquared's bankruptcy proceeding, (b) strip Harbinger of its rights over LightSquared by making false bids for LightSquared's assets and then claiming that Harbinger was in breach of its fiduciary duties by opposing the bids, despite knowing that the value of LightSquared's assets far exceeded the bids, and (d) attempt to influence the Bankruptcy Court into undervaluing LightSquared's spectrum assets so as to defeat confirmation of the Second Amended Joint Plan and push LightSquared into liquidation.  With respect to Auction 97, the RICO Enterprise, through the actions of DISH and Ergen, engaged in wire fraud to undermine the bidding process in order to acquire spectrum at less than fair value.

236.    Defendants' misconduct carries the threat of continuing wrongdoing extending indefinitely into the future.  DISH is in the business of, among other things, acquiring spectrum assets, including through the bankruptcy process, and admits that it will continue to acquire more spectrum assets in the future.  As a matter of the routine conduct of their businesses, the DISH Defendants have engaged in systematic and ongoing misconduct, including undermining the FCC auction process and manipulating the bankruptcy process to acquire spectrum, including through the use of wire fraud, bankruptcy fraud, and obstruction of justice in the underlying bankruptcy proceedings.  There is a substantial threat that these Defendants will continue these practices into the future beyond the LightSquared bankruptcy, given their past practices and their admitted desire to acquire more spectrum assets.

237.    Additionally, Defendants have engaged in a series of related acts of misconduct, including wire and mail fraud, bankruptcy fraud and obstruction of justice extending over several years.  In furtherance of the RICO Enterprise, DISH first engaged in wire fraud during the

summer of 2009 in furtherance of a scheme to wrongfully prevent DBSD from emerging from bankruptcy.  Similarly, in December 2011, the DISH Defendants used the wires to communicate concerning the creation of Bal Harbour – a front used to deceitfully and illegally purchase the LP Debt.  Beginning in at least as early as January 2012, the DISH Defendants tracked LightSquared's progress in bankruptcy via the wires.  Defendants thereafter engaged in a continuous series of actions constituting racketeering activity, including acts in violation of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 152 (bankruptcy fraud), and 18 U.S.C. § 1503 (obstruction of justice).  These ongoing acts of malfeasance extend at least as far as March 4, 2015, when Defendant SPSO advocated for the Bankruptcy Court's consideration of the illegal Peters Report, which was submitted to influence and undermine the plan confirmation process.

238.    As set forth above, each Defendant acted in violation of the federal wire fraud statute (18 U.S.C. § 1343) when they used the interstate wires to engage in communications in furtherance of a scheme to use artifice, fraud, and deceit to prevent LightSquared's emergence from bankruptcy in order to purchase its spectrum assets at below market value.  As the RICO Enterprise's goal was to obtain LightSquared's valuable spectrum rights and to strip Harbinger of its equity in LightSquared and deprive it of its valuable rights under the Stockholders' Agreement, the scheme involved money or property as its object.  It was reasonably foreseeable that the wires would be used to execute the Fraudulent Scheme.

239.    During the Relevant Period, Defendants also engaged in bankruptcy fraud as codified in 18 U.S.C. § 152.  At the direction of the DISH Defendants, Sound Point and Ketchum purposefully delayed the closing of trades to interfere with the provision of the Exclusivity Order requiring good-faith negotiations and then SPSO later joined the Ad Hoc Secured Group to preserve its majority and uphold the sale provisions, violating the Exclusivity Order.

Additionally, Defendants knowingly and fraudulently made misrepresentations in filings and made false oaths or accounts in the Adversary Proceeding when they lied under oath during critical trial testimony concerning, *inter alia*:  (i) the reasons for delaying the closing of the LP Debt trades, which were, in fact, purposely delayed in order to obstruct critical plan negotiations during LightSquared's exclusivity period; (ii) the circumstances surrounding SPSO's vote against a forbearance agreement that would have forestalled LightSquared's bankruptcy; (iii) Defendants' involvement in the manipulation of the closing of the LP Debt trades; (iv) Defendants' reasons for terminating the Stalking Horse Bid; and (v) the validity of the LBAC and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee.

240.     Defendants obstructed justice during the Bankruptcy Proceedings in violation of 18 U.S.C. § 1503.  With the intent of interfering with critical plan negotiations, and driving a wedge between Harbinger and the Ad Hoc Secured Group, Defendants purposefully delayed the closing of trades in LP Debt, violated the Exclusivity Order and misrepresented the adequacy of the LBAC and Stalking Horse Bids and illegally submitted the Peters Report to influence the Bankruptcy Proceedings.  Defendant DISH also failed to produce critical Valuation Materials until after the close of evidence in the Adversary Proceeding.  During the course of the Bankruptcy Proceedings, in which each of them was a participant as a Defendant and/or a witness, Defendants, with the intent or purpose of influencing the outcome of the Adversary Proceeding in favor of Defendants in that proceeding, affirmatively lied, or presented one or more witnesses who lied, under oath and engaged in "a troubling pattern of noncredible testimony."  Defendants' witnesses proffered false testimony under oath during the Adversary Proceeding and Bankruptcy Proceeding concerning (i) Ergen's motivation for purchasing the LP

110

Debt and the circumstances surrounding Ergen and Kiser's LP Debt purchases; (ii) the reason for Ergen voting against a forbearance agreement in May 2012 that would forestall LightSquared's bankruptcy filing; (iii) Defendants' role in manipulating the closing of the LP Debt trades; (iv) Defendants' reasons for terminating the Stalking Horse Bid; and (v) the validity of the LBAC and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee.  Defendants also obstructed justice in the Bankruptcy Proceeding by causing a former-FCC official to submit the Peters Report concealing that it was (a) submitted in violation of a criminal federal statute and (b) permitted post-hoc by the FCC based on misrepresentations regarding Peters' involvement in LightSquared matters while at the FCC, all to influence the Bankruptcy Court's valuation of LightSquared's spectrum and prevent the confirmation of LightSquared's Second Amended Joint Plan.

241.    Each of the instances of mail and wire fraud, fraud on the Bankruptcy Court, and obstruction of justice detailed in this Complaint constitutes a predicate act of racketeering activity because each act furthered and executed the Fraudulent Scheme.

242.    It was specifically intended and foreseen by Defendants that the RICO Enterprise would engage in and conduct activities that affected interstate commerce.  The pattern of racketeering consisted of multiple acts of racketeering by each of Defendants.  The activities of the RICO Enterprise were interrelated, not isolated, and were perpetrated for the same or similar purposes.  The activities extended for several years, up to at least March 4, 2015, when Defendants advocated for the Bankruptcy Court's consideration of the illegal Peters Report, which was submitted to influence and undermine the plan confirmation process.

243.    Harbinger has been injured in its business and property as a direct and proximate cause of Defendants' violations of Colo. Rev. Stat. § 18-17-104(3), including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above.  Defendants' misconduct directly caused Harbinger's injury by: stripping it of its equity in LightSquared and depriving Harbinger of its bargained-for rights under the Stockholders' Agreement, including in particular, its ability to appoint and remove a majority of LightSquared's board, ability to designate and chair committees, and direct certain management decisions.

244.    As a result of actions undertaken by and among Defendants to violate Colo. Rev. Stat. § 18-17-104(3), pursuant to Colo. Rev. Stat. § 18-17-106(7), Harbinger is entitled to recover its general and special compensatory damages of not less than $1.5 billion, plus trebling, interest, costs, and attorneys' fees incurred by reason of Defendants' violations of Stat. § 18-17-104(3).

**FOURTH CAUSE OF ACTION**
**COLORADO ORGANIZED CRIME CONTROL ACT**
**PURSUANT TO COLO. REV. STAT. § 18-17-104(4)**
**(AGAINST ALL DEFENDANTS)**

245.    Plaintiffs restate each and every allegation of paragraphs 1 through 244 as if fully set forth herein.

246.    During the Relevant Period, Defendants knowingly conspired together to violate Colo. Rev. Stat. § 18-17-104(4) through the conduct, or participation – directly or indirectly – in the conduct, of an enterprise through a pattern of racketeering activity within the meaning of Colo. Rev. Stat. §§ 18-17-104(3) and (4).

247.    In furtherance of the conspiracy and to effectuate its objectives, each of Defendants agreed that the following predicate acts, among others, would be committed by one or more of the members of the conspiracy:  wire fraud in violation of 18 U.S.C. § 1343,

bankruptcy fraud in violation of 18 U.S.C. § 152, and obstruction of justice in violation of 18 U.S.C. § 1503.

248.     Specifically, Defendants agreed to use wire fraud, among other things, to: (i) acquire DBSD's spectrum assets and the LP Debt in bad faith; (ii) track LightSquared's movement towards bankruptcy as a possible acquisition target for DISH; (iii) form the undercapitalized entities, Bal Harbour and SPSO, to knowingly conceal the true source of the LP Debt purchases to circumvent the transfer restrictions in the Credit Agreement; (iv) purchase the LP Debt for the benefit of a Disqualified Company under the Credit Agreement; (v) act as a competitor rather than an ordinary creditor in voting against an amendment that would have allowed LightSquared to avoid bankruptcy; (vi) make the LBAC and Stalking Horse Bids for LightSquared's assets for far less than they are worth to influence the Chapter 11 process and gain the allegiance of the Ad Hoc Secured Group; (vii) conceal and misrepresent the sufficiency of the LBAC and Stalking Horse Bids in order to claim that Harbinger was breaching its fiduciary duties and strip Harbinger of its contractual right to control LightSquared's board and committees; (viii) terminate the Stalking Horse Bid under false pretenses in order to obtain an even lower price for LightSquared's assets for DISH; (ix) illegally submit expert evidence; and (x) engage in wrongful and corrupt bidding practices to undermine the bidding process during the FCC's Auction 97 in order to acquire spectrum at less than fair value.

249.     Defendants also agreed to use bankruptcy fraud, among other things, to: (i) purposefully delay the closing of trades and join the Ad Hoc Secured Group; (ii) file false misrepresentations in the Bankruptcy Court; (iii) knowingly misrepresent the validity of the LBAC and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee; (iv) lie under

oath during critical trial testimony during the Bankruptcy Proceeding; (v) violate the Exclusivity Order; and (vi) cause a former FCC official to illegally submit evidence in violation of a criminal federal statute to influence the Bankruptcy Court's valuation of LightSquared's spectrum and prevent the confirmation of LightSquared's Second Amended Joint Plan.

250.    Additionally, Defendants agreed to use obstruction of justice, among other things, to:  (i) delay the closing of trades and then later join the Ad Hoc Secured Group to interfere with Harbinger's relationship with the Ad Hoc Secured Group and create a false appearance of conflict; (ii) provide false testimony in the Bankruptcy Proceeding, including regarding the existence of a conflict; (iii) fail to produce material documents, including the Valuation Materials, in that proceeding; (iv) make false statements about the validity of the LBAC and Stalking Horse Bids to influence the Chapter 11 process; (v) violate the Exclusivity Order; and (vi) submit the illegal Peters Report to influence the Bankruptcy Process.

251.    These predicate acts were performed at the direction of, and/or were foreseeable to, Defendants, and conducted for the purpose of using subterfuge, deceit, misinformation, and dishonest means to acquire LightSquared's spectrum assets.

252.    Defendants committed and caused to be committed a series of overt predicate acts of racketeering in furtherance of the conspiracy, including but not limited to the acts described in this Complaint.

253.    Defendants acted in violation of the federal wire fraud statute (18 U.S.C. § 1343) when they used the interstate wires to engage in communications in furtherance of a scheme to use artifice, fraud, and deceit to prevent LightSquared's emergence from bankruptcy in order to purchase its spectrum assets at below market value.  As the RICO Enterprise's goal was to obtain LightSquared's valuable spectrum rights and strip Harbinger of its equity in LightSquared and

deprive it of its rights under the Stockholders' Agreement, the Scheme involved money or property as its object. It was reasonably foreseeable that the wires would be used to execute the Fraudulent Scheme. As detailed in Table 1 above, each of Defendants engaged in multiple acts of wire fraud to: (i) foster the creation of SPVs to be used as subterfuge to acquire the LP Debt; (ii) deceitfully represent that SPSO was an Eligible Assignee of the LP Debt when in fact, its purchases were undertaken to benefit Disqualified Companies; (iii) communicate with counterparties to the LP Debt purchases or their representatives, and as part of those communications, use deceit to disguise that SPSO's purchases of the LP Debt were for the benefit of LightSquared's and Harbinger's competitor, DISH; (iv) monitor and execute improper trades of the LP Debt; (v) acquire a blocking position in the LP Debt to benefit a Disqualified Company; (vi) transfer funds to support the improper trades; (vii) submit the LBAC and Stalking Horse Bids for LightSquared's assets in order to take advantage of SPSO's wrongfully-obtained blocking position and gain the support of the Ad Hoc Secured Group; (viii) knowingly misrepresent the validity of the LBAC and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee; (ix) withdraw the Stalking Horse Bid in an effort to destabilize the sale process and, ultimately, permit DISH to obtain LightSquared's assets at an even lower price; and (x) engage in wrongful and corrupt bidding practices to undermine the bidding process during the FCC's Auction 97 in order to acquire spectrum at less than fair value. As there are numerous communications within the exclusive control of Defendants which reveal Defendants' use of the mail and wires in furtherance of the Fraudulent Scheme, the Plaintiffs do not have access to all those communications.

254.    During the Relevant Period, Defendants also engaged in bankruptcy fraud as codified in 18 U.S.C. § 152.  At the direction of the DISH Defendants, Sound Point and Ketchum purposefully delayed the closing of trades to interfere with the provision of the Exclusivity Order requiring good faith negotiations and then SPSO later joined the Ad Hoc Secured Group to preserve its majority and uphold the sale provisions, violating the Exclusivity Order. Additionally, Defendants knowingly and fraudulently made misrepresentations in filings and made false oaths or accounts in the Adversary Proceeding when they lied under oath during critical trial testimony concerning, *inter alia*:  (i) the reasons for delaying the closing of the LP Debt trades, which were, in fact, purposely delayed in order to obstruct critical plan negotiations during LightSquared's exclusivity period; (ii) the circumstances surrounding SPSO's vote against a forbearance agreement that would have forestalled LightSquared's bankruptcy; (iii) Defendants' involvement in the manipulation of the closing of the LP Debt trades; (iv) Defendants' reasons for terminating the Stalking Horse Bid; and (v) the validity of the LBAC and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee.

255.    Defendants also obstructed justice during the Bankruptcy Proceedings in violation of 18 U.S.C. § 1503.  With the intent of interfering with critical plan negotiations, and driving a wedge between Harbinger and the Ad Hoc Secured Group, Defendants purposefully delayed the closing of trades in LP Debt, violated the Exclusivity Order and misrepresented the adequacy of the LBAC and Stalking Horse Bids to influence the Bankruptcy Proceedings.  Defendant DISH also failed to produce critical Valuation Materials until after the close of evidence in the Adversary Proceeding.  During the course of the Bankruptcy Proceeding, in which each of them was a participant as a Defendant and/or a witness, Defendants, with the intent or purpose of

influencing the outcome of the Adversary Proceeding in favor of Defendants in that proceeding, affirmatively lied, or presented one or more witnesses who lied, under oath and engaged in "a troubling pattern of noncredible testimony."  Defendants' witnesses proffered false testimony under oath during the Adversary Proceeding and Bankruptcy Proceeding concerning (i) Ergen's motivation for purchasing the LP Debt and the circumstances surrounding Ergen and Kiser's LP Debt purchases; (ii) the reason for Ergen voting against a forbearance agreement in May 2012 that would forestall LightSquared's bankruptcy filing; (iii) Defendants' role in manipulating the closing of the LP Debt trades; (iv) Defendants' reasons for terminating the Stalking Horse Bid; and (v) the validity of the LBAC and Stalking Horse Bids.  Defendants also obstructed justice in the Bankruptcy Proceeding by causing a former-FCC official to submit the Peters Report concealing that it was (a) submitted in violation of a criminal federal statute and (b) permitted post-hoc by the FCC based on misrepresentations regarding Peters' involvement in LightSquared matters while at the FCC, all to influence the Bankruptcy Court's valuation of LightSquared's spectrum and prevent the confirmation of LightSquared's Second Amended Joint Plan.

256.    It was specifically intended and foreseen by Defendants that the RICO Enterprise would engage in and conduct activities that affected interstate commerce.  The pattern of racketeering consisted of multiple acts of racketeering by each Defendant.  The activities of Defendants were interrelated, not isolated, and were perpetrated for the same or similar purposes by the same persons.  The activities extended for several years, up to at least March 4, 2015, when Defendants advocated for the Bankruptcy Court's consideration of the illegal Peters Report, which was submitted to influence and undermine the plan confirmation process.

257.     Harbinger has been injured in its business and property as a direct and proximate cause of Defendants' violations of Colo. Rev. Stat. § 18-17-104(4), including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above.

258.     As a direct result of the conspiracy by and among Defendants to violate Colo. Rev. Stat. § 18-17-104(3), and thus Colo. Rev. Stat. § 18-17-104(4) as well, Harbinger has suffered substantial general and special compensatory damages in an amount to be proven at trial, but not less than $1.5 billion.  Pursuant to Colo. Rev. Stat. § 18-17-106(7), Harbinger is entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of  Colo. Rev. Stat. § 18-17-104(4).

### FIFTH CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH CONTRACT
### (AGAINST THE DISH DEFENDANTS, LBAC, SPSO, AND SO HOLDINGS)

259.     Plaintiffs restate each and every allegation of paragraphs 1 through 258 as if fully set forth herein.

260.     At all relevant times, Harbinger had an existing contractual relationship with LightSquared.  More specifically, on November 12, 2010, LightSquared and Harbinger entered into the Stockholders' Agreement pursuant to which Harbinger was granted a right to: (i) appoint and remove the majority of the LightSquared board; (ii) designate committee members; (iii) chair committees; and (iv) approve critical management business decisions through its board votes.  Additionally, LightSquared is forbidden from entering into any agreement that violates the rights granted to Harbinger.

261.     At all relevant times, the DISH Defendants, LBAC, SPSO and SO Holdings were aware of the Stockholders' Agreement and understood the importance of LightSquared's contractual obligations and Harbinger's rights thereof.  These Defendants intended to remove

Harbinger's influence over LightSquared, and in fact, repeatedly expressed to the Bankruptcy Court their desire to do so.

262.    As alleged herein, Defendants intentionally and improperly interfered with the Stockholders' Agreement by committing acts that amounted to criminal and tortious conduct, including, but not limited to:  (i) making material misrepresentations to LightSquared, the parties, and the Court regarding the good-faith nature of their bids for LightSquared's assets, and Harbinger's ability to independently exercise its rights under the Stockholders' Agreement; (ii) obstructing justice in the Bankruptcy Proceedings; (iii) committing mail and wire fraud; (iv) committing bankruptcy fraud; and (v) committing acts of racketeering.  Defendants' conduct was wrongful, without justification or excuse, and contrary to generally accepted standards of morality.  Moreover, Defendants' acts were committed with actual malice and/or a wanton and willful disregard of Harbinger's rights.

263.    Defendants' wrongdoing prevented LightSquared from performing under the Stockholders' Agreement causing it to be breached and rendering performance impossible.  As a result, Harbinger was injured by the loss of its shareholder rights under the Stockholders' Agreement.

264.    But for Defendants' wrongdoing, Harbinger would not have been injured.

265.    By reason of the foregoing, Harbinger is entitled to a judgment against Defendants, jointly and severally, for damages in an amount to be determined at trial, but not less than $1.5 billion.

### SIXTH CAUSE OF ACTION
**ABUSE OF PROCESS**
**(AGAINST THE DISH DEFENDANTS, LBAC, SPSO, AND SO HOLDINGS)**

266.    Plaintiffs restate each and every allegation of paragraphs 1 through 265 as if fully set forth herein.

119

267.    Defendants abused the legal process by deliberately and intentionally disrupting the Bankruptcy Proceedings with the sole purpose of stripping Harbinger of its equity interests and control rights under the Stockholders' Agreement and wrestling away LightSquared's valuable wireless spectrum.

268.    To achieve their illegal collateral objective, Defendants used the Bankruptcy Proceedings in a perverted manner by:  (i) never intending to honor their bids, setting an unreasonably short time for the LBAC Bid and withdrawing the Stalking Horse Bid for pretextual reasons soon after submitting it; (ii) making repeated misrepresentations to the Bankruptcy Court as to create the impression of Harbinger's purported conflict in opposing the bids while withholding the Valuation Materials that conclusively established that the bids were grossly undervalued and Harbinger was justified in opposing them; (iii) submitting the SPSO Stipulation replete with misrepresentations to cut short LightSquared's exclusivity period and compromise Harbinger's efforts to restructure the LightSquared's entities; (iv) filing the frivolous STN motion to further undermine Harbinger's authority by driving a wedge between Harbinger and LightSquared's Special Committee; (v) falsely testifying to conceal their Fraudulent Scheme; and (vi) illegally submitting an expert report in violation of Section 207.

269.    Defendants intended to frustrate the Bankruptcy Proceedings and the Debtors' restructuring as to achieve their objective of depriving Harbinger of its control rights and equity interests.  Such objective is utterly inappropriate and unrelated to any legal purpose, including related to the Bankruptcy Proceedings.  Defendants' actions were done without any justification or excuse, and the abuse of the legal process necessarily prejudiced the largest stakeholder which they targeted in the Chapter 11 Case, Harbinger, and the Debtors in their ability to reorganize and emerge from bankruptcy in a timely and efficient manner.  As this Court has found,

Defendants' gamesmanship effectively breached the "outer limits" of what is acceptable in a bankruptcy proceeding.

270.     Defendants have injured Harbinger by stripping it of its valuable control right and equity interests.

271.     But for Defendants' actions, Harbinger would not have been injured.

272.     By reason of the foregoing, Harbinger is entitled to a judgment against Defendants, jointly and severally, for damages in an amount to be determined at trial, but not less than $1.5 billion.

## DEMAND FOR JURY TRIAL

Harbinger demands a trial by jury on all issues and claims so triable.

## PRAYER FOR RELIEF

A.     On the First and Second Causes of Action, directing Defendants to pay to Plaintiffs actual damages of not less than $1.5 billion, plus trebling, interest, costs, and attorneys' fees, in an amount to be determined at trial;

B.     On the Third and Fourth Causes of Action, directing Defendants to pay to Plaintiffs actual damages of not less than $1.5 billion, plus trebling, interest, costs, and attorneys' fees, in an amount to be determined at trial;

C.     On the Fifth Cause of Action, directing Defendants to pay damages to Plaintiffs of not less than $1.5 billion, plus interest, cost, and attorneys' fees, in an amount to be determined at trial;

D.     On the Sixth Cause of Action, directing Defendants to pay damages to Plaintiffs of not less than $1.5 billion, plus interest, cost, and attorneys' fees, in an amount to be determined at trial;

E.     Awarding Plaintiff pre- and post-judgment interest at the rate allowed by law; and

F.      Such other and further relief as this Court deems appropriate.


Dated:  July 21, 2015                              Respectfully submitted,

                                                   */s/ Marc E. Kasowitz*          

                                                   Marc E. Kasowitz
                                                   David M. Friedman
                                                   Christine A. Montenegro
                                                   Paul J. Burgo
                                                   KASOWITZ, BENSON, TORRES,
                                                     & FRIEDMAN LLP
                                                   1633 Broadway
                                                   New York, New York 10019
                                                   Telephone: (212) 506-1700
                                                   Facsimile: (212) 506-1800
                                                   mkasowitz@kasowitz.com

                                                   *Attorneys for Plaintiffs Harbinger Capital
                                                   Partners LLC, HGW US Holding Company
                                                   LP, Blue Line DZM Corp., and Harbinger
                                                   Capital Partners SP, Inc.*

122